**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| WILLIAM MCFARLAND, |
| Defendant. |

No. 17-cr-600 (NRB)

**SENTENCING MEMORANDUM OF WILLIAM MCFARLAND**

Nicholas A. Gravante, Jr.
Randall W. Jackson
Karen A. Chesley
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

June 6, 2018

*Attorneys for William McFarland*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

I.  PERSONAL BACKGROUND ............................................................................. 4

    A.  Childhood and Family ........................................................................... 4

    B.  Education and Career............................................................................. 7

    C.  Charitable Activities.............................................................................. 13

II.  THE OFFENSE CONDUCT ............................................................................. 18

III.  THE GUIDELINES CALCULATION OVERSTATES  THE SEVERITY OF
     THE OFFENSE CONDUCT .......................................................................... 20

    A.  The Guidelines Calculation................................................................... 20

    B.  The Court Should Impose A Significantly Below-Guidelines Sentence
       Due To The Guidelines' Over-Reliance On Loss Amount ...................... 21

IV.  CONSIDERATION OF THE 3553(A) FACTORS INDICATES THAT A
     NON-GUIDELINES SENTENCE OF HOME CONFINEMENT OR A
     MINIMAL PERIOD OF INCARCERATION, COMMUNITY SERVICE,
     PROBATION, AND FULL RESTITUTION IS APPROPRIATE..................... 25

    A.  Billy's History And Characteristics And The Nature Of The Offense
       Counsel Towards A Non-Custodial Sentence ......................................... 26

    B.  A Non-Custodial Sentence Is Appropriate For The  Offense And Is
       Consistent With Results In Other Cases................................................. 29

       1.  A Sentence Far Below The Guidelines Range Would Be
          Consistent With the Evolving Treatment of Fraud
          Sentencings In This Circuit. .......................................................... 29

       2.  A Non-Custodial Sentence Would Be In Line With Sentences
          Imposed Upon Similarly Situated Defendants  ............................... 35

    C.  A Non-Custodial Sentence Is Sufficient, But Not  Greater Than
       Necessary, To Promote Respect For The Law And Afford Adequate
       Deterrence and Protection...................................................................... 38

CONCLUSION....................................................................................................... 42

i

# TABLE OF AUTHORITIES

## Cases

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ............................................................................... 21

*Nelson v. United States,*
    555 U.S. 350 (2009) ............................................................................. 20

*Pepper v. United States,*
    562 U.S. 476 (2011) ............................................................................. 21

*United States v. Adelson*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................. 22, 25, 27, 40

*United States v. Algahaim,*
    842 F.3d 796 (2d Cir. 2016) ................................................................ 24

*United States v. Block,*
    No. 16-cr-595 (S.D.N.Y) ..................................................................... 31

*United States v. Bonventre, et al.,*
    No. 10-cr-228 (LTS) (S.D.N.Y.) .......................................................... 33

*United States v. Booker,*
    543 U.S. 220 (2005) .................................................... 2, 22, 25, 30

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) .......................................................... 20, 21

*United States v. Cervino,*
    No. 15-cr-00171 (S.D.N.Y.) ................................................................ 32

*United States v. Collins,*
    No. 07-cr-1170 (S.D.N.Y.) .................................................................. 33

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ........................................................... 2, 22

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ................................................. 22

*United States v. Faibish,*
    No. 12-cr-265 (E.D.N.Y.) .................................................................... 23

*United States v. Gall,*
    552 U.S. 38 (2007) .......................................................................... 20, 26

*United States v. Ghavami,*
   No. 10-cr-1217 (S.D.N.Y.) ................................................................. 32

*United States v. Graham,*
   No. 06-cr-137 (D. Conn.) ................................................................. 34

*United States v. Gupta,*
   904 F. Supp. 2d 349 (S.D.N.Y. 2012),
   *aff'd,* 747 F.3d 111 (2d Cir. 2014) .......................................... 21

*United States v. Harkonen,*
   No. 08-cr-164 (N.D. Ca.) ................................................................. 37

*United States v. Howe,*
   543 F.3d 128 (3d Cir. 2008) ......................................................... 37

*United States v. Johnson,*
   No. 16-cr-457, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ...................... 21, 24, 25

*United States v. Kelley,*
   No. 16-cr-00837 (S.D.N.Y.) ................................................................. 36

*United States v. Litvak,*
   No. 13-cr-19 (D. Conn.) ................................................................. 34

*United States v. Lumiere,*
   No. 16-cr-483 (S.D.N.Y.) ................................................................. 31

*United States v. Musgrave,*
   647 F. App'x 529 (6th Cir. 2016) ................................................... 37

*United States v. Nesbeth,*
   188 F. Supp. 3d 179 (E.D.N.Y. 2016) ............................................ 39

*United States v. Parris,*
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ............................................ 23

*United States v. Prosperi,*
   686 F.3d 32 (1st Cir. 2012) ................................................... 29, 37

*United States v. Schulman,*
   No. 16-cr-442 (E.D.N.Y.) ................................................................. 37

*United States v. Shamilzadeh,*
   No. 04-cr-1094 (E.D.N.Y. Apr. 7, 2008) ...................................... 41

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ............................................................................ 39

*United States v. Tighe*,
   No. 15-cr-62, 2018 WL 1307949 (E.D.N.Y. Mar. 13, 2018) .................................... 37

*United States v. Warner*,
   No. 13-cr-731 (N.D. Ill.) ................................................................................ 41

*United States v. Watt*,
   707 F. Supp. 2d 149 (D. Mass. 2010) ............................................................... 23


**Statutes**

18 U.S.C. § 3553(a) ........................................................................ 20, 25, 26, 38


**Other Authorities**

*Court & Community:  An Information Series About U.S. Probation & Pretrial
   Services*, U.S. Office of Probation &Pretrial Services, at 2 (2005) ......................... 41

Federal Sentencing Statistics (2017), available at
   https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/federal-sentencing-statistics/state-district-
   circuit/2017/2c17.pdf ................................................................................... 30

Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-
   Collar Cases*, 125 Yale L.J. 1018 (2016) ........................................................... 30

Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past
   Predicts the Future: Criminal History and Recidivism of Federal Offenders*,
   at 6-9 (Mar. 2017), https://www.ussc.gov/sites/default/files/pdf/research-
   and-publications/research-publications/2017/20170309_Recidivism-CH.pdf ........ 38

U.S. Sentencing Comm'n, Alternative Sentencing in the Federal Criminal
   Justice System (Jan. 2009),
   https://www.ussc.gov/sites/default/files/pdf/research-and-
   publications/research-projects-and-
   surveys/alternatives/20090206_Alternatives.pdf ............................................. 36

We respectfully submit this Sentencing Memorandum on behalf of Billy McFarland, who is scheduled to be sentenced on June 21, 2018.

## PRELIMINARY STATEMENT

Billy McFarland is 26 years old. When he was 24 years old, he began his attempt to organize a promotional music festival in the Bahamas, the now infamous "Fyre Festival." Unfortunately, Billy possessed neither the skills, nor the education, nor the resources, nor the experience and maturity to pull of an event of this magnitude. As all of those facts became increasingly obvious, Billy made a very unfortunate decision: he decided to tell lies to try to fix the mess that he created. No one regrets that mistake more than Billy, and he accepts full responsibility for it. Accordingly, he pled guilty to two counts of wire fraud based on false statements that he made to festival investors.

