

RANDALL W. JACKSON
Tel.:  (212) 303-3650
E-mail:  rjackson@bsfllp.com

September 21, 2018

<u>VIA ECF</u>

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

    Re:    ***United States v. William McFarland***, No. 17 Cr. 600 (NRB)

Dear Judge Buchwald:

    This letter is respectfully submitted in connection with defendant William McFarland's sentencing, currently scheduled for October 11, 2018. This letter supplements the defense's June 6, 2018 sentencing submission ("Jun. Sent. Sub."). For all of the reasons that we explained in our June submission, which we will not reiterate in this letter, we continue to believe that the Guidelines range grossly overstates the severity of the offense conduct (Jun. Sent. Sub. at 20-25). We also continue to believe, as stated in our June submission, that consideration of the Section 3553(a) factors indicates that a sentence far beneath the Guidelines range is appropriate. (Jun. Sent. Sub. at 25-42).  The defendant is now detained, however, and the portions of our prior submission that suggested the Court should consider imposing a non-custodial sentence are now moot.

    We come to the Court in a difficult posture, given Billy's commission of additional crimes after entering his original guilty plea before Your Honor. There can be no question that Billy McFarland is guilty of a number of very grave errors. We are not asking the Court to ignore the gravity of these actions. We are, however, humbly asking the Court to place these errors in the appropriate context and to give them only the weight that is fair, given all of the circumstances. Specifically, in addition to the reasons set out in our June submission, we believe the Court should consider three factors in fashioning a sentence far beneath the applicable Guidelines range: (a) the defendant's mental health; (b) the defendant's prompt entry of applicable guilty pleas; and (c) the unique characteristics of the defendant.



In this unique case, it is difficult to suggest any specific sentence to the Court. We can only suggest to the Court that, despite his errors, the available evidence strongly suggests that Billy is young man who is redeemable. The evidence suggests that Billy has a good heart that has been led astray by poor judgment and by untreated mental illness. The evidence suggests that this is a case where the Court can fashion a sentence that will appropriately punish the defendant without effectively throwing his life away. We are humbly pleading with the Court to consider such a sentence. For the reasons explained in more detail below, we believe such a sentence, far beneath the Guidelines range, would be sufficient but not greater than necessary to achieve the legitimate goals of sentencing.

## I.   Background[1]

After Billy's failed attempt to orchestrate the Fyre Festival, which included the misrepresentations that led his criminal charges, Billy promptly waived Indictment and appeared before Your Honor to plead guilty to the charges in Information 17 Cr. 600. (PSR ¶¶ 5, 39).

While on release, Billy began interacting with several individuals in an ill-fated operation that was called NYC VIP Access. (PSR ¶¶ 40-52). The idea behind NYC VIP Access was selling tickets to exclusive events such as the Grammy Awards and the Met Gala, but neither Billy nor the other individuals involved had sufficient access to the tickets to justify the intake of advance money for ticket sales. (PSR ¶¶ 40-52). Approximately thirty people paid Billy and the other NYC VIP Access orchestrators approximately $150,000 in advance ticket sales for tickets that they never received. (PSR ¶ 43). Certain of the customers of NYC VIP Access did, in fact, gain access to some of the events through NYC VIP Access tickets. (PSR ¶ 52). However, even where customers gained access to the events, the tickets were sometimes in less attractive areas than had been promised. (PSR ¶ 52).

In the course of these events, Billy also provided one of the NYC VIP Access participants with a check drawn from the account of another one of the participants, which ultimately bounced. (PSR ¶ 53).

In June 2018, the FBI arrested Billy on the charges in a Complaint related to the NYC VIP Access business. Shortly after his arrest, Billy voluntarily appeared for a proffer. (PSR ¶¶ 54-58). During the proffer, Billy denied having fraudulent intent but admitted nearly all of the important facts surrounding NYC VIP Access, including the fact that he had participated, that he had sent various advertising emails, that he had failed to secure the promised tickets, and that he had sent a

---

[1] We appreciate that the Court is already familiar with Billy's personal background, as set out in the PSR and in our June submission. (Jun. Sent. Sub. 4-18). The PSR and the June submission also address the offense conduct leading to Billy's initial arrest. (Jun. Sent Sub. 18-20).



fake confirmation email to a customer while he tried to buy additional time to secure tickets. (PSR ¶¶ 54-58). According to the PSR, other details were omitted or misstated about the scheme. (PSR ¶¶ 54-58).

