UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA
                                    :
          - v -                          S1 17 Cr. 600 (NRB)
                                    :
WILLIAM McFARLAND ,
                                    :
          Defendant.
- - - - - - - - - - - - - - - - - x


**THE GOVERNMENT'S SENTENCING MEMORANDUM**


                         GEOFFREY S. BERMAN
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States
                         of America


KRISTY J. GREENBERG
Assistant United States Attorney
     – Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA
                                    :
          - v -                              S1 17 Cr. 600 (NRB)
                                    :
WILLIAM McFARLAND,
                                    :
          Defendant.
- - - - - - - - - - - - - - - - - -x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced in this matter on October 11, 2018, at 11 a.m. The Government respectfully submits this memorandum in advance of the sentencing, and in response to the defendant's sentencing memorandum dated June 6, 2018 ("June 2018 Def. Mem.") and the defendant's sentencing memorandum dated September 21, 2018 ("September 2018 Def. Mem."), in which the defendant asks the Court to impose a sentence far beneath the Guidelines range.  (September 2018 Def. Mem. at 1, 2).  The Government respectfully requests that the Court impose a sentence within the Guidelines range of 188 to 235 months' imprisonment to reflect the seriousness of the offense, to promote respect for the law, and to provide for deterrence.

I.    **Background**

      A.    **Offense Conduct**

On March 6, 2018, William McFarland ("McFarland" or the "defendant") pled guilty before this Court to one count of wire fraud in connection with a scheme to defraud investors of a company controlled by McFarland, Fyre Media Inc. ("Fyre Media"), as well as its subsidiary ("Fyre Festival LLC"), which was formed to hold a music festival called the "Fyre Festival" (the "Festival") over two weekends in the Bahamas.  (United States Probation Office's Presentence

Investigation Report, dated September 6, 2018 ("PSR") ¶¶ 1, 2, 5).  McFarland also pled guilty to a second count of wire fraud in connection with a scheme to defraud a ticket vendor for the Festival of $2 million. (PSR ¶¶ 1, 3, 5).

On July 26, 2018, McFarland also pled guilty before this Court to one count of wire fraud in that McFarland, while on pretrial release, engaged in a sham ticket-selling business for exclusive events through NYC VIP Access, a company controlled and operated by McFarland, by, among other things, making false representations that NYC VIP Access had tickets for sale to special events in fashion, music and sports when it did not. (PSR ¶¶ 7, 11).  McFarland also pled guilty to one count of bank fraud in that McFarland provided a forged check in the name of a then-employee ("Employee-1") to McFarland's driver ("the Driver"), which the Driver attempted to deposit into the Driver's bank account and would have resulted in the unauthorized withdrawal of funds from Employee-1's bank account. (PSR ¶¶ 8, 11).  McFarland also pled guilty to falsely stating in a voluntary in-person proffer with a federal law enforcement agent, among other things, that (i) McFarland did not think that he would defraud customers from his prior businesses, Magnises and Fyre Festival, when he solicited them to buy tickets for NYC VIP Access; and (ii) Employee-1 authorized McFarland to write a check from Employee-1's bank account for $25,000 in the name of Employee-1 to the Driver, for the Driver to then deposit into the Driver's bank account. (PSR ¶¶ 9, 11).

### McFarland's Fraud on Investors of Fyre Media and Fyre Festival

From at least in or about 2016, up to and including in or about May 2017, McFarland conducted a scheme to defraud individuals by inducing them to invest millions of dollars in Fyre Media, a digital media company that was founded and run by McFarland as Chief Executive Officer. (PSR ¶ 16).  McFarland started Fyre Media to build a digital application that would

allow individuals organizing commercial events, such as concerts, to bid for talent bookings at such events. (*Id.*) McFarland orchestrated this scheme through several means and methods, as described below. (PSR ¶ 17).

McFarland repeatedly made materially false statements to investors about Fyre Media's revenue and income, and manipulated Fyre Media's financial statements and supporting documentation to hide Fyre Media's true financial condition. (PSR ¶ 17).  McFarland represented to investors that Fyre Media had earned millions of dollars of revenue solely from talent bookings; a review of Fyre Media's records shows that those numbers were significantly overstated. (PSR ¶ 18).  For example, in September 2016, McFarland created fraudulent Fyre Media spreadsheets purporting to show offers made and accepted through Fyre Media.  These "offer reports" were designed to, and did, exaggerate the success of the Fyre Media platform. (*Id.*). On at least one occasion during this timeframe, McFarland emailed a fraudulent offer report to a potential investor, who subsequently made an equity investment in Fyre Media. (*Id.*).

In December 2016, McFarland created a PowerPoint presentation to update existing investors on Fyre Media's financial and operational performance.  This investor presentation stated that Fyre Media was "on track to achieve **$160M** [in] completed bookings by Q4 2017." (Emphasis added). (PSR ¶ 19).  A few days later, McFarland edited a "Fyre Business Update" email initially drafted by the Chief Revenue Officer. McFarland revised the investor correspondence to triple the stated goal for completed bookings — from $50 million to $150 million — and increase the number of "talent represented" from 200 to 1,200. (*Id.*).  McFarland later sent the revised correspondence, including the inflated figures, to investors, who relied on the inflated metrics in making further investments in Fyre Media. (*Id.*).

In January 2017, McFarland created a Private Placement Memorandum ("PPM") concerning Fyre Media and Fyre Festival LLC, which was widely distributed to existing and prospective investors in early 2017. (PSR ¶ 20).  The PPM stated that "[s]ince launching in May 2016, **thousands** of offers representing **tens of millions of dollars** of performance and appearances have been made and accepted with Fyre." (Emphasis added). (*Id.*).  The statements regarding the total number of offers and their value were false.  Between May 2016 and April 2017, only **60** bookings for performance and appearances were, in fact, confirmed and paid.  The total fees paid to Fyre Media as a result of these 60 bookings totaled only **$57,443**. (*Id.*).  The PPM (as well as numerous other investor communications) also falsely stated that Fyre Media had acquired a parcel of real estate in the Bahamas worth approximately $8 million, to be used as the site of the Fyre Festival. (*Id.*)  Certain investors relied on this purported acquisition in making their investment decisions. In fact, Fyre Media never acquired any real estate in the Bahamas. (*Id.*)

Between February and April 2017, McFarland created additional false offer reports for Fyre Media, which were used to induce investors to invest money in Fyre Media. (PSR ¶ 21). On February 2, 2017, McFarland provided a contractor for each of McFarland's three businesses (the "Contractor"), with an offer report generated by Fyre Media's Chief Technical Officer directly from the fyreapp.com booking platform. (*Id.*). Shortly thereafter, McFarland provided the Contractor with detailed instructions concerning how to manipulate the data contained in the offer report, including to: "Make sure 35% [of the locations are] international cities;" "[S]prinkle in a couple of higher offer amounts;" and "[S]how $30.1 mm total bookings in January with strong repeat buyer percentages." (*Id.*).  As instructed by McFarland, the Contractor then created a new offer report, in which the Contractor fabricated offers for talent purportedly submitted by

offeror accounts (which, in fact, did not exist) for performances at arbitrarily selected venues. (*Id.*). Although the original offer report generated from the fyreapp.com booking platform included just $1.459 million in total offers for the month of January 2017, the new, fabricated, offer report included $34.79 million in purported total offers for the same time period. (*Id.*).

In April 2017, McFarland created a second fraudulent offer report. (PSR ¶ 22). McFarland again started with a report generated from the fyreapp.com booking platform and asked the Contractor to inflate the numbers generated from fyreapp.com. (*Id.*). In response to a question from the Contractor as to whether he should "continue the trend" for offers in this new offer report, McFarland replied "yes let's increase them." (*Id.*). Between February and April 2017, McFarland sent the offer reports to numerous existing and potential investors. (*Id.*). Using these false offer reports, among other documents, McFarland repeatedly made false statements to investors and prospective investors about the volume of offers received by talent through Fyre Media's booking platform. (*Id.*). McFarland paid the Contractor thousands of dollars from McFarland's personal bank account to create the false spreadsheets. (*Id.*)

McFarland also provided falsified income statements to investors that purported to show that from approximately April 2016 to February 2017, Fyre Media had earned millions of dollars in income from talent bookings. (PSR ¶ 16). In reality, Fyre Media's income from talent bookings from approximately May 2016 to April 2017 was only $57,443. (PSR ¶ 20). In addition, McFarland provided falsified documents to investors showing over 2,500 confirmed talent bookings in a single month when, in fact, there were only 60 confirmed talent bookings in the entire year. (*Id.*).