Billy was not indicted in this case—almost immediately after his arrest, he waived his right to have his case presented to a jury. This is because Billy has, from outset of this case, acknowledged his guilt and approached the entire tragedy with a deep sense of remorse for his wrongful conduct. He has wanted to minimize as much as possible the burden on the Government, his investors, and every other stakeholder involved in this unfortunate situation.

We understand that the Court must impose an appropriate punishment. We respectfully submit that consideration of the Section 3553(a) factors weighs heavily in favor of a sentence that is considerably below the advisory range calculated under the U.S. Sentencing Guidelines (the "Guidelines"). One key factor here is the need for the sentence to reflect the seriousness of the offense and to provide just

1

punishment.  Taking that into consideration, the Guidelines calculation in this case is driven almost entirely by the loss amount of $26 million—without that 22-level enhancement, the Guidelines range would be 0-6 months.  But this is not a case where the defendant pocketed $26 million dollars.  This is a case where the defendant was making a genuine effort to execute a tragically flawed business plan and made very serious mistakes along the way.  That is to say that while the crime here was serious, the loss amount here is out of proportion to the nature of the crime.  Courts have repeatedly concluded that where the sentence calculated under the Guidelines dramatically overemphasizes the importance of the loss amount, the Guidelines "are of diminished value to sentencing judges," and in such situations courts have routinely imposed sentences that are significantly below the range set out by the Guidelines.  *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) (quoting Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008)).  We respectfully submit that this is the paradigmatic case where the Guidelines dramatically overemphasize the importance of the loss amount.

Another key factor in this case is the history and characteristics of the defendant.  Apart from the serious mistakes Billy made leading to the instant charges, Billy has spent the better part of his young life operating within the boundaries of the law and devoting his time to helping others.  Billy has never been arrested or charged with any crime before this case.  We submit that the more than 60 letters submitted by friends, family members, and business associates of Billy

are powerful evidence of the type of impact Billy has had on the people around him.[1] These are not descriptions of a person who has led a ruthless life, the type of irredeemable person undeserving of a second chance. The letters describe how Billy used his personal time developing and working on a computer-programming course for a class of fifth graders in the Bronx. They describe how he spent time helping homeless people find work and shelter. They describe the life of a young man who, in his personal dealings, has been uniformly kind, generous, and hardworking. The letters describe the kind of person who has sought to bring out the best in others. Billy never asked for anything in return from these efforts; he is simply a person who, at his core, derives joy from helping others. He is the paradigmatic example of an essentially good young man who simply made a bad mistake.

In light of these factors and others described in this Memorandum, we respectfully ask your Honor to impose a sentence far beneath the Guidelines range set out in the PSR. We know that the Court's fair assessment of all of the factors will lead to the decision of the appropriate and just sentence; we respectfully submit that a sentence of six months of home confinement or, in the alternative, a minimal period of incarceration, along with 1,000 hours of community service and three years of probation would be sufficient, but not greater than necessary to achieve the goals of the sentencing statute. We expect that any sentence the Court imposes will also include the more than $26 million in restitution that Billy has already agreed

---

[1] These letters are attached as Exhibit A to this submission.

to pay, which will be a tremendous financial burden that is likely to last a substantial portion of his life.

Billy has already experienced ridicule and public derision far exceeding what most defendants are forced to endure. The barrage of attention that this case has garnered has been a nightmare for Billy and for his family. The infamy of his failed business endeavor and his related criminal conviction will be a punishment throughout his life. Moreover, Billy will spend a good portion of his life working to repay investors for the money they lost. He is committed to doing just that.

We are therefore asking the Court to impose a sentence that adequately punishes Billy's wrongful conduct, but recognizes that he is a young, first-time offender, who derived no personal gain from his attempt to host a music festival (and instead lost approximately $2 million of his own money) and who will be in a better position to make restitution to investors if he is not incarcerated. We are asking the Court to impose a sentence that will allow a young man who made a mistake to attempt to atone, and we are asking that Billy be given a second chance. We appreciate the Court's consideration of the information that follows.

## I.   PERSONAL BACKGROUND

### A.   <u>Childhood and Family</u>

Billy comes from a close-knit family that has been deeply impacted by the criminal charges brought against him. PSR ¶¶ 54-57. Billy was raised by two loving parents, Steve and Irene, who work together in a family real estate business in New Jersey. PSR ¶ 54. Billy has one sister, Eleni, a 23-year old structural engineer, who says that Billy has always been "my mentor and my protector." PSR

4

¶ 55; Ex. A at 4 (Eleni McFarland letter).  Billy also grew up with six cousins, including Christopher O'Sullivan, who is his best friend.  PSR ¶ 56.  Christopher explained their strong relationship:  "I have known Billy all my life, and am very lucky to call him my best friend.  For as long as I can remember, we have been at each other's sides."  Ex. A at 13 (Christopher O'Sullivan letter).  Billy was also extremely close with his maternal grandfather, who the family called "Papou."  *Id.*  After Billy's maternal grandmother passed away, Billy frequently visited Papou to watch Jets games or help him around the house.  *Id.*  Despite the events of the past year, Billy's family members remain supportive of him.  Billy, in turn, continues to feel terrible about "the pain he caused his family."  *Id.* at 15.

Billy's family members and friends describe him as a bright, engaged child, someone who was always hard worker by nature, endlessly curious and eager to try new things.  Ex. A at 6 (Irene McFarland letter).  His friends also recall that he was "a supportive friend" who was always happy to help others.  Ex. A at 49 (Gregory Gianis letter).  One childhood friend said: "if I struggled with a class I could always count on Billy to help … he would challenge me and teach me so that I would understand the concepts for the long run."  *Id.*  Christopher recalls that during a sailing training program they took when they were 10 years old, Billy was elevated to the advanced group but "would always come to us at the beginner level and help us rig our sails, explain what we were being taught, and lend a helping hand in any way he could."  Ex. A at 13-14 (Christopher O'Sullivan letter).

In high school, Billy began learning the martial art of Brazilian jiu-jitsu, and began long training sessions at a gym in Union City, New Jersey, not very far away from his home). But as a friend explained, Billy didn't keep his new passion to himself—instead, he soon began teaching the sport to his classmates, and even his football coach. Ex. A at 39 (Mac Cordrey letter). Another person who trained with Billy recalled that he "volunteered his time to help the less experienced students in the class learn the proper techniques." Ex. A at 73 (Philip Retif letter). The same friend said that this behavior was in line with Billy's generally giving nature: "Billy's generous giving of his time is a behavior that I have often seen him exhibit throughout many areas of his life. . . . Whether it is in sports, through sharing his vast knowledge of coding or through inviting others into his many inventive projects, I know Billy to be one of those few people that genuinely enjoy helping others." *Id.* at 73-74.