On July 26, 2018, Billy appeared before Your Honor and pleaded guilty to all of the charges in Superseding Information S1 17 CR 600-01, fully admitting that he had engaged in fraudulent conduct and other related crimes. (PSR ¶ 11).

After Billy's guilty plea, his court-appointed counsel Susan Walsh, asked two respected mental health professionals to evaluate Billy – clinical psychologist Dr. Cheryl Paradis and forensic psychiatrist Dr. Andrew Levin. Both evaluated Billy and completed recent reports, which are attached to this submission as Exhibits A and B, respectively.

Billy is scheduled to be sentenced by Your Honor on October 11, 2018.

## II.   Guidelines Calculation

The Plea Agreement between the defendant and the Government provides that the loss amount is greater than $25,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(L). (PSR ¶ 12). After other applicable enhancements, the Plea Agreement stipulates that the total offense level is 33, with a Criminal History Category of I. (PSR ¶ 12). Pursuant to the plea agreement, the Government agreed that because Billy had clearly demonstrated acceptance of responsibility in a timely fashion, a three-level reduction for acceptance of responsibility was warranted (PSR ¶ 12(g)). The Stipulated Guidelines Range is therefore 135 to 168 months' imprisonment. (PSR ¶ 12(j)). Pursuant to the agreement, Billy also agreed to a forfeiture amount of $26,191,306.28. (PSR ¶ 12(k)).

The Probation Department accepted all of the Guidelines calculations in the plea agreement except the parties' stipulation that the defendant should receive a three-level reduction in the offense level for acceptance of responsibility. (PSR ¶ 72, 131). Under the Probation Department's calculation, the total offense level is 36 and the applicable range is 188 to 235 months' imprisonment. (PSR ¶ 129). Nevertheless, considering all of the applicable sentencing factors, the Probation Department recommends that the Court impose a sentence that is approximately half of the sentence at the bottom of the Guidelines range calculated by the Probation Department, 96 months' imprisonment. (PSR at 39).



### III.   Discussion

**A.   The Court Should Take Into Consideration that the Defendant's Conduct is Related to Serious Untreated Mental Health Issues**

Pursuant to Section 3553(a), as Your Honor well knows, the Court must take into consideration the history and characteristics of the defendant, the need for the sentence to afford adequate deterrence, and the need for the sentence imposed to allow the defendant to be provided with needed medical care and other correctional treatment. We submit that the defendant's mental health is implicated by all of these factors. We further submit that, here, consideration of these factors and their interaction with the defendant's mental health situation indicates that the Court should impose a sentence well beneath the Guidelines range.

As described above, two highly respected mental health professionals, Dr. Cheryl Paradis and Dr. Andrew Levin, have now evaluated Billy's mental health and its relationship to the offense conduct. Dr. Paradis has been retained numerous times by the Government for mental health and competency evaluations. *See, e.g.*, *United States v. A.O.*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597 at *3 (S.D.N.Y. Aug. 8, 2016) ("On December 21, 2015, the Court held a hearing at which four witnesses testified: (i) Dr. Cheryl Paradis, Psy.D., the Government's expert witness"); *United States v. Chichakli*, No. S3 09 cr. 1002 (WHP), 2014 WL 12656499 at *1 (S.D.N.Y. Aug. 8, 2014) ("this Court . . . approved Cheryl Paradis, a licensed psychologist, for the Government"). Her detailed report paints a powerful picture of the impact that Billy's mental health issues have had on his conduct.