McFarland repeatedly made misrepresentations to investors designed to overstate Fyre Media's financial condition and stability. (PSR ¶ 23). McFarland touted exclusive, but in fact,

nonexistent, relationships with certain artists and talent. (*Id.*).  McFarland also told investors that a reputable venture capital firm (the "VC Firm") had completed its due diligence process and had decided to invest in Fyre Media. (*Id.*)  To the contrary, a VC Firm employee communicated to McFarland that the VC Firm would not invest in Fyre Media without first completing its due diligence of Fyre Media, which the VC Firm had not done due to McFarland's failure to provide many of the requested documents. (*Id.*).

In late 2016, McFarland established Fyre Festival LLC to hold the Festival over two weekends in the Bahamas. (PSR ¶ 24). McFarland made repeated misrepresentations to investors with respect to their investments in Fyre Festival LLC. (*Id.*). McFarland overstated the Festival's receivables that he used as collateral for numerous investments to cover Festival expenses. (*Id.*). McFarland also falsely told several investors that a number of top musicians would perform at the Festival, when, in fact, no such agreements were ever reached. (*Id.*).  In investor presentations and emails that McFarland provided to prospective investors concerning Fyre Media and Fyre Festival LLC, McFarland also falsely stated that several artists had "exclusive contracts" with Fyre Media; *i.e.*, that all of their future bookings would be made through fyreapp.com. (*Id.*).  No such contracts, in fact, were ever in place for those artists. (*Id.*).

McFarland also secured numerous investments in Fyre Festival LLC by claiming that investors would have the rights to payouts from Festival event cancellation insurance policies when, in reality, no event cancellation insurance policies had been executed for the Festival. (*Id.*).  Ultimately, the Festival was cancelled and widely deemed to have been a failure after experiencing problems with, among others things, accommodations, artists, food and security. Patrons, some of which paid thousands of dollars for admission, were disappointed to find that

the luxury villas and gourmet meals they were promised were limited to tents and prepackaged meals. (*Id.*). When the Festival was canceled, these investors lost their investments in full.

McFarland also repeatedly made materially false statements to investors about his own financial condition. (PSR ¶ 28).  For example, in order to induce several investors to make an investment in Fyre Media, McFarland provided an altered stock ownership statement to inflate the number of shares he purportedly owned in a publicly traded company (the "Publicly Traded Company"), so that it would appear that McFarland could personally guarantee the investment. (*Id.*). Specifically, McFarland showed that he owned $2.56 million in shares in the common stock of the Publicly Traded Company, when, in fact, McFarland owned just $1,499 worth of its shares, a tiny fraction of the shares indicated by the altered stock ownership statement. (*Id.*).

In addition, despite the fact that McFarland's applications to two banks ("Bank-1" and "Bank-2") for millions in personal loans had not been approved, McFarland misrepresented to investors that the monies from those bank loans could serve as collateral for their investments. (PSR ¶ 29).  On one occasion, McFarland sent an investor a snapshot of an email purporting to be from a Bank-1 banker ("Banker-1") to McFarland approving a $3 million dollar loan. (*Id.*). Not only had Banker-1 not sent that email, Bank-1 had not approved McFarland's loan application. (*Id.*).

In order to influence Bank-1 and Bank-2 to grant McFarland's applications for millions of dollars in loans, McFarland falsely represented that he owned a greater number of shares in the Publicly Traded Company than he actually did.  (PSR ¶ 30).  With respect to Bank-1, McFarland provided an altered stock ownership statement to inflate the number of shares he purportedly owned in the Publicly Traded Company, and a fraudulent income statement for Fyre Media that showed grossly inflated revenue and income. (*Id.*).

McFarland also made materially false statements to Fyre Media's investors about Magnises, a credit card and private club for millennials that sold tickets to exclusive events, which was founded and run by McFarland as Chief Executive Officer from in or about 2013, up to and including in or about 2017. (PSR ¶ 31). McFarland told certain of Fyre Media's investors that Magnises would be (and then was) sold for approximately $40 million, and that McFarland made a profit of several million dollars personally from the sale, when in reality, McFarland had not sold Magnises. (*Id.*).  In at least one instance, McFarland used the fictitious acquisition to solicit investment in the Fyre entities using the purported "post-sale" value of Magnises as collateral. (*Id.*).  As part of this scheme, McFarland falsely told Fyre Media's investors that certain individuals, including celebrities and business moguls, were the acquirers of Magnises, when in fact, they were not. (*Id.*).  McFarland also falsely stated to Fyre Media's investors that that a group of acquiring partners were forming a new company ("Saddleback Media") to purchase Magnises, when no such group existed. (*Id.*).  To imbue this scheme with a gloss of legitimacy, McFarland engaged two large and reputable law firms to prepare transactional documents to unwittingly "paper" the fictitious deal. (*Id.*).  McFarland also created a fake employment retainer agreement between himself and Saddleback Media that bears the electronic signature of Saddleback Media's purported President, a certain "G. Smythe," an individual who does not exist. (*Id.*).  McFarland engaged in this scheme in order to create the false impression for investors and potential investors that McFarland was a successful entrepreneur with a proven track record of success. (*Id.*).

McFarland's materially false and misleading statements and omissions to investors were purposefully designed to make Fyre Media, Fyre Festival, and Magnises appear more successful and financially strong than they actually were, to tout McFarland's management expertise and

oversight of Fyre Media, Fyre Festival and Magnises, and to induce investors to invest tens of millions of dollars into McFarland's companies. (PSR ¶ 32). Through this scheme, McFarland caused losses to at least eighty victim-investors, totaling more than $24 million dollars. (PSR ¶ 33).

Throughout the period of his fraud, McFarland received money, benefits, and perks, which enabled him to live an extravagant lifestyle, including maintaining a Manhattan residence, employing a private driver of a luxury vehicle, taking frequent trips by private plane, and making seemingly magnanimous donations to charitable interests and friends. (PSR ¶ 34). These activities were funded, in substantial part, with investor money. (*Id.*). McFarland also benefited from his fraud by falsely creating a reputation as a skilled entrepreneur, which gained him access to celebrities and premier events. (*Id.*). McFarland held tens of thousands of shares in Fyre Media and Magnises, and stood to directly benefit from fraudulently inflating the worth of these companies. (*Id.*).

### McFarland's Fraud on a Fyre Festival Ticket Vendor

In or about April 2017, McFarland conducted a scheme to defraud a ticket vendor ("Vendor-1") by inducing Vendor-1 to pay two million dollars for a block of advance tickets for future Festivals over the next three years. (PSR ¶ 35). McFarland also provided Vendor-1 with a fraudulent income statement for Fyre Media that grossly inflated Fyre Media's revenue and income. (*Id.*). McFarland signed a guaranty agreement (the "Guaranty Agreement") on behalf of Fyre Media and Fyre Festival LLC with Vendor-1 to unconditionally guarantee that Vendor-1 would receive no less than $2.4 million in sales proceeds from the sale of its pre-purchased Festival tickets. (PSR ¶ 36). Vendor-1 relied on McFarland's misrepresentations overstating Fyre Media's financial condition before entering into the Guaranty Agreement. (*Id.*).

## McFarland's Fraud on Customers of NYC VIP Access

McFarland was on pretrial release from July 1, 2017, to June 12, 2018 in connection with the criminal case before this Court regarding the criminal conduct described above.  From at least in or about late 2017, up to and including in or about March 2018, McFarland owned and operated NYC VIP Access, a company, based in New York, New York, which purported to be in the business of obtaining, and selling for profit, tickets to various exclusive events including fashion galas, music festivals, and sporting events.  (PSR ¶ 37).  From at least in or about late 2017, up to and including in or about March 2018, McFarland, while on pretrial release, perpetrated a scheme to defraud attendees of the Fyre Festival and former Magnises customers, among others, by soliciting them to purchase tickets from NYC VIP Access to exclusive fashion, music and sports events when, in fact, no such tickets existed. (PSR ¶ 40).  NYC VIP Access purported to sell tickets to the following events, among others: the 2018 Met Gala, Burning Man 2018, Coachella 2018, the 2018 Grammy Awards, Super Bowl LII, and a Cleveland Cavaliers game and team dinner with Lebron James. (*Id.*).