Billy is also the kind of person who makes friends easily, and has a large group of people who continue to support him even during this difficult time. As Christopher explains, people are "drawn to Billy because of his contagious personality, sense of humor, and joy for life." Ex. A at 14 (Christopher O'Sullivan letter). Billy, in turn, is drawn to people, and has worked to "bring hundreds of other people together to form friendships they would not have had." *Id.* A childhood friend of Billy's says that Billy has been "remarkably consistent" in the 10 years they have known each other: "Whether its interacting with a 35-year-old fireman in his gym or a close friend, Billy has always demonstrated the same

personableness, loyalty, kindness, and that innate ability to inspire others." Ex. A at 40 (Mac Cordrey letter). Billy's former girlfriend said, "Billy always finds a way to encourage the people in his life and give them a sense of confidence that I haven't seen many people [be] able to do. . . . He often knows exactly what to say to make someone's day better, or give them a boost of encouragement when they really need it. His charismatic personality brings a smile to nearly everyone he meets, and he has a way of making you feel special." Ex. A at 93 (Allie Zachar letter).

      B.    <u>Education and Career</u>

From a young age, Billy showed a special talent for working with computers. He taught himself computer programming by the age of 10, and created his first technology start-up company at the age of 12. Ex. A at 6 (Irene McFarland letter). At 13, his best friend remembers Billy "work[ing] with web programmers in India that were three times his age." Ex. A at 14 (Christopher O'Sullivan letter). By 14, he had sold two technology-related companies. Ex. A at 6 (Irene McFarland letter). During high school, Billy designed, hosted, and managed websites and other internet applications. Ex. A at 39 (Mac Cordrey letter). As a high school senior, Billy enlisted the help of two friends to create Spling, an Internet company focused on content sharing and marketing. *Id.*

During this time, Billy suffered from Attention-Deficit and Hyperactivity Disorder ("ADHD"). PSF ¶ 65. Billy elected to try to control the symptoms associated with ADHD—which include an inability to sustain focus, a lack of organization, and restlessness—without medication. *Id.* He made this decision because he is generally opposed to taking any drugs of any kind. Ex. A at 7 (Irene

McFarland letter).  Billy continues to struggle with the symptoms of ADHD to this day.

Billy graduated from high school in New Jersey in 2010 and spent a short time in college at Bucknell University in Pennsylvania.  PSR ¶¶ 73-74.  However, during his freshman year a startup accelerator called DreamIt Ventures selected Spling's 19-year old founders to participate in "a three month boot camp that provided founders with a variety of technology resources to help build a company." Ex. A at 39 (Cordrey letter).  Billy and Spling's other founders left college to work full-time on the startup.  *Id.*  From 2011 until the start of 2015, Billy worked on Spling, which generated approximately $500,000 per year in total annual revenue (of which Billy earned an annual salary of $60,000).  PSR ¶ 78.

Since the age of 19, Billy has been financially independent from his parents. In addition to running Spling, Billy founded Magnises in early 2012.  PSR ¶ 77. Magnises was a private club for 20-somethings that, at its peak, had approximately 30 employees and generated millions of dollars in revenue.  *Id.*  In addition to selling memberships, Magnises also earned income by partnering with companies to host promotional events, including Forbes, Samsung, Barclays Center, Jack Daniels, AB-Inbev, Johnnie Walker, Lincoln Motorcars, and Diageo.[2]  Magnises

---

[2] In the PSR (at pp. 24-25), the Probation Officer claims that Billy made certain false statements to Magnises investors.  This alleged conduct was never charged, nor did the Government provide any discovery regarding this claim.  Moreover, it rests on the faulty premise that Magnises' sole source of revenue was membership subscriptions, when in fact a substantial portion of income was earned through marketing deals and sponsorships.  In any event, far from claiming to have been defrauded, three Magnises investors—Bruce Paisner, Mitch Blumenfeld, and

became defunct after the Fyre Festival's high-profile failure, (*id.*), which damaged Billy's reputation to the point that any business run by him was no longer viable. When it became clear that Magnises could not survive, Billy worked to make sure that the company's employees were able to find new jobs where they could earn an equal or higher salary. Ex. A at 26 (Christopher Bledsoe letter) (describing Billy's "focus on protecting the livelihood of Magnises' employees" when the company began to fail).

Despite the mistakes that he made later, Billy worked hard to successfully manage his early start-up companies. An investor in Magnises and Spling stated that "Billy is one of the most hardworking, bright, and talented entrepreneuers that I have had the pleasure of meeting" and noted that he "would not think twice about investing in him again." Ex. A at 63 (Gianni Martire letter). Other investors agreed. *See. e.g.*, Ex. A at 29 (Mitchell Blumenfeld letter) ("All of my business and personal dealings with Billy have been characterized by honesty and integrity, which is why I have supported (invested) several of his ventures of the years."); Ex. A at 69 (Bruce Paisner letter) ("In Billy's dealings with me he was always helpful and honorable, with, in my experience, an unusual ability to understand people and figure out ways to accommodate investor needs while building his businesses"). His sister said:

> In all of his companies, he loves to train his employees, help them discover their strengths, and set them up on their future career. He

Gianni Martire—have submitted letters on Billy's behalf testifying to his honest character and hard work on behalf of investors. We respectfully submit that the Court should not consider any of these claims in connection with this sentence.

> likes to help people forge their own path.  I personally know of many people that he has given jobs, trained, and/or helped find jobs at other companies.  He takes the time to get to know people and to help them learn and succeed going forward.

Ex. A at 3-4 (Eleni McFarland letter).   Another friend explained, "Billy's entrepreneurial spirit is intoxicating to those around him.  Billy's creative out of the box thinking and tenacity are essential qualities that make others including myself have faith in his vision[]."  Ex. A at 71 (Lauren Reilly letter).

Billy's next start-up was Fyre Media, which he formed in 2016 as a partnership with his friend Jeffrey Atkins.[3]  PSR ¶ 76.  Through Fyre Media, Billy created an app to simplify the process of booking musicians and other artists.  *Id*. Billy then came up with the idea to host a music festival in the Bahamas as a way to promote the Fyre app.  *Id*.  The effort to create the Fyre Festival involved some 1,300 workers and more than $30 million, $2 million of which Billy put in personally.  *Id*.  Billy derived no salary from Fyre Media or the Fyre Festival.  *Id*. According to people who worked closely with Billy on the project, Billy "put his heart and soul into Fyre, hiring hundreds of employees and moving down to the Bahamas basically full-time to plan and setup the festival."  Ex. A at 57 (Christopher Khan letter).  Those efforts are reflected in the following pictures, taken from the site of the Fyre Festival, which we include to give the Court a brief depiction of some of the work Billy did in the course of his a good-faith (albeit unsuccessful) effort to host a music festival in the Bahamas:

---

[3] Atkins is an actor and musician who is also professionally known as "Ja Rule."



*Fig. 1 – View of extensive temporary lodging constructed in anticipation of the festival.*



*Fig. 2 – Close up view of temporary lodging constructed in anticipation of the festival.*



*Figure 3 – View of a stage and audiovisual equipment constructed in the Bahamas in anticipation of the festival.*

To that end, Billy paid many millions of dollars to vendors in connection with the Fyre Festival, including millions of dollars to artists in accordance with contracts that required advance payments, and millions more for the construction and engineering work necessary to make the site operational. Billy personally oversaw all of this work. The festival employed hundreds of people, both in the United States and the Bahamas. PSR ¶ 76; Ex. A at 79 (Loan Rolle letter).