We submit that there are three particularly important takeaways from Dr. Paradis's thorough report. First, Dr. Paradis observes that Billy's scores on the diagnostic tests she administered and his history strongly indicate that Billly suffers from Unspecified Bipolar Related Disorder. (Paradis Rep. at 13, 17). Second, Dr. Paradis observes that Billy does *not* suffer from Antisocial Personality Disorder. (Paradis Rep. at 14-16). Third, Dr. Paradis observes that Billy's behavior has been at least in part fueled by a substantial pattern of severe alcohol abuse, perhaps as a form of self-medication for his Bipolar Related Disorder. (Paradis Rep. at 10, 20).

With regard to Billy's diagnosis of Bipolar Related Disorder, one of the more telling aspects of Dr. Paradis's report is her description of the computerized report that was generated when she administered the computer scored Personality Assessment Inventory test. (Paradis Rep. at 12). She reports:

> Mr. McFarland's computerized report includes this: "The respondent describes significant problems frequently associated with aspects of a manic episode at a level of



> severity that is uncommon even in clinical samples. He is probably quite impulsive and unusually energetic, and most likely meets diagnostic criteria for a manic or hypomanic episode . . . . He is probably involved in these activities in an overcommitted and disorganized manner, and he may experience his thought processes as being accelerated. Content of thought is likely marked by inflated self-esteem or grandiosity that may range from beliefs of having exceptionally high levels of common skills to delusional beliefs of having special and unique talents that will lead to fame and fortune. His relationships with others are probably under stress due to his frustration with the inability or unwillingness of those around him to keep up with his plans and possibly unrealistic ideas."

(Paradis Rep. at 13). The extent to which this generic description of the diagnosis matches up perfectly with the sad circumstances that have played out in Billy's recent life is striking.

Importantly, Dr. Paradis concludes that "In my opinion, at the time of the instant offenses, Mr. McFarland's mental state was compromised by a combination of factors. He was experiencing symptoms of mania or hypomania due to an [un]treated Unspecified Bipolar and Related Disorder. He was not sleeping and felt exhausted and overwhelmed. He had a diminished capacity to foresee the consequences of his actions." (Paradis Rep. at 21). Dr. Paradis goes on to conclude that, in her opinion, "Mr. McFarland would benefit greatly from being placed in a comprehensive treatment program that offers a range of services including psychiatric care, individual psychotherapy, and substance abuse counseling. (Paradis Rep. at 21). She notes that he has "many strengths that make him a good candidate for treatment." (Paradis Rep. at 21).

These conclusions are backed up by the separate and independent analysis done by Dr. Levin, who did not consult with Dr. Paradis before preparing his report. Dr. Levin is a Board Certified Forensic Psychiatrist who is also an Associate Professor of Clinical Psychiatry at Columbia University. (Levin Rep. at 1). Dr. Levin concludes that Billy suffers from Other Specified Bipolar and Related Disorder and notes that "[a]s is typical of individuals who experience high energy mood symptoms, he experienced himself as having 'no boundaries.'" (Levin Rep. at 10). Dr. Levin also observes, as described in the PSR, that Billy suffers from ADHD. (Levin Rep. at 10). He writes that "[t]the combination of ADHD and hypomania resulted in his pattern of undertaking on multiple projects accompanied by unrealistic appraisals of success." (Levin Rep. at 10). He notes that "[u]nlike individuals who are typically antisocial, he did not steal these funds or use them for



his own gain. His misrepresentation of his assets was analogous to his tendency to lie as a child to cover up his disorganization and activities as is typical for individuals with ADHD." (Levin Rep. at 10-11).

Importantly, in Dr. Levin's report, he also describes his conversations with Billy indicating that Billy "was overwhelmed by the expectation that he pay back $26 million in restitution." (Levin Rep. 7-8). He describes how Billy's feelings about this and his related feeling that he needed to raise money to pay back investors led him down the ill-fated path towards his new charges. (Levin Rep. at 8). Dr. Levin summarizes his findings as follows:

> In summary, despite struggling with ADHD, Mr. McFarland achieved success due to relentless pursuit of his ventures fueled by his hypomanic energy. His success reinforced his grandiosity and distorted sense that there were "no boundaries." It was in this context that he developed the unrealistic plans for the festival. Despite input from others that he could not accomplish what he proposed, he clung to his grandiose plan until the end. His misrepresentation to investors grew out of an unrealistic belief that the festival would succeed and a fear of letting down those who had already invested. Following arrest he had a brief period of lower mood and then reverted to his grandiose, unrealistic ventures. The ticket venture was grounded in his desire to make restitution. It failed because he over-estimated his ability to deliver tickets, following his longstanding pattern of poor planning and grandiose appraisal. These patterns derive from his ADHD and mood disorder.