McFarland took numerous steps to make NYC VIP Access appear as it if were controlled and operated by other individuals. (PSR ¶ 41).  In order to hide his affiliation with NYC VIP Access, McFarland used email accounts in the name of Employee-1 and a fake employee ("Fake Employee") of NYC VIP Access. (*Id.*).  McFarland did so in order to provide the appearance that Employee-1 and the Fake Employee were responsible for communicating with customers by email when, in truth and in fact, McFarland regularly used email accounts of Employee-1 and the Fake Employee to communicate with customers. (*Id.*).  McFarland did not have an email account in his own name at NYC VIP Access. (*Id.*).  Neither Employee-1 nor the Fake Employee communicated with customers by email. (*Id.*).

At the direction of McFarland, Employee-1 met with and called customers to solicit them to purchase tickets for events. (PSR ¶ 42).  McFarland did not meet or speak with customers. McFarland also provided prospective customers with contracts that falsely represented that NYC VIP Access had tickets to exclusive events in fashion, music, and sports. (*Id.*).  In order to distance himself from the operation, McFarland directed that Employee-1 sign the contracts between NYC VIP Access and the customers. (*Id.*).  After McFarland induced customers to wire money to pay for the tickets, McFarland either did not provide tickets at all, or did not provide tickets as advertised. (*Id.*).

McFarland set up an account with a payment processor ("Payment Processor-1") in Employee-1's name, and arranged for customer payments made by wire transfer or through Payment Processor-1 to be deposited into Employee-1's bank account (the "Employee-1 Bank Account"), to which McFarland had access and control. (PSR ¶ 43).  McFarland instructed and caused ticket sale proceeds to be sent to the Employee-1 Bank Account and the bank account of the Driver, as well as mobile payment service accounts belonging to other NYC VIP Access employees, for the purpose of concealing his ownership and control of the funds.  Employee-1, the Driver and other employees then provided the ticket sale proceeds to McFarland in cash. (*Id.*).  Through this scheme, McFarland caused losses to at least thirty victim-customers totaling at least approximately $150,000. (*Id.*).  A few examples of McFarland's fraudulent ticket sales scheme are described in more detail below. (*Id.*).

### The 2018 Met Gala Ticket Scam

The Met Gala is an annual exclusive event thrown by a prominent fashion magazine (the "Magazine") for approximately 600 invited guests. (PSR ¶ 43).  The Met Gala is typically sold out by December. (*Id.*).  The vast majority of tickets are sold by invite only, and if a brand

purchases a table, all guests must be approved by the Magazine. (*Id.*).  All guests must provide a

biography and a photo. (*Id.*).  All tickets must be paid for and are non-transferrable. (*Id.*).  No

third party ticket brokers were authorized to sell tickets to the Met Gala. (*Id.*).

On or about December 17, 2017, McFarland sent email solicitations from the Employee-1

Email Account to a mass email list of prospective customers regarding ticket sales to the 2018

Met Gala held on April 30, 2018. (PSR ¶ 44).  The email with the subject "2018 MET GALA –

Red Carpet & Gala Tickets" read as follows:

> You asked, and we are now excited to announce that we are offering tickets to the
> 2018 Met Gala - the biggest single night of celebrity, fashion, and
> entertainment.  The 2018 Met Gala is on Monday, April 30 at The Met in NYC.
> We partnered with the sponsoring brands to get you a chance to buy tickets.
> Tickets include red carpet, seats for the event/dinner, and an invitation to the
> after-party. Tickets are extremely limited. Please respond with your brief bio and
> number of guests you'd like to have attend, and we'll follow up with a call.

(*Id.*).  The email ends with the first name of Employee-1 and Employee-1's phone number. (*Id.*).

McFarland told Employee-1 that they would sell tickets to the dinner and red carpet

access for $2,500 per ticket. (PSR ¶ 45).  McFarland stated that customers needed to submit a

biography, and McFarland would decide who to accept for tickets. (*Id.*).  According to

Employee-1, one customer ("Victim-1") wanted email confirmation of Victim-1's ticket

purchase from the Met Gala. (*Id.*).  When Employee-1 told McFarland, McFarland indicated that

the customer would get the confirmation. (*Id.*).  McFarland then told Employee-1 that there was

an email from the host of the 2018 Met Gala (the "Gala Host") to the Employee-1 Email

Account in which the Gala Host confirmed Victim-1's tickets to the 2018 Met Gala (the "Gala

Host Email"). (*Id.*).  McFarland told Employee-1 to show Victim-1 the Gala Host Email in

person, which Employee-1 did. (*Id.*).  At the time, Employee-1 believed that the Gala Host Email

was real.  According to both Employee-1 and Victim-1, Victim-1 questioned the authenticity of

the Gala Host Email. (*Id.*).  The Gala Host did not send the Gala Host Email, which purportedly confirmed the purchase of the victim's tickets. (*Id.*).

None of the victim customers who purchased tickets from NYC VIP Access were on the guest list for the 2018 Met Gala. (PSR ¶ 47).  None of the victims received tickets for the 2018 Met Gala, and McFarland caused the victims to be charged a total of over approximately $36,000 for fraudulent 2018 Met Gala tickets. (*Id.*).

### The Burning Man 2018 Ticket Scam

On or about January 4, 2018, McFarland sent email solicitations from the Employee-1 Email Account to a mass email list of prospective customers regarding ticket sales to Burning Man 2018, an annual counterculture event in Nevada's Black Rock desert from August 26 through September 3. (PSR ¶ 48).  The email with the subject "Burning Man 2018 - $325 - 24 Hours" read as follows:

> We were going to save this, but the snow in NYC today has us thinking of the playa. **We have 2018 Burning Man (8/26-9/3) passes today only for $325 per person.** Ticket prices go up to $525 tomorrow until we sell our allocation. Email me to reserve. PS - We will be able to help with camp invitations, parking passes, and more closer to Burning Man. (*emphasis in original*)

(*Id.*). The email ends with the first name of Employee-1 and Employee-1's phone number. (*Id.*).

McFarland told Employee-1 that sponsors for Burning Man 2018 provided tickets to the event. (PSR ¶ 49).  However, Burning Man does not have any sponsors or partnerships. (*Id.*). Burning Man does not work with ticket resellers or entities, so third party ticket brokers cannot purchase tickets. (PSR ¶ 50).

Employee-1 sold one ticket to Burning Man 2018 at McFarland's direction. (*Id.*). Customers made payments to another NYC VIP Access employee's payment processor account ("Employee-2 Payment Processor-2 Account") for Burning Man 2018. (*Id.*).  There was no record of any ticket purchases or transfers to either of the two victims who purchased Burning

Man 2018 tickets from NYC VIP Access, or any ticket orders that contain the name of NYC VIP

Access. (PSR ¶ 51).  Neither of the two victims received tickets for Burning Man 2018, and

McFarland caused the victims to be charged a total of $1300 for fraudulent Burning Man 2018

tickets. (*Id.*).  The victims made the payments to NYC VIP Access at the Employee-2 Payment

Processor-2 Account. (*Id.*).

### The 2018 Grammy Awards Ticket Scam

A customer ("Victim-9") received an email purporting to be from the Fake Employee at

an email account (the "Fake Employee Email Account") offering two tickets located in the 100-

level for $1,800.  (PSR ¶ 52).  On or about November 25, 2017, Victim-9 made a payment of

$1,800 through an online payment system from New York, New York. Victim-9 did not receive

tickets to the 2018 Grammy Awards. (*Id.*).  In addition, other customers ("Victim-5") and

("Victim-6") each purchased tickets to the 2018 Grammy Awards for $700 a ticket. (*Id.*).