Even so, the difficulties and costs inherent in planning an event of that magnitude on an island with no infrastructure were simply too much. During what others around Billy described as a "time of extreme stress and pressure to deliver on a large-scale event, the likes of which had never before been done," Billy made false statements to Fyre Festival investors in order to obtain the funds necessary to execute the festival. Ex. A at 57 (Christopher Khan letter). None of this excuses Billy's conduct, but we submit that it is important that others who have known Billy view his actions during this period as "out of character" and "not reflect[ing] him as a person." *Id.* As Billy's cousin explained, the festival "required significantly more money, time, resources, and expertise to pull off than they had to offer. And while the final result fell incredibly short, from the time I spent with the Fyre team as they worked tirelessly to pull this off, the effort was undoubtedly there." Ex. A at 14 (Christopher O'Sullivan letter).

C.   Charitable Activities

Billy's eagerness to help people whenever possible has been a constant throughout his life. This has manifested in ways large and small.

For example, Billy founded a charity to teach fifth-graders in the Bronx about computers and business development. PSR ¶ 79; Ex. A at 91 (Jesse Yarbrough letter). During the course that he created, Billy taught 30 students the basics of computer programming and business development, and how to build their own websites. *Id.* He also brought in a series of celebrity presenters, hosted a finale dinner at a Manhattan restaurant, and bought each of the students a Macbook so that they could continue building their websites after the program ended. Ex. A at

13

91 (Jesse Yarbrough letter). Below are a small set of photos of some of Billy's work with this program.  (These photos are redacted in the publicly filed version of this submission).



*Fig. 4 – Billy instructing students on programming.*





*Fig. 6*



*Fig. 7*

The teacher responsible for working on the program with Billy said, "Our 5th grade students described this experience as the most memorable time of their six years spent at PS 536." *Id.* The school has since created a follow-up course to continue to implement the projects started in Billy's program.

Several of Billy's friends recall that Billy was particularly attentive to the homeless individuals he encountered in New York City. His cousin recalls that one evening in December, Billy saw a homeless man in the street "and provided him enough money for multiple nights of food and shelter." Ex. A at 14 (Christopher O'Sullivan letter). Another friend remembers that Billy would take extra food from restaurants in order to give to people on the street. Ex. A at 49 (Gregory Gianis letter). And in a story that is perhaps most indicative of Billy's character, Billy met a homeless man called "Voice" outside his apartment building and would give him a few dollars each day. Ex. A at 92 (Allie Zachar letter). Billy also let Voice use his apartment to clean up from time to time. Billy encouraged Voice to apply for a job, telling him that he would match every dollar Voice earned. *Id.* Voice was able to find employment as a janitor, and true to his word, Billy paid Voice a salary equal to the one he earned as a janitor. Eventually, "[V]oice was able to rent his first apartment with the encouragement and help from Billy." *Id.*

Billy has also used his technology skills to help retired NFL players, a program he started after learning that many retired football players have difficulty transitioning into new careers after leaving the league. PSR ¶ 79; Ex. A at 24 (Jason Bell letter). In this respect, Billy helped former NFL players develop the

16

technology and make the connections necessary to organize charities and other projects. *Id.* For example, Billy helped former Vikings player Emmanuel Lamur create a charity in Haiti by connecting him with Donna Karan, who was working with Hillary Clinton on charitable projects in Haiti. Billy then built Emmanuel's website for free (http://www.thelamurcharity.org/). Billy also helped Anthony Barr develop plans for creating a new fashion line after he retires from the Vikings, including by introducing him to potential investors and other fashion designers.

Billy also gives back to society in other, more difficult to categorize, ways. One of the letters Your Honor will review is from a man named Hakim Sourzes. Billy met Hakim four years ago when Hakim was an Uber driver, and came to learn that Hakim's son, Claudio, had a learning and social disability. Ex. A at 85 (Hakim Sourzes letter). Billy helped Claudio get into college and find a job, and later paid for all of Claudio's books for school. *Id.* When Hakim became ill, Billy "made regular visits to the hospital" and paid for Hakim's rent, food, and medical costs; Hakim wrote that, "In a very real sense, he saved my life." *Id.*

Similarly, when Billy learned that a former jiu-jitsu instructor, Jason Moore, was having trouble covering the rent for his gym, Billy provided Jason with a year's rent. Ex. A at 92 (Allie Zachar letter). When a doorman was fired from Billy's apartment building, Billy found him a new job and provided financial support. *Id.*

This charitable activity has been a lifelong aspect of Billy's character. In her letter, Billy's mother recalls that, when he was a child, Billy would work hard to make sure no classmate was ever picked on or left out, and devoted himself to

helping his friends.  Ex. A at 7 (Irene McFarland letter).  One of these friends developed a social and anxiety disorder in middle school, and during that year, Billy had lunch with his friend and his therapist every day to help his friend overcome these issues.  *Id.*  Billy's sister has described how he has served as a constant resource for her and her friends, and has helped them with school projects and finding jobs.  Ex. A at 3 (Eleni McFarland letter).

Billy volunteered with Habitat for Humanity for four years, and also worked with his church group to build a home in Tijuana, Mexico.  Ex. A at 62 (Katherine Liakis letter).  He makes considerable donations to his childhood church and participates in fundraising efforts for the American Cancer Society and the Susan G. Komen breast cancer foundation.   Ex. A at 14 (Christopher O'Sullivan letter). Even after being charged in this case, during one of the most difficult times in his life, Billy continued his charitable acts.  In August 2017, the United Nations needed a host for its World Humanitarian Day in Times Square when its original host cancelled a few days before the event.  They reached out to Billy, who secured Grammy-nominated recording artist Ryan Leslie as the host and helped to organize the successful event.  Ex. A at 61 (Ryan Leslie letter).

## II.     THE OFFENSE CONDUCT

On March 6, 2018, Billy pled guilty to two counts of wire fraud based on false statements he made to Fyre Festival investors and a ticket vendor regarding the financial status of Fyre Media and his personal finances.   PSR ¶¶ 2-3, 5. Specifically, Billy inflated the amount of money generated by Fyre Media and his own assets in order to induce investors to provide money that Fyre Media could—

and did—use to host the Fyre Festival.  Without the income anticipated to have been generated by the festival, however, Fyre Media and Billy did not have the resources to repay investors the $26 million they had put into the festival.  Billy will spend the better part of his life working to repay that money.

While Billy's illegal conduct must be punished, we submit that it is important to view his actions of light of his age and inexperience.  Billy undoubtedly made a series of a bad decisions during a period in time when he was trying to put together an extremely ambitious event—a music festival on a largely empty Bahamian island, where no large-scale event had ever been held before.  Billy's boundless enthusiasm, coupled with his prior successes, led him to believe that he would be able to make the festival work, which would allow him to repay investors and further promote the use of the Fyre Media app.  As his sister explained, "Billy has always been a big dreamer, and it has been heartbreaking to see him leap too big and to fall too short."  Ex. A at 3 (Eleni McFarland letter).