(Levin Rep. at 12).

The conclusions of Dr. Paradis and Dr. Levin are thus essentially parallel to one another, and they both indicate that: (a) Billy's misdeeds are strongly related to his untreated mental health issues, including his bipolar type disorder; and (b) these are issues of a type that can be treated, under the appropriate circumstances.

Here, we submit that the appropriate circumstances are a meaningful prison term that is not so long as to permanently derail Billy's ability to get back on track in society, followed by a longer period of supervised relief that includes a requirement for mental health treatment. While the Bureau of Prisons has some ability to offer counseling, experience has instructed that its resources are limited and that the impact of rehabilitative treatment while incarcerated is also necessarily limited. *See, e.g.* Mona Sobhani, *Extending the Logic of the Juvenile*



*Justice System to a Separate Justice System for Mentally Ill Offenders*, 8 Alb. Gov't L. Rv. 439, 458-59 (2015) ("Data suggests that conditions found inside prisons exacerbate mental illness, and that mental health care in the criminal justice system is profoundly lacking").

None of this is to excuse Billy's misbehavior. Billy takes full responsibility for his actions and all of his mistakes. Indeed, his conversations with his us over these difficult months have been dominated by his expressions of remorse at letting down his investors and his family, and other people who believed in him. Certainly, we do not suggest that Billy's mental health issues negate his responsibility or the need for punishment in this case. But we do think that they are a substantial factor that the Court should consider, both in terms of Billy's level of culpability and in terms of the deterrence inquiry. Indeed, courts have repeatedly found a diagnosis of mental illness affecting a defendant's impulse control such as bipolar disorder relevant to sentencing determinations. *See, e.g.*, *United States v. Follette*, 990 F. Supp. 1172 (D. Neb. 1998) (observing that "[p]eople with Bipolar disorder are seriously mentally ill. 'Bipolar disorder' is often called manic depression. These patients frequently have difficulty conforming their conduct to the law because the unrealistic and extreme moods that characterize the illness seriously impair their judgment" and imposing a probationary sentence including home confinement and "intensive court-ordered treatment with a board-certified psychiatrist").

The natural question that is raised by all of Billy's actions, which have been so harmful to the victims, to Billy's family, and to himself, with minimal benefit to the perpetrator, is *why*. Why would a young man with Billy's talents, family support, and intelligence engage in business propositions that were so obviously beyond the scope of his abilities and destined to lead to disaster? Again, Billy has taken full responsibility for his mistakes, but we think an important part of the puzzle in terms of *why* we are here is answered by the work of Dr. Paradis and Dr. Levin. This is just not a case that is as simple as good vs. evil and the need for harsh punishment. The Court must impose a prison sentence in this case – that much cannot be disputed. But the sentence imposed should take into account all of the evidence that sentences focused only on punishment through lengthy incarceration often run counter to the interests of all stakeholders. See, e.g., Jalila Jefferson-Bullock, *The Time Is Ripe to Include Considerations of the Effects on Families and Communities of Excessively Long Sentences*, 83 UMKC L. Rev. 73, 87-89 (2014) ("Paradoxically, longer federal sentences have also resulted in a staggering increase in recidivism."); Sobhani, 8 Alb. Gov't L. Rev. at 460-61 ("Rather than treating mental illness, corrections and detention facilities in the U.S. justice system actually contribute to the worsening of mental disorders. As previously mentioned, untreated symptoms are sometimes responsible for the criminal activity seen in this population, thus incarceration does not reduce recidivism since the core of the problem has not been addressed.")