Victim-5 flew from Florida to New York for the event, only for Victim-5 and Victim-6 to be

rejected at the door. (*Id.*).  An email from the Fake Employee Email Account stated that their

tickets were located in the lower 100-level. (*Id.*).  However, the tickets for other customers

("Victim-4") and ("Victim-8") were in a much higher level. (*Id.*).  The Fake Employee was not a

real person, and McFarland used the Fake Employee Email Account. (*Id.*).

### McFarland's Bank Fraud

In or about March 2018, McFarland provided a forged check for $25,000 with the bank

account number and name of Employee-1 to the Driver, knowing that Employee-1 had not

authorized McFarland to do so. (PSR ¶ 53).  The Driver attempted to deposit the forged check

into the Driver's bank account, which would have resulted in the unauthorized withdrawal of

funds from the Employee-1 Bank Account. (*Id.*).

**McFarland's False Statements During a June 20, 2018 Proffer with the Government**

On or about June 20, 2018, in a voluntary in-person proffer with a federal law enforcement agent (the "McFarland Proffer"), during which McFarland was represented by counsel, McFarland falsely stated, among other things, that:

- McFarland did not think he would defraud customers from his prior businesses, Magnises and Fyre Festival, when he solicited them to buy tickets for NYC VIP Access. (PSR ¶ 54).

- An individual named Valeria LNU told McFarland that he would provide McFarland with an allocation of six tickets to the Met Gala. Valeria was not going to charge McFarland for the six Met Gala tickets. (*Id.*).

- McFarland did not send the Met Gala email solicitation to customers. Employee-1 directed Employee-2 to send the Met Gala email solicitation, with McFarland's advice. (*Id.*).

- McFarland falsely stated that he did not believe Employee-1 sold any tickets to the Met Gala. (PSR ¶ 55). Later, McFarland truthfully admitted to creating a fake email purporting to be from the Gala Host confirming a customer's Met Gala ticket purchase. (*Id.*). However, McFarland falsely stated that he believed he would get that customer's Met Gala tickets eventually. (*Id.*).

- McFarland was offered tickets to Burning Man through a group of pilots in the Air Presidente Atlantic Facebook group. (PSR ¶ 56). A post within the group offered tickets for sale to Burning Man and tickets to Burning Man were released every two to three months in batches. (*Id.*). McFarland also discussed acquiring tickets to Burning Man with various members of the

Facebook group. (*Id.*).  NYC VIP Access never sold any tickets to Burning

Man to the public, so McFarland never sent a list of purchases to the

Facebook Group. (*Id.*).

- McFarland initially falsely stated that Employee-1 and his friends attended the

  Grammy Awards, but when asked if Employee-1 had in fact actually attended

  the Grammy Awards, McFarland truthfully admitted that Employee-1 and two

  other individuals' tickets were declined at the door due to the tickets – which

  McFarland had provided - already being used. (PSR ¶ 57).  McFarland falsely

  stated that Employee-1 told McFarland that the two individuals who were

  declined access to the Grammy Awards along with Employee-1 were

  Employee-1's friends. (*Id.*).  To the contrary, Employee-1 told McFarland that

  these two individuals (Victim-5 and Victim-6) were NYC VIP Access

  customers, after which McFarland refunded them. (*Id.*).  McFarland falsely

  stated that NYC VIP Access sent approximately 6-10 people to the Grammy

  Awards, and everyone else got the tickets they were promised, and two groups

  even had their tickets upgraded. (*Id.*).

- Employee-1 authorized McFarland to write a check from Employee-1's bank

  account for $25,000 in the name of Employee-1 to the Driver for the Driver to

  deposit into the Driver's bank account. (PSR ¶ 58).

- McFarland spent approximately $60,000 on ticket purchases and paying NYC

  VIP Access employees, and kept approximately $20,000 of NYC VIP Access

  ticket sale proceeds for himself.[1] (*Id.*).

**B.**     **Relevant Conduct: McFarland's Fraud on Magnises Investors**

In 2013, McFarland founded Magnises, which he promoted as an exclusive club for millennials, providing its members with priority access to concerts, sporting events, restaurants, and social events, and the use of a "Magnises Card" — a black metal credit card linked to the user's own credit card. (PSR ¶ 59).  Magnises derived revenue primarily from membership dues. (*Id.*).  McFarland was the primary solicitor of investment in the unregistered equity and convertible promissory note offerings of Magnises.  McFarland and Magnises succeeded in raising approximately $3 million from at least 24 investors. (*Id.*).

Between 2013 and 2017, McFarland and Magnises made material misrepresentations and omissions in the offer and sale of securities in Magnises and in connection with the purchase or sale of Magnises securities. (PSR ¶ 60).  For example, as he did with investors of Fyre Media and Fyre Festival LLC, McFarland told Magnises' investors that a group of acquiring partners were forming a new company, Saddleback Media, to purchase Magnises; in fact, no such group existed. (*Id.*).  McFarland knowingly misrepresented that Magnises' investors would receive a significant return on their investment from the sale of Magnises to Saddleback Media. (*Id.*).

McFarland repeatedly made materially false statements to Magnises investors about key financial metrics, namely, the number of Magnises members and revenue in order to make Magnises appear to be more profitable than it was.  (PSR ¶ 61).  McFarland made false statements to existing and potential Magnises investors through PowerPoint presentation investor updates, income statements, and other documents concerning Magnises' revenue and membership numbers. (*Id.*).  These documents misrepresented that Magnises had between 7,000

---

[1] During the McFarland Proffer, McFarland also stated that he kept cash in his bedroom, and at one point had approximately $50,000 in cash, but spent almost all of it.

and 40,000 members and that, between March 2014 and August 2015, it had $2.5 million in revenue. (*Id.*).  According to former Magnises employees, however, Magnises never had more than 4,000 to 5,000 members, and had peak monthly revenues in the range of $100,000 per month. (*Id.*).  Because the revenue derived largely from Magnises membership payments, McFarland's gross inflation of Magnises' membership numbers was material to investors. (*Id.*). Certain Magnises investors relied on the inflated numbers provided to them by McFarland, and would not have made subsequent investments in Magnises if they had known the truth. (*Id.*).

McFarland also made false statements concerning how Magnises operated its business. (PSR ¶ 62).  In soliciting investments in Magnises, McFarland also communicated to investors that Magnises had strategic partnerships with certain entertainment and hospitality providers, purportedly enabling Magnises' concierge service to obtain tickets for Magnises members at reduced rates. (*Id.*).  In truth, such strategic partnerships did not exist, and Magnises employees and contractors repeatedly purchased tickets for Magnises members at McFarland's behest from public websites. (*Id.*).  Where tickets were unavailable from public websites, however, McFarland nonetheless would promise tickets to Magnises members, only to be unable to provide them. (*Id.*).  Magnises' purported strategic partnerships with entertainment and hospitality providers were a key aspect of the Magnises business model, according to certain Magnises investors, and formed part of the basis on which they invested. (*Id.*).

## II.    Guidelines Calculation

### A.    Offense Level

Pursuant to U.S.S.G. § 3D1.2(d), both counts of wire fraud are grouped for guideline calculation purposes.

Pursuant to U.S.S.G. § 2B1.1(a), the base offense level is seven.  (PSR ¶ 75).

Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss attributable to the offenses – the amount defrauded from Fyre investors, Vendor-1 and NYC VIP Access customers – was more than $25 million but less than $65 million, 22 levels are added.  (PSR ¶ 76).

Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offenses involved more than 10 victims, 2 levels are added.  (PSR ¶ 77).

Pursuant to U.S.S.G. § 2B1.1(10)(C), because the offenses involved sophisticated means, 2 levels are added.  In furtherance of the scheme to defraud Fyre investors, McFarland regularly used a series of fictitious and forged documents to deceive investors.[2]  Here, the criminal conduct was "more complex, demonstrate[d] greater intricacy, [and] demonstrate[d] greater planning than a routine" fraud.  *United States v. Lewis,* 93 F.3d 1075, 1080 (2d Cir. 1996). Among other things, the defendant orchestrated a sham regarding the purported sale of Magnises to Saddleback Media, a fictitious company, for $40 million, and engaged two large and reputable law firms to prepare transactional documents to unwittingly "paper" the fictitious deal. (PSR ¶¶ 31, 78).  The fake Magnises acquisition was part of McFarland's plan to deceive investors and potential investors into believing that McFarland was a successful entrepreneur with substantial assets. (*Id.*).