After the Fyre Festival failed, Billy was immediately cooperative with federal authorities who began investigating him and the festival.  He spoke freely to the FBI agents who visited his home, and voluntarily turned over all of the documents requested by the Government for its investigation.  Billy made no attempt to obstruct justice; to the contrary, he tried his best to assist the Government's investigation when approached by the FBI.  PSR ¶¶ 29-31.  Billy has also accepted responsibility for his actions, fully and without qualification.  As part of his

acknowledgement of guilt, waived Indictment and promptly pled guilty to the charges against him.

## III.   THE GUIDELINES CALCULATION OVERSTATES THE SEVERITY OF THE OFFENSE CONDUCT

As this Court is well aware, the Guidelines are advisory and are merely one factor to consider in determining an appropriate sentence.  *See United States v. Gall*, 552 U.S. 38 (2007).  Judges must consider all of the 18 U.S.C. § 3553(a) factors to make an "individualized assessment" of what sentence would be "sufficient, but not greater than necessary" to achieve the various purposes of the criminal justice system in a particularly case.  *Id*. at 49-50; *see Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").  In other words, district courts "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

A.   The Guidelines Calculation

Billy has no prior criminal record, and thus is a Criminal History Category I fraud defendant, with a base offense level of 7.  PSR ¶¶ 46-49.  When he pled guilty, Billy agreed to a stipulated loss amount of approximately $26 million, which added 22 points to his offense level, yielding an offense level of 30 and a Guidelines range of imprisonment of 97-121 months after additional enhancements and credit for acceptance of responsibility.   PSR ¶¶ 6, 34-45.

The Guidelines calculations in this case are almost entirely driven by the loss amount, which are alone responsible for increasing Billy's Guidelines sentence from 0-6 months to over 8-10 years.

B.   The Court Should Impose A Significantly Below-Guidelines
     Sentence Due To The Guidelines' Over-Reliance On Loss Amount

This Court "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime" and is "generally free to impose sentences outside the recommended range" of imprisonment suggested by the advisory Guidelines. *Cavera*, 550 F.3d at 188-89. A decision to issue a non-Guidelines sentence may be "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also Pepper v. United States*, 562 U.S. 476, 501 (2011) ("[A] district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views"). In the context of the facts of this case, that the loss amount enhancement nearly tripled the Offense Level for the crime at issue renders a sentence within the range irrational on its face and warrants a non-Guidelines sentence. *See United States v. Johnson*, No. 16-cr-457, 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (determining that a Guidelines sentence of 87-108 months was "well out of proportion to [the defendant's] appropriate sentence" where it was "overwhelmingly due to the loss enhancement"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (the "irrationality" of the Guideline's focus on loss amount was clear

21

where 20 of the defendant's 30 offense level points were due solely to the loss calculation).

Courts in this Circuit have increasingly recognized the absurdity of a sentencing regime in which the loss amount dwarfs all other relevant factors. Even before *Booker*, courts expressed concern that the "Guidelines place undue weight on the amount of loss involved in the fraud," which may be "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). Judge Rakoff was sharper in *United States v. Adelson* two years later, when he stated that "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" rendered the Guidelines calculation "wildly off-base" and found that, in that case, "the calculations under the guidelines have so run amok that they are patently absurd on their face." 441 F. Supp. 2d 506, 508-09, 515 (S.D.N.Y. 2006). He added: "What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id.* at 512.

Judicial criticism of the Guidelines' over-emphasis on loss amount has continued to build since then. In a concurrence in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), Judge Underhill, sitting by designation, noted the flawed nature of the Guidelines for high-loss cases:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. ***The***

> ***higher the loss amount, the more distorted is the guideline's advice to sentencing judges***.  As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

*Id.* at 380 (Underhill, J., concurring) (quoting Bowman, 20 Fed. Sent'g Rep. at 168) (emphasis added).  Other judges have described Guidelines' myopic focus on loss amount as "a black stain on common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008), "of no help," *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010), and "almost useless," *United States v. Faibish*, No. 12-cr-265 (E.D.N.Y.), Sentencing Tr., Mar. 10, 2016, Dkt. 271 at 23:1-12 ("[T]he guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table.").

The Second Circuit responded to these criticisms in 2016 and held that the idiosyncratic nature of the loss amount enhancement was alone sufficient to justify consideration of a non-Guidelines sentence:

> [T]he Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range.  This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.  ***Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.***

23

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (emphasis added) (citations omitted) (remanding to "permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence").

Two months ago, Judge Garaufis accepted the Second Circuit's advice in *Algahaim* to "consider the 'unusualness' of this enhancement in its determination of a reasonable sentence." *Johnson*, 2018 WL 1997975, at *3-4 (quoting *Algahaim*, 842 F.3d at 800). He recounted the history of criticism of the loss amount enhancement, and explained his own concerns about its inability to yield a reasonable sentence:

> Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less underline solely responsible for a white-collar offender's Guidelines sentence. . . . That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.
>
> Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. The problems with the loss enhancement have been evident since the inception of the Guidelines. In 2004, then-District Judge Gerard Lynch generously called the loss enhancement a "questionable" aspect of the Guidelines. He identified all of the problems with this scheme: the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on. These concerns have continued unabated.

*Id.* at *3-4 (citations omitted).

For these reasons—as the Probation Department recognizes in proposing a below-Guidelines sentence—this is not a case in which the Guidelines can suggest a

reasonable sentence that would be "sufficient, but not greater than necessary" to achieve the sentencing goals of 18 U.S.C. § 3553(a).   Instead, because the "application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors." *Johnson*, 2018 WL 1997975, at *4; *see also Adelson*, 441 F. Supp. 2d at 512 ("[T]he Court, confronted with an absurd guideline result that not even the Government seriously defended, and with inapt analogies to other cases and defendants, chose to focus its primary attention on the non-guidelines factors set forth in § 3553(a)."). For the reasons explained below, those factors counsel in favor of a substantially below-Guidelines sentence.

## IV.   CONSIDERATION OF THE 3553(A) FACTORS INDICATES THAT A NON-GUIDELINES SENTENCE OF HOME CONFINEMENT OR A MINIMAL PERIOD OF INCARCERATION, COMMUNITY SERVICE, PROBATION, AND FULL RESTITUTION IS APPROPRIATE

As the Court is well aware, Section 3553(a) requires this Court to consider a number of factors to "tailor" a sentence that reflects the particular circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005).  These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b. to afford adequate deterrence to criminal conduct;
    c. to protect the public from further crimes of the defendant; and
    d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the Guidelines calculation;

(5) any pertinent policy statement by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among similar defendants; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A fair balancing of these factors—including Billy's contributions to his community, his lack of personal gain, the comparable severity of his crime as measured against sentences given for similar conduct, and his full acceptance of responsibility—all weigh in favor of a sentence that is substantially below the Guidelines and that permits any custodial sentence to be minimal and/or served in home confinement.

A.    Billy's History And Characteristics And The Nature Of The Offense Counsel Towards A Non-Custodial Sentence

Section 3553(a) contains a "broad command to consider . . . the history and characteristics of the defendant" when imposing a sentence. *Gall*, 552 U.S. at 50 n.6 (internal quotations omitted). Here, Billy's personal history and characteristics strongly support a sentence below the advisory Guidelines.