We submit that a sentence that includes time in prison but puts its emphasis on a longer term of supervised release with strict mental health treatment conditions will adequately punish the defendant while also giving him the best opportunity to become a productive member of society in the remainder of his life. We respectfully request that the Court impose such a sentence.

### B. The Defendant's Prompt Entry of His Guilty Pleas Weighs In Favor of a Substantially Below-Guidelines Sentence

#### 1. Acceptance of Responsibility

As an initial matter, while we have enormous respect for the difficult work of the Probation Department and the serious examination it conducted of the appropriate level of departure from the Guidelines in this case, the Court should reject PSR's suggestion that the Court should not reduce the defendant's offense level, as stipulated in the plea agreement, for acceptance of responsibility.

While the defendant's additional criminal conduct after a guilty plea generally weighs against a finding of acceptance, here, three factors counterbalance that fact and justify the Government's decision to stipulate to the propriety of a Section 3E1.1 three-level reduction. First, far from putting the Government to its proof at trial, Billy promptly accepted responsibility for the core fraud with which he is charged and did not even require the Government to go to the grand jury. His waiver of indictment and immediate entry of guilty plea on the original charges, charges that make up 99% of the loss amount in this case, shows acceptance.

Second, Billy promptly pled guilty to new charges, which do not involve violence or any similar conduct, but reflect a much smaller extension of the same poor judgment and broken thinking that were reflected in the initial charges. For the reasons already described in this letter, we believe there are mitigating factors the Court should consider in terms of what led to this conduct.

Finally, while Billy has accepted responsibility for obstructive conduct based on his omissions and misrepresentations during his proffer, we submit that this is not the type of obstructive conduct, like threatening witnesses or attempting to flee, which reflects a true failure to accept responsibility. Indeed, quite to the contrary, the agents were not even forced to arrest Billy for the new conduct. The moment he learned of the new charges he voluntarily surrendered to the custody of the FBI. His voluntary proffer, while beset with problems, including admissions to the major points regarding the new conduct. And of course, Billy's plea to the new conduct came far before trial or even any motion practice. This is all to say that the plea agreement provides for a just and appropriate calculation of Billy's Guidelines range that adequately reflects all of his improper conduct. There is no justification



here for going beyond the agreement and denying the defendant the Section 3E1.1 reduction. The Court should decline to do so.

**2.    Billy Should Not Be Treated More Harshly After Prompt Guilty Pleas than Fraud Defendants that Have Forced the Government to Go to Trial**

As detailed in our June submission, courts in this Circuit have imposed sentences substantially below the Guidelines range for defendants *convicted at trial* of fraudulent conduct that was either far more extensive or involved much greater sophistication than the conduct at issue here. (Jun. Sent. Sub. at 30-35). Among others mentioned in that portion of our prior submission, it is notable that none of the Madoff Securities trial defendants, including the COO and the principles of the Investment Advisory business, received sentences in Billy's Guidelines range. (Jun. Sent. Sub. at 30-35). Those defendants all faced Guidelines ranges of life imprisonment, after one of the longest fraud trials in history, where multiple defendants testified. There is simply no justification for treatment of Billy that is harsher than the perpetrators of the decades-long, multibillion dollar Madoff scheme, particularly given that those defendants went to trial.

The other trial defendants referenced in our prior submission received even lower sentences, even after trial. (Jun. Sent. Sub. at 30-35). As explained there, the trend in sentencing of fraud defendants has increasingly been towards substantial departures from the Guidelines range, even after trial. Here, the Probation Department's recommendation, while substantially higher than the sentence we believe would be appropriate, is reflective of this fact. Considering all of the factors, the arm of the Court tasked with assessing and contextualizing the relevant sentencing facts suggests a sentence that is approximately half of its calculation of the Guidelines. That speaks volumes in terms of the growing recognition of how out of step the Guidelines are from the reality of appropriate sentencing for these types of crimes. We frankly believe the recommendation of the Probation Department is still far too high and would be out of step with the sentences many similar fraud defendants have received in this district. But the core of the Probation Deparment's recommendation – its recognition that the Guidelines here are far out of step with basic fairness and the goals of the sentencing statute – is think that we believe the Court should follow.