Pursuant to U.S.S.G. § 3C1.3, because the statutory sentencing enhancement under 18 U.S.C. § 3147 applies, 3 levels are added.

---

[2]  The creation and use of false documentation often constitutes "sophisticated means." *See United States v. Valente*, 688 Fed.Appx. 76, 80 (2d Cir. 2017) (fabrication of false documents relating to status of funds taken from victims constituted sophisticated means); *United States v. Stitsky,* 536 Fed.Appx. 98, 112 (2d Cir. 2013) (creation and dissemination of marketing materials containing material misrepresentations factor that led to application of sophisticated means enhancement); *United States v. Regensberg*, 381 Fed.Appx. 60, 62 (2d Cir. 2010) (creation of fake loan documents and fraudulent earnings statements*); United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005) (creation of false bank documents, appraisals, and blueprints).

**B.**     **McFarland Has Not Clearly Demonstrated Acceptance of Responsibility**

The Probation Office takes the position that pursuant to U.S.S.G. §§ 3E1.1(a) and

3E1.1(b), no levels should be subtracted for acceptance of responsibility because McFarland's

continuance of his criminal conduct while he was on pretrial release and after his guilty plea

demonstrates that he has not clearly demonstrated acceptance of responsibility for the offense.

(PSR ¶ 84).  Although the parties had stipulated in the plea agreement that three levels would be

subtracted for the defendant's acceptance of responsibility for the offense conduct and timely

guilty plea, the defendant's conduct subsequent to his guilty plea and prior to his sentence has

not clearly demonstrated acceptance of responsibility to the satisfaction of the Government.

Accordingly, the Government opposes any reduction in the defendant's offense level for

acceptance of responsibility.

Attached as Exhibit B to the defendant's September 21, 2018 sentencing memorandum is

an August 20, 2018 report prepared by forensic psychiatrist Dr. Andrew Levin following his

evaluation of the defendant (the "Levin Rep.").  The defendant is reported to have made the

following statements to Dr. Levin regarding his involvement in the NYC VIP Access ticket fraud

scheme:

> Mr. McFarland recalled that he became mobilized at the end of the year because he felt
> an obligation to investors. He did not recall feeling irritable or tense. In an effort to raise
> money, he worked with his celebrity contacts and former team to develop the ticket
> selling venture. He recounted that he would obtain a few tickets for a special event and
> then attempt to obtain additional tickets which he could sell to customers. Mr. McFarland
> acknowledged that the system for acquiring and then selling tickets was "disorganized
> and sloppy." As a result, he frequently promised tickets that he was unable to deliver. He
> recalled that he was hoping to create a system that would create a cash flow permitting
> him to pay back investors. ***He did not feel that what he did was wrong*** but admitted that
> he hid his involvement in the ticket venture because his reputation had been tarnished by
> the festival.

(Levin Rep. at 8) (emphasis added).

Although the defendant acknowledges that he was unable to deliver promised tickets to customers, he omits the most critical fact in his account to Dr. Levin: he offered to sell tickets to customers with the intent to defraud them.  McFarland gives Dr. Levin the deliberate misimpression that his failure to provide tickets to NYC VIP Access customers was due to his "disorganized and sloppy" system.  (*Id.*).  Not only is McFarland's statement that "he did not feel that what he did was wrong" inconsistent with his guilty plea before this Court, it is a transparent attempt to minimize his culpability in order to obtain a psychological diagnosis that would support his bid for leniency at sentencing.  (*Id.*).  Indeed, the defendant followed the same misguided approach during the McFarland Proffer when he falsely stated that "he did not think he would defraud customers from his prior businesses, Magnises and Fyre Festival, when he solicited them to buy tickets for NYC VIP Access."  (PSR ¶ 54).  Importantly, the defendant admitted the falsity of that statement during his guilty plea to making false statements to a federal law enforcement agent in this Court.  The defendant's statements to Dr. Levin manifest his failure to accept responsibility for his criminal conduct at NYC VIP Access.  Thus, because the defendant has not clearly demonstrated that he has accepted responsibility to the satisfaction of the Government, the Government opposes any reduction to his offense level on that basis.[3]

In accordance with the foregoing calculations, the applicable offense level is 33 pursuant to the stipulated Guidelines range in the plea agreement, and 36 pursuant to the calculation of the Probation Office and the Government.

---

[3] On October 2, 2018, the Government raised this issue with Mr. Jackson and Ms. Chesley.  The Government stated that it would not oppose applying acceptance of responsibility credit to the defendant's Guidelines calculation so long as defense counsel withdrew the Levin Report from its submission, filed an amended sentencing submission removing references to the Levin Report, and agreed not to deny, through the defendant or counsel, the defendant's intent to defraud NYC VIP Access customers or the wrongfulness of his conduct.  Defense counsel declined the Government's proposal, and stated that it was not fair or appropriate.

C.       **Criminal History**

The defendant has 1 criminal history point for his wire fraud convictions entered on

March 6, 2018, and the defendant's Criminal History Category is I.  (PSR ¶¶ 87-89).

D.       **Guidelines Range**

Pursuant to the plea agreement, the resulting Guidelines range is therefore 135 to 168

months' imprisonment.  Pursuant to the calculations of the Probation Office and the

Government, the resulting Guidelines range is 188 to 235 months' imprisonment.

III.    **The Court Should Impose a Guidelines Sentence**

McFarland asks the Court to impose a sentence significantly below the Guidelines range.

(September 2018 Def. Mem. at 1, 2).  The defendant makes three principal arguments.  First, the

defendant argues that the nature of the offense does not warrant a Guidelines sentence because

the defendant did not pocket $26 million, but rather, made a genuine effort to use the money on a

flawed business plan. (June 2018 Def. Mem. at 2).  Second, the defendant argues that his history

and characteristics justify a sentence considerably below the Guidelines due to the defendant's

good heart and charitable acts, young age and untreated mental illness.  (*Id.* at 3; September 2018

Def. Mem. at 1-2, 4-8, 9-11).  Finally, the defendant argues that his timely guilty pleas, court-

ordered restitution and the public derision surrounding the Festival justify a sentence

substantially below the Guidelines range.  (June 2018 Def. Mem. at 3-4; September 2018 Def.

Mem. at 8-9).  None of these arguments suggests that a sentence substantially below the

Guidelines is appropriate in this case.  To the contrary, the Government believes that a

Guidelines sentence is entirely warranted based on McFarland's blatant and deliberate multiple

fraud schemes from which he personally profited and caused substantial harm to many victims

over the course of several years.  In addition, McFarland's history of defrauding victims over the

course of several years, his serious criminal conduct while on pretrial release, and his obstructive

22

conduct designed to conceal his illegal activities from the Government justify a Guidelines sentence. Indeed, McFarland's actions demonstrate a lack of remorse and acceptance of responsibility. Lastly, in the unique circumstances of this case, there is a heightened need for specific deterrence for this defendant, whose propensity to commit crimes is extraordinary, and to protect the public from his scams.

### A.    The Nature and Circumstances of McFarland's Offenses Are Egregious

For the past five years, the defendant has been the consummate con artist. The defendant's actions reveal a profoundly greedy, self-absorbed man focused exclusively on himself. He betrayed and deceived his investors, customers, and employees while he was living the high life at his luxury apartment, traveling to exclusive locales, staying at luxury hotels, being chauffeured in his Maserati, and entertaining himself and his friends at restaurants, bars, and casinos. Whenever he needed more money, he lied to investors to get it. Whenever he wanted more money, he gave it to himself from business accounts. Whenever one scheme began to falter, he hatched a newer and more elaborate one. Beginning in 2013, McFarland's lies defrauded numerous Magnises investors of approximately $3 million. (PSR ¶ 59). But that wasn't enough. McFarland's lies got bolder and the amount he obtained from his investors got bigger. With Fyre Media in 2016 and Fyre Festival in 2017, McFarland's lies about the rapid growth and incredible financial success of the Fyre companies led roughly 80 investors to lose over $24 million.