As set forth in Part I and in the more than 60 letters submitted by Billy's friends, family members, and colleagues, Billy's conduct prior to the recent events was generally that of a conscientious and law-abiding member of the community, as well as a good son, brother, and friend. He was never charged or convicted of any crime before this point. The most constant themes in his life were kindness and a

devotion to helping others achieve their full potential.  As a child, that meant helping a classmate fit in socially, teaching others computer programming, and taking the time to show younger martial arts students new skills.  Later, it included creating a new computer entrepreneurship programs for fifth graders; the teacher who worked with him on that program said: "Mr. McFarland is gracious, kind, and selfless.  It was an honor to work with him and his team.  The PS 536 team will forever be grateful to Mr. McFarland for his generosity."  Ex. A at 91 (Jesse Yarbrough letter).  And perhaps most impressive is the small acts of kindness that Billy did largely outside of public view, like letting a homeless man shower in his apartment, secretly footing the annual rent bill for his friend's gym, or building a website for a Haitian charity.  These "good deeds were not performed to gain status or enhance his image.  Most of them were unknown to all but a few people until the time of his sentencing." *Adelson*, 441 F. Supp. 2d at 513.  As the court observed in *Adelson*, "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Id.* at 513-14.

In consideration of the history and characteristics of the defendant, it cannot be overstated that Billy was only 24 years old when much of his conduct occurred.  Because he jumped into the start-up world at the age of 19, he never received much of the training and experience that would have come with formal education and/or work for a more established company.  Instead, he was running companies as a

teenager, with only his common sense, technical abilities, and enthusiasm driving him. His youth, lack of training, and desire to fulfill others' expectations caused him to suffer from a serious lapse in judgment—a mistake that he acknowledges and for which he has apologized.

We submit that it is also important, in consideration of this factor, that Billy was not seeking to simply take funds from investors for personal use, but instead used investors' money to attempt to host the music festival. The Government has not charged Billy with taking investor money for personal purposes—and in fact, Billy personally lost $2 million on the festival as well. PSR ¶ 76. And while the investors were undisputedly harmed by the loss of their funds, we think it is important to note that nearly all of the investors were sophisticated individuals who understood the enormous risks of this type of investment and were not financially ruined by their losses.

For these reasons, we respectfully submit that the Court should impose a sentence substantially below the guidelines that entails home confinement or a minimal period of incarceration, community service, and probation. Such a sentence would be consistent with the emerging judicial skepticism towards viewing prison as the default consequence of a non-violent first-time offender, especially when, as in this case, Billy's prior conduct demonstrates that he is essentially a good person who simply made a terrible mistake. Billy has no criminal history, and while his actions resulted in terrible consequences for investors, they were not violent and occurred during a relatively short period of time. Given those factors, as

well as his youth when he made misrepresentations to investors, we respectfully submit that this is an appropriate case in which to consider a non-custodial sentence.

B.     A Non-Custodial Sentence Is Appropriate For The
       Offense And Is Consistent With Results In Other Cases

A non-custodial sentence would appropriately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  While the wire fraud statute captures a broad swath of conduct, with widely varying degrees of seriousness, several aspects of this case distinguish it from the typical fraud case and make it a better candidate for a non-custodial sentence.  As described above, Billy is a first-time offender who did not personally profit from his fraud.  *See United States v. Prosperi*, 686 F.3d 32, 38 (1st Cir. 2012) (affirming a post-trial sentence of probation, a downward variance from a range of 87 to 108 months, in part because "[t]here was no intent on defendants' part to enrich themselves personally").  The conduct also occurred over a relatively short period of time, and although it was wrongful, Billy's intentions were good:  he was operating on the basis of a misguided desire to ensure that the Fyre Festival was a success, which he genuinely believed would make money for all of the festival's investors.  And, when everything turned bad, Billy attempted to aid FBI agents immediately when they approached him.  He did not lie or attempt to obstruct justice, but instead confessed to his conduct and accepted responsibility for the harm that he caused.

1.     *A Sentence Far Below The Guidelines Range Would Be Consistent With the Evolving Treatment of Fraud Sentencings In This Circuit.*

29

A recent study of fraud cases in the Southern District of New York revealed that "[i]n recent years, roughly seventy percent of defendants in major white-collar cases received a downward departure from their Guidelines-calculated sentencing range, and those departures were, for the most part, quite large."   Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L.J. 1018, 1052-53 (2016).   Thus, "judges in S.D.N.Y. have not shied away from using the discretion afforded by *Booker* to impose sentences significantly shorter than those produced by the Guidelines."   *Id.*   Indeed, "when a below-range sentence is imposed, it is generally vastly shorter than the sentence recommended by the Guidelines.   The lengthy sentences produced under the Guidelines are rarely actually imposed, at least in S.D.N.Y."   *Id.*   Those findings are also reflected in the most recent statistics provided by the U.S. Sentencing Commission, which show that in 2017, courts in the Second Circuit imposed a below-Guidelines sentence for 70.7% of all fraud defendants.   *See* Federal Sentencing Statistics (2017), Tbl. 10, available        at        https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/2c17.pdf (hereinafter, "Federal Statistics").   Of these below-Guidelines sentences, nearly 60% were not government-sponsored.   *Id.*

Courts    have    imposed    significantly    below-Guidelines    sentences    in circumstances even less compelling cases than this one.   Indeed, courts in this Circuit have imposed sentences substantially below the Guidelines range for defendants *convicted at trial* of fraudulent conduct that was either far more

30

extensive or involved much greater sophistication than the conduct at issue here. For example:

- In *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y.), a former portfolio manager at Visium Asset Management was convicted of securities and wire fraud for orchestrating a complex scheme to overvalue securities to inflate the value of the fund. Gov't Sentencing Mem., No. 16-cr-483, Dkt. 98 at 1-2. The Government argued that the scheme caused a $9.5 to $25 million in loss to investors, *id.* at 3, and the parties agreed that it resulted in millions of dollars in unlawful gain. Sentencing Tr., June 14, 2017, Dkt. 117 at 2. Judge Rakoff varied from the Guidelines range of 87 to 108 months despite the defendant's "highly significant" role in the scheme for months and his "attempt at blackmail" to conceal his crimes, imposing after trial a sentence of 18 months of imprisonment, *id.* at 29;

- In *United States v. Block*, No. 16-cr-595 (S.D.N.Y), the former CFO of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors. *Former Chief Financial Officer of American Realty Capital Partners Sentenced For Accounting Fraud*, Dep't of Justice Press Release (Nov. 8, 2017), https://www.justice.gov/usao-sdny/pr/former-chief-financial-officer-american-realty-capital-partners-sentenced-accounting. The Court accepted the Government's calculation of roughly $300 million in

shareholder loss and stated that the defendant had "brazenly" falsified key accounting numbers, but rejected the Government's proposed sentence of at least seven years' imprisonment. *Brian Block Sentenced To 18 Months In Prison*, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/171109929/brian -block-sentenced-to-18-months-in-prison. Noting, among other things, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend, the court imposed a sentence of 18 months' imprisonment, *id.*;