**C.    The Unique Characteristics of the Defendant Weigh in Favor of a Substantially Below Guidelines Sentence**

As the Court know, Section 3553(a) requires the Court to take into consideration the particular characteristics of the defendant in fashioning a an appropriate sentence. Without repeating the points made in our June submission (Jun. Sent. Sub. at 25-28), we submit that certain of these characteristics deserve



special emphasis in light on the new charges and the new information that we have regarding Billy's mental health. Specifically, we think that Billy's charitable work takes on a new significance in light of the context that Dr. Paradis and Dr. Levin's analysis provides. We now know that Billy's mind over the last several years of his still young life has essentially been in a state of extreme turmoil. The lack of control and mood disturbances that his family endured and that ultimately led to his crimes were long developing. All of the excesses that were reflected in his decision-making comes into focus in light of our understanding of his bipolar disorder symptoms.

In the midst of that psychological chaos, that Billy devoted as much of his time as he did to endeavors like the PS 536 Computer-Programming & Entrepreneurship Program speaks volumes. Even as Billy was spiraling out of control in his professional life, a powerful humanitarian component of his character remained intact that made him want to spend time with a group of fifth graders in the Bronx and try to teach them how to program computers. The principal of the school, Jesse Yarborough, explained it best, noting:

> As part of the program, Mr. McFarland and his team planned and executed weekly lessons on computer coding and business development for our students. Billy McFarland encouraged students to develop a website based on something that they were passionate about, and taught them skills they would need to develop a business plan. In addition, Mr. McFarland provided laptops (Apple MacBooks) for all participating students, organized guest speakers from the entertainment industry, and hosted a culminating event at a restaurant in Manhattan. Our 5th grade students described this experience as the most memorable time of their six years spent at PS 536. Mr. McFarland is gracious, kind, and selfless. It was an honor to work with him and his team. The PS 536 team will forever be grateful to Mr. McFarland for his generosity.

(Jun. Sent. Sub. Ex. A at 91). The photographs from those sessions, which we submitted with our June submission, tell the tale. These are kids that you can see are having one of the most rewarding experiences of their lives, and you can see that reflected in Billy's visible engagement.

This is all to say, Your Honor, that Billy McFarland is unique. We believe that the good aspects of Billy's character that were referenced in many of the letters the Court has seen are the real, core parts of him. This is a young man who has made incredible mistakes, but who still has the potential to be an enormous contributor to society. Nothing in this case speaks to any malicious intent on his



part, just a sea of bad judgment, poor decisions, and the type of core instability that can only be explained by mental illness.

So much of the evolution of sentencing in the last few decades has been about recognizing that individuals, particularly very young individuals, often make enormous mistakes that nevertheless should not equal a sentence that effectively nullifies their life. Courts have recognized that we have to examine the specific characteristics of the defendant, including his youth. Indeed, the Supreme Court's recent decision in *Miller v. Alabama*, 567 U.S. 460 (2012), finding life imprisonment for juvenile offenders unconstitutional, was a reflection of this recognition. In *Miller*, the Court observed that "[b]ecause juveniles have diminished culpability and greater prospects for reform, we explained, they are less deserving of the most severe punishments." *Miller*, 567 U.S. at 471 (internal quotation marks omitted). No one is arguing that Billy, as a man in his early twenties, was or is a child. But he is also far from a fully developed adult. He is a very young man whose development has been hampered by mental illness, and his prospects for reform are still enormous. So we submit, Your Honor, the very same rationale that led the Supreme Court to conclude even teenage *murderers* deserve compassion and mercy, means that Billy should be given the same here, where he committed financial crimes borne out of mania and a severe misjudgment of what was possible.

We know that this case has taken turns the Court could never have predicted. Nor could counsel. We humbly ask that the Court at the last juncture exercise all of the mercy and compassion that the situation can justify. We appreciate the Court's consideration.

Respectfully submitted,

__/s_____
Randall W. Jackson
Karen A. Chesley

cc:    Kristy Greenberg, AUSA (by ECF)