Neither the public ridicule surrounding the Festival's failure nor his own arrest deterred McFarland from running yet another scam. Determined to continue living the extravagant lifestyle to which he had become accustomed, in 2017, McFarland launched a fake ticket-selling scheme to generate cash quickly over the course of several months. Determined not to get caught, he found young and naïve employees to interact with customers, accept ticket sale

proceeds into their bank accounts, and provide McFarland with cash. McFarland's arrangement allowed him to run the business and keep the money he stole from customers. In the McFarland Proffer, McFarland stated that he had blown through $50,000 in cash that he had reported having to the Probation Office just two months earlier. NYC VIP Access ticket sale payments suggest that by early 2018, McFarland had already swindled over 30 customers of over $100,000. It is plain that McFarland did not learn his lesson from his first guilty plea. The only thing McFarland learned was how to try to conceal his role in NYC VIP Access in order to have plausible deniability if law enforcement should ever inquire about the company's activities.

One would expect that after he was arrested the second time in June 2018, McFarland would have been chastened. He was not. McFarland sought and received an audience with the Government, and proceeded to lie repeatedly for hours. And his lies were not designed simply to exculpate himself; his lies were designed to pin the blame on Employee-1, whom McFarland knew was listed on documents and had conversations with customers. One also would expect that after having pled guilty to new fraud charges and a charge for making false statements in July 2018, McFarland would have been chastened. He was not. In August 2018, McFarland told a forensic psychologist that he did not believe he had done anything wrong with respect to NYC VIP Access. (Levin Rep. at 8). After being convicted for committing new and serious criminal conduct, McFarland still had the audacity to lie about it.

McFarland's egregious criminal conduct separates him from other run-of-the-mill fraud schemes. He is the sole criminal mastermind who ran sophisticated fraudulent schemes for three companies over the course of several years. McFarland's schemes inflicted huge losses of over $26 million to over 100 victims. And even when he was caught, he persisted in telling blatant

lies to try to cover up his wrongdoing.  For all these reasons, the nature and circumstances of McFarland's criminal conduct warrants a Guidelines sentence.

### 1.   McFarland Intended to Defraud Fyre Investors from the Outset

McFarland cannot plausibly claim that he lied to Fyre investors and took their money only after becoming overwhelmed with the rising costs and difficulties of the Festival, and only with the good intention of executing the Festival to repay investors. (June 2018 Def. Mem. at 13; *see also* PSR ¶ 70).[4]  McFarland began making material misrepresentations to investors about Fyre Media's financials shortly after Fyre Media was launched in May 2016, and well before the Festival was announced on December 12, 2016.  For example, according to one victim, in July 2016, McFarland told an investor that Fyre had a $2M-$3M net profit/month, knowing those numbers to be false and knowing that the investor would share that information with other potential investors who relied upon it in making their investments.  On August 1, 2016, McFarland falsely told Fyre investors that Fyre represented "400 of the biggest names in music, sports, and entertainment." (*See* Email from McFarland to investors, dated August 1, 2016, attached hereto as Exhibit B).  That same day, McFarland falsely told another investor that Fyre Media had "$2.5mm in accepted offers!" (*See* Email from McFarland to investor, dated August 1, 2016, attached hereto as Exhibit C).  In truth and in fact, as of August 1, 2016, Fyre had

---

[4]  McFarland stated that he lost approximately $2 million of his own money to the Festival. (PSR ¶ 117).  This does not appear to be the case.  According to McFarland, he made an annual salary of $60,000 from 2011-2015 at Spling, an annual salary of $100,000 from 2012-2017 at Magnises, and no annual salary at Fyre. (PSR ¶¶ 117-119).  Based on his salary, McFarland did not have had the personal funds to make such an investment in the Festival. McFarland also claimed to have retained a 35% share in Magnises, which he reported had peaked at approximately $6 million in revenue, but that was not true. (PSR ¶ 61, 118).  Based on the sources of funds in McFarland's personal bank account, which contained commingled funds with the Fyre and Magnises business bank accounts, it does not appear that McFarland had $2 million in personal funds to invest in the Festival.  Rather, the expenses that were paid for the Festival from McFarland's personal bank account were paid with commingled funds that derived from the Fyre business bank account and Fyre investors and customers.

$11,100 in accepted offers.  On November 8, 2016, McFarland sent an investor a deck falsely stating that: "[s]ince launching in May 2016, thousands of offers representing tens of millions of dollars of performances and appearances have been made and accepted with Fyre." (Victim Impact Statement of C.J.).  As stated above, these statements regarding the total number of offers and their value were false. (PSR ¶ 20).  In sum, McFarland's fraud on the Fyre investors was never well-intentioned; rather, it was a deliberate plan to deceive investors from the outset motivated by unadulterated greed.

### 2.  McFarland Was Motivated By Greed

McFarland used Fyre investors' money not solely for business purposes, as he argued in his submission (June 2018 Def. Mem. at 18-19, 28), but also to support his lavish spending on himself.  From May 2016 to April 2017, McFarland's personal bank account received over $17 million from various sources, including approximately $13.7 million from the Fyre business bank account, $2.3 million from investors and customers, and other smaller amounts from the Magnises business bank account, BZM Transportation (another of McFarland's companies) bank account, and other deposits and transfers.  From May 2016 to April 2017, although McFarland spent the majority of the money in his personal bank account (the majority of which was derived from Fyre investor money in the Fyre business account) on business expenses for the Festival and Magnises, it also appears that he spent approximately $600,000 – which is just the amount of money that could be accounted for from his personal bank account – on personal expenses, including luxury apartments, interior design and home furnishings, hotel stays, dining and entertainment, transportation, clothing and other miscellaneous expenses.[5]  *See* William

---

[5] Exhibit A represents a rough estimate of what appears to be McFarland's personal spending from May 2016 to April 2017, based on the Government's review of expenses in William McFarland's personal bank account statements.  Based on the Government's review of statements from McFarland's personal bank account and Fyre and Magnises business bank

McFarland Bank Account Personal Expenses Chart, attached hereto as Exhibit A.  In 2016,

McFarland paid approximately $8,000 in monthly rent for his luxury apartment in Manhattan.

(PSR ¶ 104; Ex. A(1)).  In early 2017 – at the same time when McFarland was aggressively

soliciting investments for the Festival – McFarland upgraded to a three-bedroom penthouse

apartment with approximately $21,000 in monthly rent. (*Id.*).  McFarland spent nearly $115,000

on rent for his luxury apartments from May 2016 to April 2017.  (*Id.*).  In addition, it appears

that McFarland spent roughly $215,000 on furniture and interior design expenses. (Ex. A(2)).

Among the places he travelled to – just during the time he was defrauding Fyre investors in 2016

and 2017 – were Atlantic City, Las Vegas, Beverly Hills, Orlando, and the Hamptons, and

McFarland spent approximately $62,000 on luxury hotel stays in these locations. (Ex. A(3).)

McFarland's extravagant spending also included the following estimated personal expenses: (i)

$46,000 on fine dining at expensive restaurants and entertainment in exclusive clubs in

Manhattan (Ex. (A)(4)); $64,000 in transportation costs to include payments on the defendant's

Maserati, car service, and yacht charters in the Hamptons (Ex. A(5)); $41,000 for high-end

clothing (Ex. A(6)); and $87,000 for miscellaneous personal expenses (Ex A(7)).  Although

McFarland noted that he derived no salary from Fyre Media or the Fyre Festival, (June 2018 Def.

Mem. at 10), he did not need a salary because he used the funds from Fyre investors and

---

accounts, as well as discussions with the defendant's accountant and the defendant's employees,
the Government learned that the defendant's personal bank account consists of commingled
funds from his Fyre and Magnises business bank accounts, as well as other sources. Given that
charges to many of the same luxury hotels and expensive restaurants that McFarland frequented
appear on the defendant's personal bank account as well as the Fyre and Magnises business bank
accounts, it seems likely that there are additional expenses in the Fyre and Magnises business
bank accounts that are personal in nature as well, but are not counted in the attached charts. (Ex.
A.)  It is also possible that certain of the charges that are listed as personal expenses on Exhibit A
were business expenses.  That said, it is evident that at least a number of the expenses from the
McFarland personal bank account listed on Exhibit A are personal in nature, such as
McFarland's rent payments.  (*See* Ex. A(1)).

customers, among others, as his own personal piggy bank, from which he withdrew substantial funds for personal use on a regular basis. (*See* Ex. A.)