- In *United States v. Cervino*, No. 15-cr-00171 (S.D.N.Y.), following his conviction at a three-week jury trial, Judge Carter sentenced Cervino to one year and a day for his role in a complex scheme to profit from the manipulation of the price of securities, through which the defendant received cash payments and large commissions while clients lost their entire investment. Judgment, No. 15-cr-00171, Dkt. 367 at 3. Cervino also lied to the SEC during the course of its investigation. Gov't Sentencing Mem., No. 15-cr-00171, Dkt. 362 at 3-7. Cervino's Guidelines range was 135-168 months (*id.* at 8), and thus his sentence represented a 91% reduction, even after trial, from the bottom end of the Guidelines;

- In *United States v. Ghavami*, No. 10-cr-1217 (S.D.N.Y.), defendant Ghavami was the supervisor of a desk at UBS engaged in conduct that the court described as a "very serious" bid-rigging fraud scheme that "spanned

years" and "victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury."  Sentencing Tr., July 24, 2013, Dkt. 426 at 123:11-17.  The Government sought a Guidelines sentence of at least 210 months' imprisonment, but the court rejected much of the government's claimed loss, determined a Guidelines range of 41 to 51 months' imprisonment, and varied to a sentence of 18 months' imprisonment.  *Id.* at 109:8-11, 158:19-22;

- In *United States v. Collins*, No. 07-cr-1170 (S.D.N.Y.), the defendant lawyer had prepared "legal documents over years for the transactions planned by company insiders to effect the fraud."  Sentencing Tr., July 15, 2013, Dkt. 244 at 21:8-14.  The Government contended that there were thousands of victims, billions of dollars in losses, and that the defendant's participation in the scheme was longstanding.   *Id.* at 17:7-9, 20:6-12. Although the Guidelines called for life imprisonment, *id.* at 20:23-21:1, Judge Preska imposed a sentence of one year and one day in prison, *id.* at 36:1-2;

- In *United States v. Bonventre, et al.,* No. 10-cr-228 (S.D.N.Y.), the defendants were convicted at trial and faced Guidelines ranges of life imprisonment for orchestrating the Madoff Securities fraud – the largest, longest-running, and most damaging Ponzi scheme in history.  The court imposed far below-Guidelines sentences for each of the several defendants, sentencing two of the defendants to just thirty months'

33

imprisonment and two others to terms of six years' imprisonment, after literally decades of complex, fraudulent conduct facilitating the Madoff scheme. Dkts. 1225, 1232, 1233, 1243. One of the six-year sentences was for Annette Bongiorno, one of the earliest employees at Madoff, who personally reaped many millions of dollars from the fraud and perjured herself at trial.  Gov. Sentencing Mem., Dkt. 1082 at 18-22, Dkt. 1225;

- In *United States v. Litvak*, No. 13-cr-19 (D. Conn.), the court rejected the government's request after trial for a Guidelines sentence of 108 months' imprisonment and imposed a sentence of two years for sophisticated fraudulent conduct affecting numerous victims, and causing millions of dollars in loss, in over 55 securities transactions over the course of three years.  Sentencing Tr., July 25, 2014, Dkt. 273 at 61:13-17, 158:15-19;

- In *United States v. Graham*, No. 06-cr-137 (D. Conn.), the defendant, an in-house lawyer, was convicted of conspiracy and fraud charges for his role in a fraudulent reinsurance transaction.  Judge Droney determined that the fraud caused a loss of over $500 million and that the defendant affirmatively concealed the fraudulent nature of the transaction.  Order of Oct. 31, 2008, No. 06-cr-137, Dkt. 1164 at 15.  The court varied from a Guidelines sentence of life imprisonment and imposed a sentence of one year and one day, along with two years of supervised release.  Judgment, No. 06-cr-137, Dkt. 1269 at 1.

34

In each of the above cases, the defendants refused to take responsibility for their actions and were convicted by a jury of extraordinarily complex frauds that spanned years. A custodial term of imprisonment here would fail to account for the differences between those defendants' conduct and Billy's conduct—including his immediate acceptance of responsibility—and would overstate the seriousness of Billy's offense conduct. *See* U.S.S.G. Ch. 1, Pt. A ¶ 3, at 3 ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity"). We do not dare suggest that Billy is entitled to any sentence, but we respectfully submit that the sound reasoning behind the post-trial sentences described above strongly militates in favor of a non-custodial sentence for Billy.

2.    *A Non-Custodial Sentence Would Be In Line With Sentences Imposed Upon Similarly Situated Defendants.*

One important factor this Court must consider is the need to avoid sentencing disparities. A non-custodial sentence, or a minimal period of incarceration, is in line with sentences imposed by other judges for conduct similar to that to which Billy has pled guilty.

The Second Circuit's sentencing statistics reveal that a substantial percentage of fraud defendants—15.9%—received non-custodial sentences. *See* Federal Statistics at Tbl. 5. The Sentencing Commission has acknowledged that fraud defendants are often well-suited to receive probation: "[o]ffenders convicted of fraud and other white collar offenses, while still primarily sentenced to prison, also more often are sentenced to alternatives; approximately one-third of fraud and

35

white collar offenders are sentenced to prison alternatives." U.S. Sentencing Comm'n, Alternative Sentencing in the Federal Criminal Justice System (Jan. 2009), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf.

Courts frequently impose non-custodial sentences for defendants in fraud cases similar to this one, particularly where the defendant has accepted responsibility and pled guilty. Recently, in *United States v. Kelley*, No. 16-cr-00837 (S.D.N.Y.), Judge Oetken sentenced the defendant—who, like Billy, was facing a Guidelines-calculated sentence of 97-121 months—to six months of home confinement, 1,000 hours of community service, and three years of probation. Sentencing Tr., Sept. 29, 2017, Dkt. 44 at 7:6, 29:3-17. Kelley had conspired to bribe a New York pension fund official, which earned her $200,000 in commissions from the ill-gotten business. She also concealed the scheme by agreeing to testify falsely in an SEC investigation about the bribes. Nonetheless, the court properly credited Kelley for ultimately confessing her wrongdoing and pleading guilty. Unlike Billy, the defendant in Kelly was a highly trained woman who was in her fifties when she engaged in the criminal conduct at issue. But even there, where the court was not dealing with the misjudgments of a 24-year old, the court appropriately recognized that acceptance of responsibility should be a powerful factor in consideration of a non-custodial sentence for a non-violent white collar defendant.