McFarland wanted to have access to enough cash to continue his extravagant lifestyle while on pretrial release.  To that end, McFarland charged $3,622.98 to the Employee-1 Bank Account for his stay at the Dominick Hotel in Manhattan in December 2017.  McFarland also charged $4,240.60 to the Employee-1 Bank Account for his stay at the Sixty LES Hotel in Manhattan in December 2017 and January 2018, and $205.41 for a meal at the upscale Chinese restaurant Jue Lan Club in January 2018.  One wonders just how McFarland spent $50,000 in the course of just two months.  He did not spend it on lodging, as McFarland resided with a friend at his Manhattan townhouse worth approximately $31 million free of cost. (PSR ¶ 102, 103.)  And McFarland did not spend the money on restitution to the victims of the Fyre investment fraud, Fyre ticket vendor fraud or the NYC VIP Access ticket fraud.

### 3.      The Defendant's Frauds Caused Material Harm to Many Victims

McFarland stated that "it is important to note that nearly all of the investors were sophisticated individuals who understood the enormous risks of this type of investment and were not financially ruined by their losses." (June 2018 Def. Mem. at 28).  The suggestion that any of the Fyre investors somehow assumed the risk that McFarland was lying to them is absurd.  As one victim said, "I am careful with my money and never thought someone could be so greedy, cold and manipulative as William McFarland."  (Victim Impact Statement of J.D.).  Furthermore, as stipulated in the plea agreement and described *supra* at 19, McFarland used sophisticated means to successfully manipulate many victims.

Considering McFarland's extravagant personal spending using Fyre investors' money, McFarland's claim that he should receive a more lenient sentence because Fyre investors were "not financially ruined by their losses" is all the more galling.  (June 2018 Mem. at 28).  As is

demonstrated by the powerful victim impact statements that have been submitted in this case, a

victim need not be financially ruined to have suffered a serious financial, emotional and

reputational harm as a result of criminal conduct.  Victim N.J. clearly articulated the damage that

McFarland's actions have inflicted on both Victim N.J. and Victim N.J.'s dependent family

members:

> The money I have invested is money that would put my brother through University and make sure my grandmother's medical expenses are paid for…. Due to Mr. McFarland's recklessness and greed, I am emotionally distraught and have no remedies to mend this severe financial wound.  This predicament has been a major set back financially in a lot of areas in my life as I am supporting my family overseas, putting my younger brother through college and paying medical expenses for my sick elderly grandmother who is also living overseas.  The damage that Mr. McFarland has caused due to his greedy, selfish, opportunistic ways has been very detrimental to me both emotionally and financially as an individual.

(Victim Impact Statement of N.J.).  Similarly, Victim J.N. explained how McFarland's lies have

wiped out his life savings and have forced him to delay retirement:

> [Mr. McFarland] has proven he is [an] extremely skilled and convincing liar and forger who has financially ruined my wife and I.  It took more over 20 years of saving my "Lunch Money" and invest it all $180,000.00 in this disaster.  I will never be able to replace this money that I fear to be lost forever.  Both my wife and I are in our late 50's now and Mr. McFarland has single handedly made it that I will not be able to retire until I am way into my 70's.

(Victim Impact Statement of J.N.).

The fact that McFarland committed additional serious criminal conduct while on pretrial

release in blatant disregard for this Court and the Probation Office is deeply troubling, but even

more so is the fact that McFarland chose to once again target his prior victims.  Indeed, Victim

J.S. vividly described the financial, emotional and reputational harm caused by being scammed

repeatedly by McFarland, including the loss of credibility and embarrassment among family,

friends and business contacts whom Victim J.S. had involved:

> The first case of fraudulent activity involved my purchase of a $4000 cabana package for the 2017 Fyre Festival set to take place in the Exumas, Bahamas. I purchased a cabana to host 7 of my friends and family members only to find out the day of that this was a complete scam and the golden promised luxury vacation and music festival was to be a bare nightmare and almost a case of survival on a barren island with little to no food, electricity, power and help of any kind….I have lost the trust and comfortability factor with friends and family of whom I invited to the festival because of this scam that took time, money and resources out of them. I also told numerous friends how I am going to the Met Gala and I lost priceless credibility with business contacts, friends and family since I got scammed and never ended up going.

(Victim Impact Statement of J.S.). McFarland's targeting of the same set of victims in connection with his different companies' fraud scams is truly reprehensible; it is an aggravating factor that separates this case from other fraud cases, and justifies a Guidelines sentence.

**B.     McFarland's History and Characteristics Also Show that a Guidelines Sentence Is Warranted in this Case**

**1.      McFarland Had a Privileged Upbringing**

The defendant is fortunate to have been raised by two loving parents in an intact and close-knit family. (PSR ¶¶ 94, 95, 98). The defendant has a close relationship with his family, as well as supportive relationships with his extended relatives. (PSR ¶¶ 95, 96). McFarland had many opportunities to succeed having been raised in upper-middle class economic circumstances in an affluent suburb in New Jersey. (PSR ¶ 97). He stated that he "never wanted for anything," and had a "great childhood that consisted of quality family time." (*Id.*). McFarland was privileged to attend a private high school, and had the opportunity to attend a private university, but dropped out in his first year. (PSR ¶¶ 114, 115). The fact that the defendant had such a strong upbringing and opportunities available to him makes his serial fraudster pattern and lack of regard for his victims even more disconcerting.

**2.      McFarland Lacks Remorse and Regard for Others**

It is difficult to credit McFarland's claims of charitable work in light of how he mistreated the victims of his numerous fraud schemes, as well as his own employees. In a letter

written to the defendant by a group of Fyre employees in the aftermath of the Festival,

employees stated that they had "stuck it out through no payroll, no equipment, no leadership

support, the loss of [their] CTO, and no ability to continue growing the team - all because [they]

believe in Fyre and the platform." (*See* Letter from Fyre employees to McFarland, attached

hereto as Exhibit D).  The employees made the following reasonable demands:

> This company needs to be made honest. Clear budgets. Legitimate paychecks.
> Paystubs. Health Insurance. Taxes on time. The bonuses promised to all of us in
> our contracts. Stopping on grossly unnecessary spending (private planes, $30k on
> speakers) when new members can't even get laptops. This all must be in place by
> the end of May.

(Ex. D).  The fact that Fyre employees were not being paid while McFarland was engaging in

exorbitant spending shows a complete and utter disregard for others.  It is striking that despite

the Festival debacle, a number of Fyre employees were still willing to try to make Fyre work due

to their commitment to the application.  Had McFarland simply focused on working with his

team on that project and been patient, it might have had some success.  The employees also

wrote:

> Why was there an immediate commitment to put on another festival next year
> before there was a proper logistics, financial, and team-wide discussion? This
> public statement lands as foolish, tone-deaf, and above all, concerning to the
> product team who has thus far seen no positive outcomes from this endeavor.