36

Other district courts have likewise imposed non-custodial sentences based on similar conduct after both guilty pleas and jury trials. *See, e.g., United States v. Tighe*, No. 15-cr-62, 2018 WL 1307949, at *1 (E.D.N.Y. Mar. 13, 2018) (imposing sentences of four years' probation with six months' home confinement after defendants, officers of drug repackager, pled guilty to a years-long wire fraud conspiracy to falsely certify compliance with drug safety standards, when in fact the drugs were subject to unsanitary conditions that put patients at risk); *United States v. Schulman*, No. 16-cr-442 (E.D.N.Y.), Dkt. 155, at 26:22-27:5, 37:6-12, 40:1-16 (reducing a sentence from a Guidelines range of 41 to 51 months to three years' probation with 2,000 hours of community service and a $50,000 fine, after jury conviction for "textbook insider trading" in which a lawyer betrayed his clients' trust by providing inside information to his friend); *United States v. Harkonen*, No. 08-cr-164 (N.D. Ca.), Dkt. 373 at 60:2-5, 154:2-160:3 (imposing sentence of three years' probation, with six months of home confinement and 200 hours of community service, and a $20,000 fine, where defendant was convicted by jury of wire fraud for misrepresenting the results of a drug trial, and Government argued there was over $20 million in losses and over 250 vulnerable victims).[4]

---

[4] *See also Prosperi*, 686 F.3d at 32, 34; *United States v. Howe*, 543 F.3d 128, 130-33 (3d Cir. 2008) (affirming non-Guidelines, non-custodial sentence based in part on crime being an "isolated mistake," even though defendant "engaged in a sustained effort to obstruct the investigation in order to hide his crime"); *United States v. Musgrave*, 647 F. App'x 529, 532-37 (6th Cir. 2016) (noting that defendant earned no profit from his crimes and that his criminal conduct included only one transaction, which were "appropriate mitigations"); *United States v. Mullings*, 131 F. Supp. 3d 1, 4 (finding a custodial sentence unnecessary where defendant's conduct "appeared to be an 'aberration' from his otherwise lawabiding life").

C.    A Non-Custodial Sentence Is Sufficient, But Not
       Greater Than Necessary, To Promote Respect For
       The Law And Afford Adequate Deterrence and Protection

This Court must also consider whether its sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter criminal conduct generally as well specifically for an individual defendant. 18 U.S.C. § 3553(a)(2). Here, there is no need for a lengthy term of imprisonment to reflect the gravity of the offense or promote respect for the law, because as described below, the collateral consequences of Billy's conviction and his enormous restitution obligation of $26 million provide substantial punishment for his actions.

Further, no custodial sentence is necessary to promote specific deterrence or to protect the public from any further crimes by Billy. The offense conduct occurred during one unusually difficult period in his life, and he has suffered greatly as a result. There is no basis to believe he would re-offend. To the contrary, as the Sentencing Commission has recognized, there is considerable research showing that first-time offenders like Billy are far less likely to commit another crime than other defendants. *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6-9 (Mar. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

With respect to general deterrence, this prosecution, the severe financial penalties Billy has incurred, and the intense media ridicule that has accompanied this case are sufficient to deter others from engaging in conduct that could subject

38

them to prosecution.   This is to say nothing of the lasting impact in itself of a federal felony conviction for fraud.   The Second Circuit has instructed that, in order to "properly calibrate a 'just punishment,'" a trial court must "consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing a below-Guidelines, non-custodial sentence "in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon").   Here, those consequences were dire.   Billy has suffered and will continue to suffer devastating professional, financial, and personal collateral consequences. The failure of the Fyre Festival has led to a crushing wave of civil litigation by investors and festival ticketholders, all of which will remain ongoing even after Billy is sentenced in this matter.   Billy's once-thriving businesses have failed, and his future as a convicted felon in a highly publicized case will make it more difficult for him to find new employment or start a new business.   As a friend and Fyre Festival attendee wrote in support of Billy, "the media and social media has no mercy" with respect to Billy and the festival.   Ex. A at 72 (Lauren Reilly letter). The term "Fyre Festival" is now a widely used punchline, appended to every large-scale event that fails.   *See, e.g.*, "English People Are Upset About the Fyre Festival of   Cheese,"   The   Fader   (Dec.   17,   2017),   *available   at* http://www.thefader.com/2017/12/17/the-fyre-fest-of-cheese; "A   Classical   Music Festival Just Had Its Very Own Fyre Festival-Like Implosion in Rhode Island," Vulture (Sept. 14, 2017), *available at* http://www.vulture.com/2017/09/heres-the-

fyre-festival-of-classical-music.html; "Behold 'The Fyre Festival Of Pizza,'" Jezebel.com (Sept. 12, 2017), *available at* https://jezebel.com/behold-the-fyre-festival-of-pizza-1803775996. The negative press associated with the Fyre Festival has deeply tarnished Billy's reputation, giving him a notoriety that he is unlikely to ever fully leave behind him.

Additionally, Billy has agreed to pay restitution of more than $26 million. As courts have recognized, in cases involving financial crimes, "an important kind of retribution may be achieved through the imposition of financial burdens." *Adelson*, 441 F. Supp. 2d at 514. Given the large amount of money at stake, the restitution ordered here "virtually guarantees that [Billy] will be making substantial restitution payments for the rest of his life." *Id.* This, in and of itself, is a highly meaningful punishment. And it is one that Billy takes seriously – he has already agreed to forfeit to the Government an art collection with an estimated value of over one million dollars, his interest in two trust accounts valued at approximately half a million dollars, as well as additional property and a small amount of cash. He is dedicated to continuing to work to pay his restitution.

Billy deeply regrets the conduct in which he engaged. He knows and understands that his conduct was wrong, accepts full responsibility for his actions, and is genuinely remorseful for the huge lapse in judgment, the harm he has caused, and the pain he has brought upon his family and loved ones. Billy's decision to promptly plead guilty after being charged reflects not only his deep remorse, but also his respect for the law. He has also already been punished

considerably by his public humiliation and the hurt he has caused his family, and will spend the rest of his life paying investors back.

In considering the types of sentences available, given the totality of the circumstances, a sentence of six months' home confinement or alternatively a minimal period of incarceration, 1,000 hours of community service, and three years of probation is appropriate (in addition to the $26 million in restitution to which Billy has already agreed to pay).   There are substantial benefits in imposing non-custodial community service sentences where the Guidelines contemplated imprisonment. *See United States v. Warner*, No. 13-cr-731 (N.D. Ill.), Sentencing Tr., Jan. 14, 2014, Dkt. 33 at 52:24-53:1 (imposing probation and community service, where Guidelines range was 46-57 months' imprisonment, and explaining: "[a]nd really—and I believe this with all of my heart—society will be best served by allowing him to continue his good works"), *aff'd*, 792 F.3d 847 (7th Cir. 2015); *United States v. Shamilzadeh*, No. 04-cr-1094 (E.D.N.Y. Apr. 7, 2008) (Gleeson, J.), Dkt. 11 (imposing sentence of probation and community service where defendant pled guilty to conspiracy to defraud financial institutions of over $146 million).

In selecting an appropriate candidate to perform community service, the Office of Probation and Pretrial Services recommends that courts "look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence." *Court & Community:   An Information Series About U.S. Probation & Pretrial Services*, U.S. Office of Probation & Pretrial Services, at 2

41

(2005).  Billy's close-knit family, longstanding commitment to his community, and genuine desire to help others make him an ideal candidate for community service.

In fact, given his extensive record of volunteerism, he already has a number of places where he could perform service to benefit others, such as a school, his church, or a homeless shelter.

## CONCLUSION

For the foregoing reasons, this Court should impose a fair, just and reasonable sentence of six months' home confinement or, in the alternative, a minimal period of incarceration, plus 1,000 hours of community service and three years of probation.

Dated:  June 6, 2018                                   Respectfully submitted,

/s/ *Nicholas A. Gravante, Jr.*
Nicholas A. Gravante, Jr.
Randall W. Jackson
Karen A. Chesley
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

*Attorneys for William McFarland*

42