(Ex. D).  McFarland's commitment to put on another festival without consulting anyone shows

his lack of respect for his employees.  It also shows that McFarland was far more interested in

the fame and notoriety generated by the Festival than he was in paying back investors and his

employees.  Indeed, McFarland's attempts to justify his criminal conduct as a result of his youth,

enthusiasm, and inexperience fail, as McFarland's employees were the same age or younger than

he was, and yet they clearly recognized that McFarland had not been acting with integrity. (June

2018 Mem. at 1, 19).

**3.      The Court Should Reject the Defendant's Meritless Attempt to Blame His Criminal Conduct on a Recently Discovered Psychological Diagnosis**

McFarland argues that "[n]othing in this case speaks to any malicious intent on his part, just a sea of bad judgment, poor decisions, and the type of core instability that can only be explained by mental illness." (September 2018 Def. Mem. at 10-11). And yet, no explanation of the defendant's mental illness was provided in the defendant's first sentencing submission and accompanying exhibits. The defendant's first sentencing submission and exhibits also made no mention of the manic episodes that allegedly occurred during the defendant's formative years, the years he defrauded Fyre investors, and the time period after his guilty plea; these manic episodes are now described in detail in his second sentencing submission and cited as the reason for his criminal conduct. Nor was any such information presented to the Probation Office in the preparation of the presentence report. For example, the defendant reported to the Probation Office that he was "intoxicated a few times while he was in college but disclaimed ever having any issues," (PSR ¶ 112). And yet, Dr. Cheryl Paradis observed that the defendant's "behavior has been at least in part fueled by a substantial pattern of severe alcohol abuse, perhaps as a form of self-medication….." (Paradis Rep. at 10, 20). As described below, there are several instances in which it appears that an inaccurate or incomplete recitation of facts was provided to Dr. Paradis and Dr. Levin as a basis for their diagnoses.

Dr. Paradis notes that the instant offense was of the limited duration of nine months to a year (2016, 2017), and that the defendant was very successful in business prior to that time, during which he did not display the typical behaviors of psychopathy that include pathological lying, conning or manipulative behaviors, callousness or lack of empathy, among others. (Paradis Rep. at 16, 20). That is incorrect. The defendant pled guilty to defrauding Fyre investors in 2016 and 2017, defrauding a ticket vendor in 2017, defrauding NYC VIP Access

customers in 2017 and 2018, defrauding a bank in 2018, and making false statements to a federal law enforcement agent in 2018.  The defendant's charged conduct was not of a limited duration; it spanned at least three years (and more if one considers the defendant's manipulative behavior with Magnises).  Thus, Dr. Paradis's conclusion that the defendant did not display the typical behaviors of psychopathy cannot be credited given her misunderstanding of the facts.

Both Dr. Paradis and Dr. Levin appear to base their diagnoses of the defendant on inaccurate understandings of the defendant's conduct that are belied by the evidence.  (*See* Paradis Rep. at 13; Levin Rep. at 10, 11, 12.)  With respect to the defendant's fraud on Fyre investors, the defendant was neither impulsive nor disorganized.  Rather, he engaged in a calculated plan to misrepresent Fyre's success with falsified financial documents and promotional materials.  Nor is McFarland's misrepresentation of his assets to engender the trust of investors analogous to a child's tendency to lie to cover up his disorganization and activities as is typical for individuals with ADHD, as strangely posited by Dr. Levin.  (Levin Rep. at 10-11).  Nor were the defendant's misrepresentations to Fyre investors based on his unrealistic belief about the Festival's success.  (Levin Rep. at 10, 12).  As stated above, the defendant lied to Fyre investors from the outset, well before the Festival was announced in December 2016 or planning had begun in January 2017.  *See supra* at 25-26.  Indeed, according to one Fyre employee, the understanding at Fyre Media was that the Festival would be operating at a loss for the first year.

As described *supra* at 20-21, the defendant's statements about NYC VIP Access in which he makes no mention of an intent to defraud customers and states he did not do anything wrong

manifest his failure to accept responsibility.[6]  Dr. Levin also incorrectly states that McFarland is

not antisocial because he did not use the Fyre investors' funds for his own gain.  (Levin Rep. at

7-9, 10-11).  As described *supra* at 26-28, McFarland did use investor funds for his own gain.

Dr. Levin also stated that McFarland had "approximately $2 million which he contributed

towards the restitution, but otherwise had spent all the investors' money on the failed

arrangements." (Levin Rep. at 7).  The Government has seen no evidence of the defendant's

payment of restitution to investors from funds that personally belonged to McFarland.  (*See* Ex.

A). In fact, the Probation Office noted that although the defendant stated his desire to make

restitution, he has not done so. (PSR, p. 25).[7]

### C.   There is a Heightened Need for Specific Deterrence in This Case

In this case, there is a great need for specific deterrence, and greater than it usually is for

defendants with none or little criminal history.  McFarland was not deterred by his arrest in his

first case.  Instead, he brazenly dreamed up a new scheme targeting the same victims.  After he

found out he was being investigated by law enforcement for new criminal conduct, he told

witnesses not to speak to the FBI.  And after he was arrested, and with his counsel present, he

made numerous material false statements to the Government about his new criminal conduct in

---

[6] McFarland's parents told Dr. Levin that McFarland "went to great lengths to deliver, albeit unsuccessfully, the promised tickets, e.g., waiting for hours to meet with event organizers to persuade them to provide tickets." (Levin Rep at 8).  Considering that the defendant's parents also stated that the defendant "did not share with them that he developed the ticket selling venture," (*id.*), they do not appear to have been in a position to have firsthand knowledge of defendant's purported efforts to obtain tickets.

[7]  It bears noting that at the McFarland Proffer, McFarland stated that the sale of Fyre Festival merchandise in late May 2018 was McFarland's idea, but McFarland instructed his associate (the "Associate") to publicly deny McFarland's association with the sale.  According to McFarland, the sale lost approximately $300 due to the Associate's need to pay the venue that held the sale.  Of course, because McFarland hid his involvement with this sale from the Government, the Government will never know if he made a profit or what he did with it.

an effort to convince the Government that he was innocent, and that someone else was solely to blame.  Even after his guilty plea to this new criminal conduct, the defendant claimed he did nothing wrong in an effort to generate a favorable report from an evaluating psychiatrist. (Levin Rep. at 8).  So far, the criminal justice system has utterly failed to get the defendant's attention. The sentence imposed in this case must be long enough to deter the defendant from engaging in criminal conduct again.  A Guidelines sentence is warranted.

As for general deterrence, the defendant was a CEO of several companies.  He was entrusted with the responsibility to protect his investors' funds.  Rather than do that, he pilfered their funds so that he could sustain his lavish lifestyle.  He did this over the course of several years.  Accordingly, a Guidelines sentence is necessary to ensure that others in similar positions of responsibility recognize the importance of their obligations and are deterred from using money they intend to safeguard for their own benefit.

### D.     There is a Need to Protect the Public from McFarland

On September 27, 2018, Judge Seibel sentenced defendant Michael Scronic, a 46 year-old former hedge fund manager with a Guidelines range of 121-151 months' imprisonment, to 96 months' imprisonment in connection with his scheme to defraud the fund's 45 investors of more than $22 million over a seven-year period.  *See United States v. Michael Scronic*, 18 Cr. 43 (CS).[8]  The *Scronic* case is similar to McFarland's case in several respects.  Scronic lied by telling investors that his fund had positive returns when it did not.  Both Scronic and McFarland used sophisticated means to cause comparable losses to victims.  They both inflated the financial success of their businesses in order to secure investments from many victims.  Like Scronic, McFarland used investor money to pay for hundreds of thousands of dollars in personal

---

[8] The Probation Office has recommended a sentence of 96 months' imprisonment for McFarland. (PSR ¶¶ 35, 39).

expenses.  Both Scronic and McFarland counted their mothers, family friends and friends among the victims they betrayed, and caused serious anguish to their victims, many of whom were not living the lavish lifestyles they were.  Both defendants had every advantage in life, with supportive families and intellectual gifts that afforded them many options.

Although Scronic is older and more experienced than McFarland, McFarland's conduct was worse in several respects, as he engaged in multiple frauds that targeted many of the same victims more than once, causing them to feel a deep sense of betrayal. (*See* Victim Impact Statement of N.J.; Victim Impact Statement of J.S.).  The fact that McFarland continued his criminal and obstructive conduct while on pretrial release also makes his conduct more serious than Scronic's and justifying a harsher sentence.  McFarland's actions show that were he to be released from prison any time soon, he would be a clear and present danger to commit the very same crime again.  The need to protect the public from McFarland's next scam also warrants a Guidelines sentence.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a Guidelines sentence of imprisonment in this case.

Dated:      New York, New York
             October 3, 2018

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney


                           By:    /s/ Kristy J. Greenberg
                                  Kristy J. Greenberg
                                  Assistant United States Attorney
                           Tel.:  (212) 637-2469