Iabnmcfs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          17 Cr. 600 (NRB)

 5   WILLIAM McFARLAND,

 6               Defendant.                Sentence

 7   ------------------------------x

 8                                    New York, New York
                                      October 11, 2018
 9                                    11:05 a.m.

10
     Before:
11
                   HON. NAOMI REICE BUCHWALD,
12
                                      District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  KRISTY GREENBERG
17        Assistant United States Attorney

18   RANDALL JACKSON
     KAREN CHESLEY
19        Attorneys for Defendant

20   ALSO PRESENT:

21   FBI Special Agent Brandon Racz

22

23

24

25
```

Iabnmcfs

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Is the government present and

 3    ready?

 4              MS. GREENBERG:  Yes, your Honor.

 5              Kristy Greenberg, for the government.  With me at

 6    counsel table is FBI Special Agent Brandon Racz.

 7              Good morning.

 8              THE DEPUTY CLERK:  Is the defendant present and ready

 9    to proceed?

10              MR. JACKSON:  Yes.  Good morning, your Honor.  Randall

11    Jackson and Karen Chesley, for the defendant, William

12    McFarland.

13              THE COURT:  All right.

14              Let me begin, as I always do, by ensuring that I have

15    received the documents that I should have in connection with

16    the sentence.

17              First, there's the revised final presentence report,

18    dated September 6, 2018.

19              So I don't forget, let me confirm that both parties

20    have received the PSR.

21              MR. JACKSON:  Yes, we have, your Honor.

22              Thank you.

23              MS. GREENBERG:  Yes, your Honor.

24              THE COURT:  Are there any objections to it?

25              MR. JACKSON:  No, your Honor.
```

Iabnmcfs

| | |
|---|---|
| 1 | MS. GREENBERG:  No, your Honor. |
| 2 | THE COURT:  All right. |
| 3 | Then we have the defendant's first sentencing |
| 4 | submission concerning the initial charges, which is filed June |
| 5 | 6, 2018, and includes as Exhibit A letters in support of |
| 6 | Mr. McFarland. |
| 7 | There is also a second sentencing submission from the |
| 8 | defendant dated September 21, 2018.  Exhibit A to that |
| 9 | submission is the report of Dr. Paradis, a psychologist; and |
| 10 | Exhibit B is the report of a forensic psychiatrist, Dr. Levin. |
| 11 | Then there's the government's submission of October 3 |
| 12 | with Exhibits A to D. |
| 13 | And then there are, if our count is correct, six |
| 14 | victim impact statements. |
| 15 | Next, there's the defendant's letter of October 5 with |
| 16 | exhibits, and finally defendant's letter of October 8, which |
| 17 | includes as an exhibit a second letter or a letter from |
| 18 | Dr. Levin. |
| 19 | Are there any other documents I should have received |
| 20 | in connection with the sentence? |
| 21 | MS. GREENBERG:  No, your Honor. |
| 22 | MR. JACKSON:  No, your Honor. |
| 23 | THE COURT:  I have a threshold matter that I would |
| 24 | like to raise. |
| 25 | Does the defendant wish to pursue its objections to |

Iabnmcfs

1    the government's challenge to Mr. McFarland's assertion that he

2    invested $2 million of his own money in the Fyre Festival.

3            And, further, does the defendant wish to pursue a

4    challenge to the government's position that Mr. McFarland used

5    investor funds to live an extravagant personal lifestyle?

6            If the defendant wishes to pursue either of those

7    matters, the Court is open to holding a *Fatico* hearing.

8            MR. JACKSON:  So, your Honor, with regard to the

9    second assertion on the part of the government, that

10   Mr. McFarland used investor money to live an extravagant

11   lifestyle --

12           THE COURT:  Leave aside the adjective "extravagant,"

13   although it might be appropriate.  But just did he utilize

14   investor money for his personal living expenses?

15           MR. JACKSON:  So, your Honor, we don't contest the

16   fact that Mr. McFarland used money that came in, at least some

17   money that came in for personal uses.  However, a large portion

18   of the money that Mr. McFarland used was money that was his.

19   Our only contention, your Honor, is that the government's

20   submission in this context doesn't delineate between money that

21   was actually Mr. McFarland's and any investor money that came

22   in.

23           Our only real quibble with it is that we think it's

24   overstating the reality of the situation.  There was a

25   significant amount of money that Mr. McFarland made through his

Iabnmcfs

1    consulting projects and various projects that he had and it was

2    hopelessly commingled with investor funds.  It is a mistake

3    that he made.

4         So we're not quibbling with the fact that investor

5    money ended up being part of the mix of money that

6    Mr. McFarland utilized.  I think his business activities

7    intersected very significantly with his personal activities,

8    because, frankly, he was taking artists out, he was taking

9    people out that were connected with the business.  So it's the

10   fact we are not quibbling with on the second part, but it is a

11   the implication of that we are quibbling with.  So we don't

12   think a *Fatico* hearing is necessary at all on the second issue.

13        THE COURT:  Understand that in the absence of a

14   hearing that this position that Mr. McFarland improperly used

15   investor money for his personal living expenses is going to be

16   a factor in my sentencing evaluation.

17        MR. JACKSON:  Yes, your Honor.

18        THE COURT:  OK.  What about the $2 million?

19        MR. JACKSON:  So, your Honor, with regard to the $2

20   million, we do believe that Mr. McFarland had significant

21   amount of money, approximately $2 million that was lost of his

22   own money that went into the festival.  By the government's own

23   admission, by the government's own admission, the record does

24   not undermine that.  What they've said is that a number of

25   things appear to be personal expenses that are potentially

Iabnmcfs

1    listed as business expenses.  But the records that they're

2    looking at are opaque as to how much money Mr. McFarland

3    actually lost in this business venture.

4              So we are not asking for a *Fatico* hearing, your Honor,

5    but we just don't think that what they have submitted meets the

6    standard in terms of a determination of --

7              THE COURT:  You've made the assertion, and it seems to

8    me if you're making the assertion it's your burden to prove

9    that it's true.

10             Here's why I think you might have some trouble.  The

11   PSR contains the tax returns of Mr. McFarland for the years

12   2014 and 2015.  And the 2014 return says that his adjusted

13   gross income was $9,728, and in 2015, his adjusted gross income

14   was $72,852, and there were no tax returns filed for 2016 or

15   2017.

16             There is a disconnect between reporting approximately

17   $10,000 and approximately $73,000 in the two years running up

18   to the Fyre Festival and then claiming that you put in $2

19   million of your own money.

20             In addition, even if you consider -- although they

21   don't seem to be reflected in his tax returns -- his claims of

22   moneys earned on a weekly basis from Fyre Media, Magnises,

23   Spling, the math doesn't add up to having $2 million in the

24   bank, given the reality of the lifestyle that he was leading,

25   just his expenses.

Iabnmcfs

1    So I really have a problem with your assertion that he

2    lost $2 million of his own money.  If that is something that

3    you really believe you could establish, then I want to give you

4    the chance.  If not, I am going to discount that assertion.

5    MR. JACKSON:  Your Honor, may I have one moment to

6    confer?

7    THE COURT:  Sure.

8    (Defense counsel conferred with the defendant)

9    MR. JACKSON:  Your Honor, I don't want to certainly

10   delay the proceedings at all.  I do think, your Honor, that the

11   bank records that the government produced to us, Mr. McFarland

12   accounts show, just in 2016, several different wires that came

13   in in significant amounts, thousands of dollars, adding up to

14   over $1.6 million in consulting income that came to him that

15   was completely separate from the Fyre investments.

16   We could walk the Court through, I think we could walk

17   the Court through some of the wires that came in under Stripe

18   that are related to that, but it might be helpful, your Honor,

19   if we took just a very short five-minute break for me to confer

20   with the government about that and see if there's something we

21   can discuss in terms of that.

22   THE COURT:  All right.  Could we agree that he never

23   paid taxes on that, even assuming that that is not investor

24   funds?

25   MR. JACKSON:  I agree, your Honor.  I think in 2016

Iabnmcfs

1   the -- this is what I am talking about, is all 2016 income.

2          By the time we get to 2017, when he would have paid

3   taxes on that, the entire picture of everything that happens is

4   so muddled.  I think that he does have an intention to attempt

5   to catch up on everything in terms of taxes, but this is not

6   the tax returns that your Honor was looking at earlier.  This

7   is 2016 income that is now part of a bigger, muddled

8   complicated tax picture related to 2016 and 2017.

9          THE COURT:  There may be also some issues about the

10  2014 and 2015.

11         MR. JACKSON:  I completely understand.

12         THE COURT:  That is simply inconsistent with what he

13  has otherwise claimed.

14         MR. JACKSON:  I understand, your Honor.

15         THE COURT:  You can take your break and talk to the

16  government.

17         MR. JACKSON:  Thank you.  Thank you, Judge.

18         (Recess)

19         THE COURT:  Yes, Mr. Jackson?

20         MR. JACKSON:  So, your Honor, we've conferred with the

21  government.  We've identified a number of -- identified for

22  them a number of wires that went to Mr. McFarland that we don't

23  believe were related to the festival, and in the discussion

24  that we have had with the government I think we agree that the

25  records here, the bank account, the records are so I think

Iabnmcfs

1   flawed and commingled that it would be difficult for us to

2   proceed in a way that would be helpful to the Court with a

3   *Fatico* hearing.

4           So we will withdraw the assertion of the $2 million.

5   All we would note, your Honor, is that Mr. McFarland did

6   receive an income, did receive some monies, but we can't

7   quantify the amount.

8           THE COURT:  Just to finish this up, his financial

9   affidavit to probation asserts that he still has over a million

10  eight in assets, $1,250,000 in art.  I don't think there's any

11  version of reality that supports the $2 million to the

12  festival, the $1.8 million he still had, and he told probation

13  that he made approximately $40,000 in cash monthly from his

14  freelance and consulting projects, but he typically netted

15  about $11,000.  So I think it's the right decision to withdraw

16  the assertion that he used $2 million of his own money in the

17  Fyre Festival.

18          MR. JACKSON:  We appreciate that, your Honor.

19          The one clarification that I will make, your Honor, is

20  that the assets that we are describing are largely what we say

21  are material assets.

22          THE COURT:  They are illiquid.

23          MR. JACKSON:  Largely illiquid.

24          THE COURT:  Not all of them.

25          MR. JACKSON:  Mr. McFarland agreed to forfeit those

Iabnmcfs

1    things, but also I think the approximation of the amount of

2    money that he was making for consulting in the PSR refers to

3    one period of time.  It doesn't refer to the entirety of this

4    time period.

5              THE COURT:  I can only go on what you told them.  OK.

6              MR. JACKSON:  Thank you.

7              THE COURT:  All right.  Another sort of preliminary

8    matter is the exchange between counsel after the sentencing

9    submissions were made concerning whether Mr. McFarland should

10   not receive acceptance of responsibility points for guidelines

11   purposes.

12             I have reached a view about that, but if there's

13   anything that either side wants to say, I certainly don't want

14   to deprive you of the opportunity.

15             MR. JACKSON:  No, your Honor.  We would be happy to

16   hear the Court's view.  Thank you.

17             MS. GREENBERG:  Your Honor, I would like to speak on

18   that.

19             Just in response to the points that were made in the

20   defendant's last submission and in light of the clarification

21   in Dr. Levin's recent letter, even reviewing that new letter,

22   we still think that the defendant does not deserve a reduction

23   in his guidelines ranges because he's not clearly demonstrated

24   an acceptance of responsibility.

25             What you see is, based on the statements that the

Iabnmcfs

1  defendant made to Dr. Levin, he is severely minimizing his

2  conduct.  The government's position is not, as defense counsel

3  has said, based on one stray misinterpreted line in a

4  psychiatric report.

5       After reviewing the defendant, Dr. Levin concluded

6  that the defendant believed he could deliver the promised

7  tickets, but that it proved impossible, that he overestimated

8  his ability to deliver on the tickets, but it ultimately didn't

9  happen because he was disorganized and sloppy.

10      The stated intention to deliver those tickets, that

11  was just false.  He's attributing the failure to deliver the

12  tickets to sloppiness or disorganization.  That's wildly

13  misleading.  Simply put, what he's saying is I had the best of

14  intentions, but I was just poor in my execution.

15      The basis for his guilty plea to making false

16  statements to the government was that he lied when he told the

17  government that his intentions were to actually provide the

18  tickets, when in fact, as he stated at his guilty plea, he

19  said, When I sold the tickets I intended to defraud the

20  customers.  So neither the reports from Dr. Levin or

21  Dr. Paradis address his lies to the government on this issue.

22      Also, the clarification of Dr. Levin and the defendant

23  on this point, it simply not only isn't true, it just defies

24  logic.  The report states that the defendant claimed he did not

25  feel that what he did was wrong, but he admitted that he hid

Iabnmcfs

his involvement in the venture because his reputation had been

tarnished by the festival.  Then the clarification is, well, he

did not know it was wrong at the time of the offense.  As he

stated at the plea, I sold the tickets with the intent to

defraud customers.

The Met Gala and the Burning Man examples, those

tickets didn't exist for him to sell.  The defendant clearly

knew that selling tickets he had no intention of providing was

wrong at the time and that it was illegal.  He knew that at the

time of the events.  Otherwise he couldn't have plead guilty to

it.

Indeed, the defendant had already pled guilty in this

Court to the Fyre Festival, to the Fyre investment fraud, so no

doubt he knew that conducting a whole new fraud where that was

his stated intention was wrong at the time.  That's why he went

to great lengths to conceal his involvement and his role in NYC

VIP Access from the public.

Dr. Levin also further clarified in his letter that at

the time the defendant didn't believe it was wrong because his

goal was to make restitution.  Well, that just defies logic.

The defendant could not have believed it was OK to defraud a

set of new victims in NYC VIP Access in order to repay the

victims of his prior fraud on the prior investors, especially

where, as was the case, he targeted numerous of the same sets

of victims.

Iabnmcfs

1      The ticket scam we stated yielded proceeds of over

2  $100,000.  If that was his intended goal, why didn't any of the

3  victims see any restitution?  He didn't make any restitution.

4      To the contrary, he met with probation in April and he

5  said he had $50,000.  He then two months later meets with the

6  government and he said he spent it all in two months.  So the

7  defendant's proclaimed motivation here to engage in this fraud

8  because he wanted to make restitution to his prior fraud

9  victims, it simply cannot be believed.

10      Because he is simply not admitting to the fraudulent

11  nature of his conduct, we just don't believe acceptance of

12  responsibility has been clearly demonstrated by the defendant.

13      MR. JACKSON:  May I respond, your Honor?

14      THE COURT:  Yes.

15      MR. JACKSON:  A few things, Judge.

16      First of all, I think that Dr. Levin's report was in

17  no way an attempt to have a verbatim description of what his

18  conversation was with the defendant.  This was a psychiatrist

19  attempting to probe into the damaged, flawed thinking of a man

20  who was engaging in something very stupid and trying to

21  understand why, why the defendant was able to sort of justify

22  to himself at the time what was the thinking process that

23  allowed him to get to the point where he thought that he could

24  execute something like this.  He was describing that for the

25  Court.

Iabnmcfs

1      Mr. McFarland has never denied his guilt and never

2  denied his fraudulent intent from the time of his guilty plea

3  until now.  I've spoken with him about it numerous times.  The

4  doctors both spoke with him about it.  Dr. Levin clarified that

5  he told him about his guilty plea and acknowledged his guilt

6  and said that he had remorse.

7      What we are talking about in Dr. Levin's report in

8  terms of the analysis that the doctor was doing was trying to

9  understand what the self-rationalization was, what the thinking

10  process was that led up to that.  It was unquestionably

11  unhealthy, illogical thinking, unquestionably.

12      I would just quibble, your Honor with a couple of the

13  components of the analysis that the government is engaging

14  here.

15      First of all, the idea that he could not have engaged

16  or started down this path because he believed that he thought

17  he could achieve restitution, I don't agree with that, your

18  Honor.

19      We have spoken with the defendant from the time that

20  he first entered the guilty plea.  Every conversation that we

21  have had with him has been just wanting to figure out how over

22  the course of his life he's going to begin to pay back this

23  restitution.

24      I really do think that that was part of what fueled

25  him in terms of some really flawed thinking, thinking that we

Iabnmcfs

1   admit that the doctors both acknowledge was problematic,

2   psychiatrically and psychologically unsound thinking but that

3   was part of the process.

4          And Mr. McFarland didn't ask to speak to these

5   doctors, as we highlighted in our report, your Honor.

6          THE COURT:  Wait a second.

7          A, As a matter of law, his lawyers are his agents.

8          MR. JACKSON:  Absolutely, Judge.

9          THE COURT:  B, whether it was his idea in the first

10  place or his lawyer's idea in the first place, he didn't have

11  to be interviewed.  He understood what these were a

12  psychiatrist and a psychologist not hired for treatment

13  purposes, but hired for mitigation and litigation purposes.

14         Indeed, I don't know that there was any requirement,

15  even though public funds had been used to obtain these reports,

16  that they ever be submitted if you didn't think they were

17  helpful.

18         MR. JACKSON:  We completely understand that, Judge.

19         The one other thing I would say, though, is I really

20  do believe that the government is taking an unfairly narrow

21  view of what fraudulent intent means in this context.  A person

22  can be attempting to engage in a business activity and have

23  full fraudulent intent.

24         Mr. McFarland both with regard to the Fyre Festival

25  and with regard to the ticket scheme has acknowledged he had

Iabnmcfs

fraudulent intent because he was saying things that were

untrue, he was saying that he could deliver tickets when he

didn't know if he could deliver tickets, when he didn't know,

when he didn't actually have them in hand.  He told a number of

lies in connection with that, just like he did with the Fyre

Festival.

         But he was in fact at different points attempting to

engage in some of these business activities, and the

government's submission itself acknowledges when it talks about

the people who got tickets or didn't get the tickets that were

in the best seat.  The tickets were delivered.  Even with

regard to this disastrous ticket thing that happened after the

initial plea, tickets were delivered to some people.  It wasn't

just a pure collection of money with no intent to engage in

business activity.

         But what it was, was a person who is psychologically

compromised engaging in a business plan that did not make a lot

of sense.  What I think is fair, your Honor, is to focus on his

activity since the time of his guilty plea, since the time the

government agreed with us to come to an agreement that he would

have acceptance of responsibility if he acknowledged guilt.

And he did acknowledge his guilt.  He acknowledged that it

constituted fraudulent intent, everything that he did in terms

of concealing his identity, lying, making promises, that he had

no real basis for assuming that he could deliver on.  That's

Iabnmcfs

1    fraudulent intent.  It was far beyond what is necessary.

2              He's acknowledged that.  He's acknowledged that in his

3    conversations with us.  I think he's acknowledged it in his

4    conversations with the doctors.

5              Your Honor, we would just submit this is a situation

6    where the removal of acceptance of responsibility points, we

7    submit, your Honor, would just be an unfairly harsh solution in

8    a situation where we really do believe the defendant was

9    attempting to answer questions about what his intent was, what

10   his thinking process was at the time, and he has not denied his

11   guilt and acknowledges his guilt today.

12             THE COURT:  I really don't feel a need to reach this

13   issue as a matter of guidelines calculation, as I would impose

14   the same sentence with or without credit for acceptance of

15   responsibility.

16             I think if I did have to reach it, which I don't, I

17   would probably reject the argument, because the government had

18   agreed to give Mr. McFarland acceptance points off after he

19   lied to law enforcement.

20             Frankly, I think that is more serious than not coming

21   perhaps fully clean to a therapist.  I think that the former is

22   much more significant to essentially the rule of law.  So I

23   think we can move on.

24             Ms. Greenberg, were you hopping up?

25             MS. GREENBERG:  No.  I understand that your Honor has

Iabnmcfs

1    stated that your sentence would not matter regardless.

2             THE COURT:  It wouldn't matter.

3             MS. GREENBERG:  But I think in terms of making just a

4    finding for the record of what the guidelines range is, I do

5    think that is something we would ask your Honor to do, just for

6    the record.

7             THE COURT:  Then it is guidelines range which I think

8    is 135 to 168 that you agreed to.  I just offer you, as I say,

9    it has no impact on my sentence.  Counsel, correct me if I'm

10   wrong about the guidelines.

11            MR. JACKSON:  No.  That's accurate, your Honor.

12            THE COURT:  My understanding was that the probation

13   department had taken away acceptance points when they reached

14   188 to 235.  Therefore, if they're back in the picture, I'm

15   correct?  135 to 168?

16            MR. JACKSON:  Yes.  That's correct, your Honor.

17            MS. GREENBERG:  Correct.

18            THE COURT:  All right.

19            Mr. Jackson, I give you the floor.

20            MR. JACKSON:  Thank you, your Honor.

21            Judge, this is a difficult day I know for all of

22   Mr. McFarland family, for his close friends.  It's a difficult

23   day for us as his attorneys, who've gotten to know him, because

24   we know that the Court has to impose a sentence that punishes

25   Mr. McFarland for everything he's done wrong.  We know that.

Iabnmcfs

1    We know that he's going to continue to be in prison after
2    today.
3           Mr. McFarland more than anyone that I've talked to in
4    this process -- and I've spoken with his family extensively, I
5    have spoken with his friends extensively, I have spoken with
6    any number of people in connection with this.
7           THE COURT:  One second.
8           MR. JACKSON:  Yes, your Honor.
9           THE COURT:  Sorry.
10          MR. JACKSON:  Thank you, Judge.
11          Mr. McFarland more than anyone, Judge, has
12    acknowledged to me his understanding that he just made
13    terrible, terrible decisions and he made tremendous mistakes
14    and he hurt the people that are closest to him, and he's going
15    to have to pay for that.  He accepts that and he acknowledges
16    that.  Nevertheless it's a difficult day.
17          There are few things, Judge, that I would ask the
18    Court to take into consideration as the Court makes its last
19    considerations in terms of the appropriate sentence.
20          The first, your Honor, is we do want to reemphasize
21    what we put into our original submission about the extent to
22    which we really do believe this is one of the cases where, as
23    serious and as harmful as the conduct was, the guidelines here
24    severely overstate the offense.
25          Now, we talk at length, and I'm not going to repeat

Iabnmcfs

1    everything that we put in our submission, your Honor, because I

2    know the Court has spent significant time looking at that, but

3    we talk at length about all of the judges who have looked at

4    the guidelines approach to fraud and said that this

5    fundamentally does not make any sense in a society where we're

6    trying to figure out ways of punishing people that does not

7    mean the complete destruction of their lives, the complete

8    destruction of their family's lives.

9            I was looking back at what Judge Rakoff said in the

10   *Addison* case, and he talked about the fact that the inordinate

11   emphasis that the sentencing guidelines places in fraud cases

12   on the amount of actual or intended financial loss renders them

13   wildly off base, and he says that the calculations under the

14   guidelines have so run amok that they are patently absurd on

15   their face.

16           Your Honor, it's one judge's opinion.  It's a judge I

17   respect a lot.  But there are judge after judge -- we highlight

18   in our submission Judge Lynch, a number of the judges have

19   looked at this and said what we are talking about in the

20   guidelines is a system where we have taken a number and just

21   taken it to places that are completely inconsistent with the

22   ideas that are the basis of the sentencing statute.

23           THE COURT:  Can I put you at rest.  I am not planning

24   on giving him a guideline sentence.

25           MR. JACKSON:  I appreciate that, Judge.

Iabnmcfs

1              So I will move beyond that, to the point that in terms

2      of -- just a couple of additional points, your Honor.

3              The first is we do believe that when the Court looks

4      at the Section 3553(a) factors in this case and applies them to

5      Mr. McFarland, it does militate not just in favor of a

6      guidelines sentence, but in favor of one that's far beneath the

7      guidelines that are set out here.

8              We would particularly emphasize that Mr. McFarland,

9      while he is a man, he is a grown man who acknowledges that and

10     takes responsibility for what he's done, he's taken

11     responsibility for what he did since the very first

12     conversation I had with him.

13             He is still a person who was extremely young at the

14     time that he was committing these.  He hadn't been convicted of

15     any crime before that.  He made some decisions that I think a

16     person with more age, more experience, more sophistication,

17     simply would not have made, and I think that it is perhaps one

18     of the best and the worst reflections of our current society

19     that a person who is as young and is as inexperienced as

20     Mr. McFarland can have the kind of infusion of investment that

21     he had.

22             That's something that would have been impossible 30

23     years ago that people would have invested in a person this

24     young, because it's sort of an instinctive understanding that

25     you don't give millions of dollars to someone with this little

Iabnmcfs

1    experience.  But we have reached the point in society where a

2    lot of investors made money, people had invested billions into

3    relatively young investors, and some of that is has gone very

4    well.  Some of it hasn't.

5         This is one of the cases where we're dealing with a

6    person who simply was too young to deal with all the

7    responsibility that fell into his lap, and he just made

8    disastrous decisions.  So we do think that youth of

9    Mr. McFarland, we would ask the Court to take that into

10   consideration.

11        We would ask the Court to take into consideration in

12   terms of his personal characteristics that, in the midst of all

13   of the bad stuff that Mr. McFarland has done, we do think that

14   he is a person within him a charitable spirit.

15        He's a person that -- I think your Honor read the

16   letter from Jesse Yarborough and saw the pictures and the

17   program that Mr. McFarland organized for fifth graders in the

18   New York City public school where he was attempting to teach

19   them about computer programming.  I talked with Mr. McFarland.

20   This is, for him, one of the most rewarding experiences he had

21   in the last several years of his young life.

22        That and the other examples that we talk about in our

23   submission, the people that he helped, some of whom wrote

24   letters, homeless people, people who were down on their luck,

25   we think that's part of the personal characteristics of

Iabnmcfs

Mr. McFarland, that he's not simply a fraudster.  He is a

person who engaged in criminal activity who made serious

mistakes, but he is a person who we submit, your Honor, has an

actual charitable spirit.

        The reason that we think that that is important is

because we think that it is a window into what Mr. McFarland's

contributions could be to his community if he gets the

appropriate opportunity after he gets out of prison to have

serious mental health treatment.  We are going to actually be

focused on how he gets reintegrated into society and take some

of the talents that he has, take some of the charitable

inclinations he has and translate them into more things that he

can do to benefit his community in the future.

        I would also, your Honor, in terms of the Section

3553(a) factors ask the Court to think about, as we described

in our submission, the need to avoid unwarranted sentencing

disparities.  I know the Court has reviewed this, and I know

that your Honor has more experience with this than any of us,

so I won't belabor the point.

        But we went through a series of examples in our

submission of trial defendants who went to trial, some of whom

perjured themselves in front of juries, and after trial still

did not receive sentences that were anywhere near what the

government is pushing for in this case.

        We talked in our submission, your Honor, about the

Iabnmcfs

1    fact that the Madoff defendants who went to trial, including

2    the COO of Madoff, including the person who ran the investment

3    advisory business for years and were all facing guidelines

4    sentences of life, ended up with sentences after trial, in

5    which multiple of them had testified, that were far below what

6    the government is pushing for here.

7            I think, your Honor, sentencing is difficult.  I don't

8    envy the role of judges who have to try to figure out in this

9    complex system what the appropriate sentence is, taking in all

10   of these factors.

11           But I do know, your Honor, that when we look at the

12   people that we compare Mr. McFarland against in our sentencing

13   submission, a long list of them had not accepted responsibility

14   in the way that he has, come in, pled guilty, not even required

15   the government to go to a grand jury but waived indictment,

16   prepared to plead guilty from the beginning, not put the

17   taxpayers and the Court to the cost of a trial or even

18   discovery, and we are not in the same league as Mr. McFarland

19   in terms of sophistication, in terms of his youth.

20           When you look at all those factors and you compare

21   them and you look at trend of sentencing that we are talk about

22   in our submission, your Honor, that is more and more, we think,

23   cognizant of the reality that, yes, people need to be punished,

24   but we don't need to take every young person who commits a

25   mistake, even an egregious one like this, and throw away their

Iabnmcfs

1    entire life and throw away their belief in anything, and the

2    life of their family for an extended amount of time.

3              We think that's important, your Honor.

4              In connection with that, we would just again emphasize

5    that the distinction between Mr. McFarland's situation and the

6    situations like the pure Ponzi schemes we talked about in our

7    submission, like the Madoff case, this isn't a case where

8    nothing real was happening.

9              Your Honor saw the submission and you saw the

10   photographs of everything that was being built up for the Fyre

11   Festival.  The government doesn't quibble with the fact that

12   the vast, vast majority of the money that was taken in in terms

13   of investor money was spent on actual expenses for the Fyre

14   Festival, which was a disaster, which Mr. McFarland every day

15   thinks about how much of a disaster it was, how much he let

16   everyone down.

17             But it's not like the Ponzi schemes where -- Madoff

18   there was no trading, there was no actual business.  It's a

19   situation where Mr. McFarland was lying and committing acts

20   that frankly he feels shame about, but in connection with an

21   actual attempt to execute a business plan.

22             So, your Honor, we think in terms of 3553(a) factors

23   and the need to avoid unwarranted sentencing disparities that

24   is something that the Court can take into consideration.

25             Your Honor, just to say a word, I know we discussed

Iabnmcfs

1   Mr. McFarland's mental health at issue at length already.  I am

2   not a mental health professional, so I don't want to attempt to

3   summarize or even crystallize what I think is in Dr. Paridis'

4   and Dr. Levin's very good reports, but I would just emphasize

5   these are both highly respected professionals.

6      Dr. Paradis, who we talked about, is one of the

7   psychologists the government goes to more than any other

8   psychologist in this district in order to determine what is

9   really going on with defendants, in terms of their thinking.

10   When Dr. Paradis took a look at Mr. McFarland in a completely

11   separate examination from the examination of Dr. Levin came to,

12   they came to similar conclusions about the type of flawed

13   mental processing that was going on with him, the need for

14   medication, and the fact that we think that that also, your

15   Honor, points to a future in which Mr. McFarland, if he gets

16   the correct opportunity is going to be able to be a person who

17   utilizes the skills, the core inclination that he has, the good

18   heart that he has underneath some of the stuff that has become

19   this big exterior of this case that has gotten so much press,

20   he is going to be able to use that in order to contribute to

21   society.

22      Your Honor, we think for all of those reasons, this is

23   a case where we hope the Court can impose a real sentence, a

24   meaningful sentence, but one that is sufficiently lenient to

25   allow the bigger emphasis to be on a substantial term of

Iabnmcfs

1   supervised release, where Mr. McFarland has serious mental

2   health treatment, mental health treatment requirements as part

3   of the conditions of that supervised release and can begin to

4   get into the process of really reintegrating himself into

5   society and into his family and becoming a contributor to the

6   community that I know he can become, that I know that his

7   family knows that he can become, and that all of the people who

8   submitted letters to your Honor and talked about all the good

9   things they saw Billy McFarland do over the course of his short

10  life know that he can become.

11          THE COURT:  Mr. McFarland, would you like to say

12  anything?

13          THE DEFENDANT:  Yes, your Honor.  I would like to

14  address you.

15          First, before we start, I know there was a lot of

16  discuss the ticket aspect, and I would like the Court to know

17  that I do take full responsibility for that.  So, regardless of

18  the negotiations that have gone on and taken place, I know that

19  what I did there was wrong.

20          So, thank you for giving me this opportunity to

21  address you.  The first thing that I want to say is that I'm

22  deeply sorry about my mistakes.  I know that I betrayed the

23  trust of my investors, customers, my family, and even the

24  Court.

25          My mistakes were serious and they hurt a lot of

Iabnmcfs

people.  This includes some of the people closest to me.  The
remorse that I feel about that fact has been crushing, and my
only real companion since has been this enormous sadness and
regret over my actions.  I know that I cannot make the harm go
away, but I am deeply sorry.

       Judge Buchwald, I come from an incredible family.
Growing up I was surrounded with loving family members, close
friends, and really all the happiness that any kid could hope
for.  I credit my parents, my sister, grandparents, aunts,
uncles, and cousins for always surrounding me with such a
loving environment.  They all tried to teach me the value of
family, friends, hard work, and caring for others.

       I also learned from my family the importance of
givings everything my all.  But I realize now there are so many
other lessons my family tried to teach me that I didn't learn,
and this is part of a really haunts me.  I know that I was very
fortunate to have had the opportunities I had and the family I
had, and I squandered them.

       For reasons that are still confusing to me today, I
made decisions that were a slap in the face of everything my
family tried to teach me.  This is an extremely bitter reality
that I am adjusting to.  Your Honor, I realize now that more
than anything I miss the lessons about courage and fear that my
parents tried to teach me.

       When I was working at my businesses from my early 20s

Iabnmcfs

up until my arrest, the thing that pushed me more than anything
was fear.  I had a deep and controlling fear of letting people
down.  When the Fyre Festival started having issues, all I
could do was think of all the people that I had to make happy,
my investors, my partners, team members, vendors, friends, and
attendees.

I was gripped with this fear of letting everybody
down.  We were trying so hard to make the festival work.  We
were putting in our all.  We were even accomplishing things
along the way that had been only dreamed of.  Soon, what
started as a small idea became a company with almost 1,000 team
members and even loftier public expectations in a matter of
just a few months, and I felt I had to shoulder the burden and
the responsibility to make everyone happy.

I thought the only way to make everyone happy was to
succeed, and that thinking led me to make the incredibly wrong
decision to lie about our success to raise the funds that I
thought we needed to execute the festival.  When the festival
failed, my world crashed.  I let everyone down.  I hurt those
who didn't deserve it.  Not only did I fail to make everyone
happy, I made them suffer.

I was distraught and overwhelmed with the weight of
what I had done, and I thought my only chance to make up for it
and to finally make everyone happy was to pay the $26 million
restitution.

Iabnmcfs

1          In the months surrounding my guilty plea, this was all

2     I could think about it.  As I began to spiral out of control, I

3     had to raise the funds that somewhere in my mind I thought

4     would make everything OK.  I know that I was so wrong, and I

5     wish more than anything that I could retract my actions.

6          Judge Buchwald, I can only tell you that I have

7     suffered every day in prison since.  I have suffered because I

8     can't believe how wrong I was.  I can't believe how stupid I

9     was.  I can't fathom that I was the one to cause all of this

10    pain and suffering that my family and friends are going

11    through.

12         I have lived every day with the weight of knowing that

13    I have literally ruined the lives of my family.  I have

14    disrespected the law and the Court and I have failed so many

15    others who worked with me and believed in me.

16         This realization didn't come by merely getting

17    arrested.  I have had to face a few difficult situations in

18    prison that I think now it's safe to say I wasn't prepared for.

19         At first I was really scared.  But I found out that

20    true fear made me think beyond myself.  It made my see that my

21    next actions could have even further serious consequences not

22    only for me but for those around me and those who cared about

23    me.  This helped me to begin clearly seeing just how wrong I

24    was, sorry I am, and how much I needed to improve.

25         The MDC is a cold tough place to have as a home.  I

Iabnmcfs

1    have no friends.  My family can visit only a handful of hours a

2    month, and there is violence and intimidation and everything

3    else that makes a tough prison a tough prison.  But the

4    difficulties of being in jail have been nothing compared to the

5    pain that I have lived with every day as a result of the harm

6    that I know I've caused.  I'm sorry.

7         I've spent day and night thinking what the feeling

8    that I had means, what it means to be sorry.  I have come to

9    believe that the best way to be sorry is through my future

10   actions.

11        I will be sorry by living my apology.  Every day I

12   spend time reflecting on the areas I need to improve and the

13   lessons I've learned since I have been awakened and really hit

14   rock bottom by the gravity of incarceration and, more

15   importantly, my actions.

16        When I leave prison, I know that I'm going to have to

17   continue working hard to be a better man.  But in the meantime

18   I study my list of accumulated lessons daily trying to improve

19   to become the man my parents raised me to be.

20        My areas of focus include patience, integrity,

21   transparency, listening to the voice of my morals, avoiding

22   short-term thinking, and separating emotions from rational

23   decision making.  I understand that reflecting, studying, and

24   practicing these lessons needs to be accompanied with a focus

25   on improving of my mental health.

Iabnmcfs

1           I don't know much about the problems that I have.  My

2     parents did attempt to convince me to get treatment many times

3     over the years, and I think I was in deep denial about just how

4     seriously I needed help.  Sometimes I do think my world did

5     need to collapse for me to recognize how badly I needed help.

6     I just wish I didn't have to affect others along the way.

7           I don't know what exactly I'll need to do moving

8     forward to improve the mental health, but I am dedicated to

9     doing whatever it takes to get better and be better.

10          Judge Buchwald, I stand before you knowing what I did

11    was wrong and desperately wanting to spend the rest of my life

12    living my apology, doing the right thing, and helping people

13    however I can.

14          I am just apologizing today, your Honor, and pleading

15    for mercy.  I know that I cannot erase my errors, but I am

16    begging you to exercise any mercy you may have and to give me a

17    chance to live my apology.  I beg you to give me a chance to

18    make you proud and show you what I can do.

19          Thank you, Judge Buchwald.

20          THE COURT:  Ms. Greenberg, I will certainly give you a

21    chance to speak, but are there any of the victims that wish to

22    speak today?  Maybe now would be a good time.

23          MS. GREENBERG:  Yes, your Honor.  I believe there is

24    one victim here today to would like to read his victim impact

25    statement.  Mr. Nemeth.

Iabnmcfs

 1              THE COURT:  If you would, sir, just state your name.

 2              MR. NEMETH:  John Nemeth.

 3         I am a simple person.  I put in my victim statement,

 4    and I will read it verbatim, I believe as the Court wants.

 5              I'm writing a victim impact letter to try to help sway

 6    you not to allow this person, William McFarland, to walk away

 7    from this dastardly fraud he perpetrated.  Mr. McFarland must

 8    receive maximum sentences for his crimes, not only to stop him

 9    from doing it again, but to send a message to the financial

10    world that when you defraud investors and clients in the

11    Southern New York District, you will be punished to the full

12    extent of the law.

13              Mr. McFarland has repeatedly lied to me and others on

14    multiple conference calls, e-mails regarding Fyre Media

15    finances, insurance policies, contracts, and more.  He has

16    proven he is an extremely skilled and convincing liar and

17    forger who has financially ruined my and my wife's life.

18              It took me over 20 years of saving my lunch money and

19    invest it all, $180,000, in this disaster.  I will never be

20    able to replace that money that I fear is lost forever.  Both

21    my wife and I are in our late 50s now.  Mr. McFarland has

22    single-handedly made sure that I won't be able to retire at a

23    normal age.  I will be working well into my 70s.  His

24    manipulation of the truth is shocking, and I hope the Court

25    understands that this is a pattern that will continue if

Iabnmcfs

1    allowed.

2              I have read in the press that Mr. McFarland is seeking

3    no jail time and blaming his issues on youth, exuberance,

4    naiveness, and now mental health issues.  This is not going to

5    pay back all of the money he fraudulently stole from many

6    people, such as my wife and I, and I hope that the Court sees

7    through his tactics and is not misled in any way as we were as

8    investors.

9              To learn through multiple media outlets that he still

10   lived before being arrested in an expensive apartment,

11   frequented expensive restaurants, and continues to squander

12   what I am assuming is left of the investors' money is

13   disheartening.

14             Upon his arrest, Mr. McFarland stated to the Court

15   that he was too broke to defend himself and was released

16   through a court-appointed attorney to his parents' home.  He

17   has since retained and is being represented by one of the most

18   expensive-billing law firms in the United States, Boies

19   Schiller.  Now to hear Mr. McFarland has been arrested again

20   the second time, for a similar scam and fraud it is

21   unconscionable to me that he has done this while out on bail.

22   This further proves he does not deserve leniency from the

23   Court, as I believe he just laughed at the justice system with

24   the continuing business-as-usual attitude while out on bail.

25             I hope that the justice system has the last laugh with

Iabnmcfs

1   Mr. McFarland and gives him the largest sentence allow under

2   law.  Mr. McFarland, William McFarland has destroyed trust,

3   careers, friendships, and family on top of the money he

4   fraudulently took from investors, from Fyre Media to the Fyre

5   Festival, Mr. McFarland has operated on his own set of rules

6   and has continued that pattern of deceit by his actions even

7   after he was arrested.

8           Mr. McFarland cannot be allowed to hurt others by his

9   deceit.  I plead with the Court give Mr. McFarland what he

10   deserves -- a long prison term.

11           Thank you, your Honor.

12           THE COURT:  Thank you.

13           Ms. Greenberg.

14           MS. GREENBERG:  Your Honor, defendant's criminal

15   conduct in this case was extraordinary.  It was extraordinary

16   for numerous reasons.

17           First, the defendant was the CEO and founder of

18   several companies, three companies that were engaged in out and

19   out fraud.

20           He acted alone.  He did not act with others in

21   defrauding people in these ventures.  And this proved to be a

22   pattern, a pattern of fraudulent conduct that he engaged in for

23   several years.

24           Indeed, over the course of time, his criminal conduct

25   became more brazen and simply escalated in its severity and

Iabnmcfs

1    egregiousness and blatant disregard for the law.

2                Starting with Magnises.  Magnises was his company from

3    2013 to 2017.  It was a company that was engaged in to not only

4    have private events but also to sell tickets to events.

5                There were over 20 investors who invested roughly $3

6    million in Magnises, and that was when Mr. McFarland first

7    started lying about the company's financial metrics, about the

8    number of members, about the revenue.

9                He did that with Magnises.  Then, when things with

10   Magnises started to falter, he moved to a new company, Fyre.

11   That was in 2016.  He did that from 2016 to 2017.  There were

12   over 80 investors, and he defrauded them of over $24 million, a

13   significant amount of money.

14               And who were his targets?

15               Among those 80 investors included family, included

16   family friends, friends of his coworkers, people that were

17   close to him.  He didn't care they were close to him.  He

18   swindled them as well.

19               With respect to Fyre, Mr. McFarland's fraud involved

20   fairly sophisticated means.  That was part of his plea

21   agreement, where he admits to the fact that he engaged in

22   sophisticated means.  Among other things, he lied to investors

23   about the sale of Magnises, which he told them was a sale for

24   $40 million.  That would make him quite wealthy and would show

25   that he had a track record of financial success as an

Iabnmcfs

entrepreneur.  Yes, somebody who was young, but somebody who
had a proven track record.  And that was significant and
material to investors.

He even managed to unwittingly have two law firms put
together merger and acquisition paperwork believing that this
sale was in fact real when it was all a sham.  That is
sophisticated means.

Now, he also forged documents.  He forged documents to
banks.  He forged documents to investors.  Again showing that
the financials of the company were far more profitable than
they in fact were.

Now, the defense has argued that the fraud really
started when the festival became overwhelming.  That's just
simply not true.  To put a finer point on it, the festival is
announced in December of 2016.  The festival is then cancelled
in April of 2017.

Fyre Media starts in May of 2016.  From May of 2016
through November of 2016, before the festival is even
announced, he has already defrauded investors of roughly $3
million, lying to them again about the profitability of the
company.

So this was not a matter of simply getting in over his
skis because of the festival.  He lied from the beginning, just
like he had lied to the investors at Magnises.  His lies
continued after the festival and became even more pronounced.

Iabnmcfs

1    He then went on to defraud those investors of the total amount

2    of over $24 million.

3            He lied to festival customers about what they could

4    expect from the festival.  He lied to his own employees about

5    how the business was doing and what investments were being

6    made.

7            We talk about the defendant's youth, but the people

8    who were working with him on his team at Fyre, those were young

9    people, too.  But those were young people who were old enough

10   to know better, just like Mr. McFarland was.  These were

11   employees who were loyal to him despite not being paid, despite

12   being promised bonuses they never received, despite being told

13   they would get insurance they never had.  They implored him to

14   focus on this digital application and to just make the company

15   honest, pay taxes, have regular paychecks.

16           But he did none of those things because ultimately

17   what we have seen from Mr. McFarland is he's not willing to be

18   patient.  He is not willing to put in the work to build the

19   business from the ground up.  That takes time.

20           The digital application by all accounts from his

21   employees was a good idea.  It was an idea that they were

22   excited about and maybe could have been quite profitable, but

23   again it takes time.

24           But the defendant wasn't satisfied with that.  He

25   wanted instant gratification.  To accomplish that, he needed to

Iabnmcfs

lie.  He wanted massive gains.  He wanted a lot of money, and
that meant big lies.  The lavish lifestyle that he was engaged
in, that was at the expense of his investors, the Fyre
customers, and of his employees.

Once Fyre was effectively defunct in 2017 and in July
of 2017 he was arrested by the government in connection with
that fraud, it didn't stop then.  At that point, he then went
on while on pretrial release to engage in yet another fraud.
This was NYC VIP Access.

Now that company essentially was a sham.  They were
selling tickets that he knew full well that he did not have in
any ability to get and sell.  There were certain examples, like
the Grammies, where certain individuals did get tickets, but
again they never got what they were promised.

So, unlike his prior companies, where there were
tickets to sell or there was a digital application, there was a
festival, here there really wasn't.  The goal here was for him
to make money and to make it quickly.  So he forged documents
showing ticket confirmations when none existed.  He just wanted
to continue to live the lavish lifestyle to which he had become
accustomed.

Here he had over 30 victims.  And what's really
galling about this one, in addition to the fact that he did
this on pretrial release and that he did before and after his
guilty plea and that he's not disclosing any of this to

Iabnmcfs

probation and just showing blatant disregard to the Court, what
is truly galling about it is he retargeted a number of the same
victims that he had already targeted for the Magnises fraud and
the Fyre fraud.

So, this idea that so much of what was motivating NYC
VIP Access was this desire to make restitution, he was
defrauding the same people.

Then, when he gets caught, even after having done
everything he can to conceal his role with NYC VIP Access and
have somebody else be the face of the company so that if
anybody came asking he wouldn't take the hit for it, after he
gets arrested the second time, what does he do?  He asks for a
meeting with the government, and he meets with the government
for hours and he lies and lies and lies -- elaborate stories
about how he intended to procure tickets from fake people from
fake websites that did not exist.  It is just a total blatant
disregard for law enforcement.

There is a real, strong need here to promote a respect
for the law.  I mean, defense counsel talks about sentencing
disparities.  I think we would be hard pressed to find a
defendant with these kinds of circumstances who engages in this
kind of pattern of fraudulent conduct who reoffends while on
pretrial release and then, even after being caught, lies again
to the government.  This is egregious conduct.

As to the use of his investor money to fund his

Iabnmcfs

extravagant lifestyle, I would note again, this is in the PSR,
but it bears repeating what is in the PSR.

He's receiving money, benefits and perks that enabled
him to live an extravagant lifestyle, maintaining a Manhattan
residence, which he upgraded at the time when he was engaging
in trying to get most money from investors in the months
leading up to the festival.  That's when he decided to upgrade
from an apartment that cost $8,000 a month to an apartment that
cost $21,000 a month, enjoying a private driver of a luxury
vehicle, taking frequent trips by private plane, making
seemingly magnanimous donations to charitable interests and
friends.  These activities were funded in substantial part with
investor money.  That is in the PSR.  That's not objected to.

He also admitted to this very same language in the SEC
judgment, the exact same language that was in that complaint,
he admitted to that as well.

The bank account records that defense referenced
earlier, I would just say they are muddled --

THE COURT:  What SEC judgment?  I don't think I was
aware.

MS. GREENBERG:  Yes, your Honor.

There is an SEC complaint filed in this district.
It's 18 Civ. 6634.  It's before Judge Koeltl.  I have the
complaint here if your Honor would like a copy of it.

THE COURT:  Is that an open case or a closed case?

Iabnmcfs

1        MS. GREENBERG:  It is a closed case on June 11, 2018.

2   The defendant not only consented to the entry of a final

3   judgment as to himself and his companies, but he admitted to

4   the allegations in the SEC complaint, which largely mirror the

5   facts that are in the PSR offense conduct summary and include

6   the paragraph regarding his use of investor money to fund his

7   lifestyle.

8        Again, I have, if your Honor would like to --

9        THE COURT:  Do you have the consent decree?

10       MS. GREENBERG:  I have the consent, Mr. McFarland's

11  written consent as well as the complaint.

12       THE COURT:  Could I see the consent decree.

13       MS. GREENBERG:  Yes, your Honor.

14       Your Honor, my apologies.  What I had printed out

15  inadvertently was the consent of Magnises and was not the

16  consent of Mr. McFarland, which is different.  But I will hand

17  both of these up.

18       THE COURT:  What companies did the SEC case involve?

19       MS. GREENBERG:  Yes.  It involved Fyre Media,

20  Magnises.  It was against Mr. McFarland personally as well as

21  two other individuals, Grant Margolin and Daniel Simon.

22       THE COURT:  Give me the civil docket number again.  It

23  was 18 Civ. what?

24       MS. GREENBERG:  18 Civ. 6634.  The consent that

25  Mr. McFarland signed is not filed on the docket, but it is

Iabnmcfs

1    written.

2         Again, I apologize, but I can hand up the complaint

3    and the Magnises consent and send the consent from

4    Mr. McFarland to your Honor.

5         THE COURT:  I would have liked to have known that.  It

6    is an admission.  And it seems to be an admission on an issue

7    that I had understood from the outset -- I think you know

8    that -- to have been in dispute here.

9         MS. GREENBERG:  Yes, your Honor.

10        I would just note I can read from the relevant part of

11   the consent in which the defendant agreed not to make or permit

12   to be made any public statement to the effect that the

13   defendant does not admit the allegations of the complaint or

14   that the consent contains no admission of the allegations.

15   That is at paragraph 11, subsection 2.

16        The defendant also agreed not to make any public

17   statements denying the allegations in the complaint or creating

18   the impression that they were without factual basis.

19        That is at paragraph 11, subsection 1.

20        THE COURT:  OK.  So you are saying that the

21   defendant's consent, broadly speaking, is an admission to the

22   allegations in the complaint?

23        MS. GREENBERG:  That's correct.

24        By complaint, I mean the SEC complaint.

25        THE COURT:  The SEC complaint.

Iabnmcfs

1          MS. GREENBERG:  Which again largely tracks the facts

2     as stated in the PSR.

3          THE COURT:  And you do have a copy of the SEC

4     complaint?

5          MS. GREENBERG:  I do, your Honor.

6          THE COURT:  Could I see that, please.

7          MS. GREENBERG:  Your Honor, I would note the relevant

8     paragraph, at least with respect to the language regarding the

9     use of investor money, is paragraph 4 of the complaint.

10          THE COURT:  I found it already.

11          Essentially what you just said in court you were

12     virtually reading from paragraph 4 of the SEC complaint, which

13     Mr. McFarland by his consent has agreed not to challenge.

14          MS. GREENBERG:  That is correct.  I would note it is

15     also the same exact language as paragraph 34 of the PSR, which

16     is also not objected to in this case.

17          Focusing on, just to put some more details on the

18     amount of investor money, focusing specifically on December

19     2016 to April 2017, when the festival was cancelled, the

20     defendant's personal bank account was being -- and again this

21     is now in that paragraph -- but it's funded in substantial part

22     by investor money, specifically, two Fyre Media business bank

23     accounts.

24          Defendant transferred over $13 million from those Fyre

25     Media bank accounts to his own personal bank account, and those

Iabnmcfs

Fyre Media bank accounts consisted largely of money from the
investors.  Specifically, those bank accounts from December
2016 to April 2017 received over $20 million from Fyre
investors.  That's the vast majority of what was in those
accounts.

So there can be no question from the bank records that
he was using investor money to fund his lifestyle.  He was also
using it to pay festival expenses.  We do not dispute that.
But he certainly was using it for his personal expenses, which,
again, we have itemized in Exhibit A and its subsections to the
government's submission.

Now, the government's estimates, are these meant to be
precise?  No.  Could there be some business expenses in there?
Yes.  But that's really not the relevant question.  The
relevant question is, is any of this personal?  And the answer
is undoubtedly yes.

Certainly the rent that he spent, the $215,000 in
interior design and furniture to furnish the penthouse, all of
which was money that he was spending in early 2017, again, when
he's making the big push for the festival, the stays in Beverly
Hills, I mean, that's not even counting hundreds of thousands
of dollars in cash withdrawals from his personal bank account,
not counting any of the travel he took to Florida or the
Bahamas, at least some of which was personal in nature, and not
even counting what appears to be personal spending from the

Iabnmcfs

1    business accounts.

2        So, though this is an estimate, we have done our best

3    to be conservative in what we think this estimate is.  The

4    point is the personal spending using investor money was

5    substantial.

6        Ultimately why is that important?  It's important

7    because it really shows the motivation here.  The motivation

8    here is greed.  It was a desire to have a flashy lifestyle.  To

9    do that when you are betraying the trust of investors,

10   betraying the trust of people close to you, in flagrant

11   disregard of employees who are not getting paid, that I would

12   submit really shows what is a selfish and self-absorbed

13   character.

14       These investors suffered a serious impact, as can be

15   shown by the victim impact statements.  The investors varied in

16   age, background, and wealth, but you see the investments are

17   anywhere from hundreds of thousands of dollars to certain

18   investors who lost several million dollars.

19       The claim that they somehow assumed this risk and that

20   they somehow could have known the magnitude of the lies from

21   the defendant, that just simply cannot be countenanced.  It's

22   callous, and it's troubling.  No one assumes the risk that

23   someone is going to lie in the way that Mr. McFarland did.

24       There was severe financial harm that was caused to

25   numerous of these victims, who talk about the depletion of

Iabnmcfs

1    their nest eggs, of their inability to pay medical and

2    educational expenses for their families, of the reputational

3    harm they suffered by being swindled by the defendant, the

4    emotional harm they suffered by just being embarrassed and

5    humiliated for being taken on this.

6           One victim talks about being both taken for the

7    festival and then later being a victim of NYC VIP Access and

8    the toll that that took.  In this case there is a significant

9    loss amount, but that also comes with serious victim impact.

10          I was prepared to dispute the $2 million, but since I

11   understand that to be withdrawn, I will move on, unless the

12   Court wants to hear anything on that.

13          Pointing to the history and the characteristics of the

14   defendant, moving on towards that, I would say that I was

15   struck by the two sentencing submissions that were submitted in

16   this case, the first one that was submitted prior to the second

17   case, which lays out the defendant as an upstanding citizen who

18   led a charitable life and where this conduct was really an

19   aberration and well intentioned mistake, to the second where we

20   are being told that the conduct can only be explained by

21   untreated mental illness and that there were red flags

22   throughout life, and that it was a life where there were just

23   manic episodes throughout that nobody noticed.

24          The two markedly different submissions and two

25   markedly different descriptions of the defendant's life, it's

Iabnmcfs

the tale of two Billys.  It's hard to square the two.

I, again, would say that with respect to the
psychological reports, I would submit that they are of little
value here.  Dr. Levin met with Mr. McFarland once for under
two hours.  Dr. Paradis met with Mr. McFarland twice.  They
only have the benefit of what he tells them.  As we know,
that's not worth a lot.

There was no consultation with the government or
agents in the preparation of this report.  We submit still that
he was not completely truthful with Dr. Levin about the nature
of his new business, and even in Dr. Paradis' report you just
see some of the facts are wrong.  The main thing she looks at
in her diagnosis is that there was a limited duration of the
conduct, that it spanned only nine months, and that he had
never done anything prior to that, that prior to that he was a
very successful businessman.  Well, that just doesn't comport
with the facts.  There were years of fraud on Magnises
investors that prove otherwise, but she was not given the
benefit of those facts in arriving at her diagnosis.

But even if you accept both doctors' diagnoses that he
is bipolar, I saw nothing in the reports that being bipolar
would make anyone lie to the extent Mr. McFarland has done
here.

Lastly, I would just say in this case in particular,
there is a real heightened need for specific deterrence.

Iabnmcfs

Plainly, at each stage here, whether it was pretrial release or even something as serious as talking about the government about what you have done after being arrested twice, the criminal justice system has simply not gotten his attention.  And a substantial term of supervised release, we've seen how he behaves on supervised release.  There's no reason based on this track record to believe that that's going to make him change.

          If he gets out anytime soon, I have no doubt that he will be on to the next scam.  Really what is needed here is a meaningful sentence, a meaningful term of imprisonment to stop him from doing this again and to protect the public from being his next victim.

          The government pointed to at least one case that had some similar facts, again a similar kind of fraud, similar targets, similar loss amount.  In that case Judge Seibel issued a sentence of 96 months, which I note is also the recommendation of the probation office.

          So, while we ask for a guidelines sentence and understand your Honor is not going to impose that, a meaningful term of imprisonment, given the seriousness of the offense, the defendant's history, and the need for specific deterrence and protection of the public warrants a meaningful and significant sentence.

          THE COURT:  Did you want to say anything else before sentence is imposed?

Iabnmcfs

1        MR. JACKSON:  Your Honor, we appreciate the Court's

2   time.  We have stated our position.  We don't agree with

3   everything that that they said, but we ask that the Court

4   exercise all the leniency that it can in the situation.

5        Thank you.

6        THE COURT:  All right.  I'm going to begin by

7   responding to the defendant's arguments as they were structured

8   in their submissions.

9        The first argument concerns the defendant's mental

10  health.  The defense submitted reports from a psychiatrist and

11  a psychologist who diagnose Mr. McFarland somewhat differently,

12  but broadly speaking conclude that he suffers from ADHD and

13  some form of mania.

14        Not that I am a professional in this regard, but I

15  tend to disagree with the doctors' position that Mr. McFarland

16  doesn't fulfill the DSM-V criteria for antisocial personality

17  disorder.  But, regardless, I accept the common conclusions of

18  both professionals that diagnose, as I said, the defendant with

19  ADHD and mania.

20        While I do not question that mania is associated with

21  impulsivity and poor judgment, neither diagnosis is an excuse

22  or justification or an explanation for the extended and

23  extensive criminal conduct of the defendant.

24        Next, structurally the defendant argued that he should

25  be given credit for promptly entering a guilty plea.  This

Iabnmcfs

argument is almost laughable if it wasn't so serious.

Mr. McFarland is unique in this Court's memory.  Not only did he repeat the same kind of crime while on bail, but he believed that he could participate in a proffer with the government and law enforcement and talk his way out of the crime he had committed while on pretrial release and then wound up having to plead guilty to making false statements to law enforcement.

The argument that was advanced, that because Mr. McFarland didn't flee or threaten witnesses, that his lying doesn't reflect a "true failure to accept responsibility" is frankly nonsense.  This is just white-collar obstruction.

The argument that someone else got some sentence raised by both the defendant and the government is an argument that I think everyone recognizes can only go so far.  Each sentence is to be individual.

The defense also argued that Mr. McFarland has certain unique characteristics.  I want to make it clear that the Court never has to find that a defendant is totally bad to impose punishment.  Everyone is a combination of good and bad.  Quite simply, though, the good that Mr. McFarland has done does not overshadow or outweigh the seriousness of his criminal conduct.

More broadly, the defense has tried to portray the defendant as a well-intentioned enthusiastic young man who got in over his head, followed by a lapse or many lapses in

Iabnmcfs

1    judgment.  The defendant emphasizes that, "Billy was not

2    seeking to simply take funds from investors for personal use,

3    but instead used investors' money to attempt to host a music

4    festival."  And he also claimed in his papers, although it was

5    withdrawn this morning, that he personally lost $2 million in

6    the festival as well.

7           The portrait simply doesn't fit the facts.  The facts

8    are quite the opposite.  The government's comprehensive

9    sentencing submission lays out the evidence in some detail and

10   I will simply highlight some of the realities.

11          Of central importance to appreciating why

12   Mr. McFarland orchestrated a fraud in connection with the Fyre

13   Festival is to recognize that Mr. McFarland made

14   misrepresentations about Fyre Media's financials well before

15   the Fyre Festival was announced in December of 2016.  Those

16   misrepresentations appear or are referenced on page 20 of the

17   government's sentencing submission.

18          Importantly, this was not a good idea gone bad.  The

19   bad intent was longstanding.  Indeed, the government's

20   submission is replete with examples of false and fraudulent

21   documents that Mr. McFarland created and used to induce

22   investments.

23          Also, the suggestion that Mr. McFarland did not use

24   investor funds for his personal use is simply belied by records

25   from his bank account and the lifestyle he lived, and

Iabnmcfs

apparently -- I learned this morning -- also belied by his

consent in an SEC proceeding in this court.

But one example really tells it all.  While the

defendant was soliciting investments for the festival, he

decided to upgrade his $8,000-a-month apartment to a

three-bedroom penthouse which cost $21,000 a month.  And, of

course, this larger apartment, which this bachelor no doubt

needed, had to be furnished -- another $200,000 plus.

Another example of living a lifestyle that his

assertions of claimed income in his tax returns certainly would

not support is the fact that Mr. McFarland had a driver to

drive him around in a Maserati.

There is another aspect of defendant's submission that

merits a response, and I quote, "And while the investors were

undisputably harmed by the loss of their funds, we think it

important to note that nearly all of the investors were

sophisticated individuals who understood the enormous risks of

this type of argument and were not financially ruined by their

losses."

While it is no doubt particularly offensive to target

the infirm and the elderly and your relatives, there's no

exception in the law that I am aware of which gives a defendant

a free pass to rip off people who can afford to be ripped off.

But since Mr. McFarland didn't conduct a suitability analysis

to learn whether the people he defrauded could afford to be

Iabnmcfs

defrauded, the fact is that some of them couldn't afford it and
they were truly hurt.

I will now turn to the specific factors a judge should
consider in sentencing under 18 United States Code 3553(a).  I
have already addressed to some extent the nature and
circumstances of the offense, but given the truly unusual
series of offenses which Mr. McFarland committed, it is worth
reviewing them.  Reviewing them in their totality demonstrates
that Mr. McMarland is a fraudster and not simply a misguided
young man.

The first is the fraud connected specifically with
Fyre and the Fyre Festival whereby over a hundred investors
loss over $24 million.

The second is the NYC VIP Access ticket scam, which
Mr. McFarland decided to commit while on pretrial release,
ripping off people for some $150,000, all the while disguising
the fact that he was the face behind the ticket scam.  Indeed,
in the second series of schemes he targeted some of the same
people he had defrauded in the Fyre scam, demonstrating his
manipulative capacity and lack of remorse.

And the third is even more unusual.  Mr. McFarland
sought a proffer session with the FBI at which, in the presence
of his lawyer, he perjured himself multiple times over, most
offensively trying to blame an employee whose name and accounts
he had used to disguise his involvement in the NYC VIP Access

Iabnmcfs

1    fraud.

2         When people commit serious crimes which show no

3    respect for the legal system and the law, there must be just

4    punishment, and that punishment must consider individual

5    deterrence and general deterrence.

6         While defendant has argued that he committed these

7    crimes because he suffers from certain psychological conditions

8    which explain his actions, I reject that evaluation.  Rather,

9    it is my conclusion, based on all the submissions which I've

10   carefully considered, that the defendant is a serial fraudster,

11   and that to date his fraud, like a circle, has no end.

12        Beyond his statement in Court today, which I do not

13   know exactly how to evaluate, the absence prior to today of any

14   moral recognition of the wrongfulness of his conduct is at the

15   heart of the need for specific deterrence.  It is also clear

16   that Mr. McFarland has actually been dishonest most of his

17   life.  He started out with small scams which have grown over

18   time.

19        What, then, is the appropriate sentence?

20        While in other cases, Mr. McFarland, youth might have

21   been the driving factor in your sentence, your commission of

22   additional crimes while on pretrial release, crimes which

23   included voluntarily lying to law enforcement are now the

24   driving factor in your sentence.  If nothing else, the Court

25   must uphold the rule of law, which includes the requirement

Iabnmcfs

1    that all citizens conform their conduct to the rules that

2    govern everyone in a civilized society.  That society is

3    gravely injured when Court orders are not followed and if

4    citizens think it is acceptable to lie to law enforcement to

5    avoid responsibility.

6         Your choices, and yours alone, are the reasons for

7    your sentence, which is six years in custody.  It's five years

8    plus one consecutive year on the 3147 counts.  For the counts

9    where the maximums are under the sentence, all those sentences

10   are to be served concurrently.  I think that would make Counts

11   One and Three in the S2 indictment -- Count Three would be 60

12   months, and one year on each of Counts One and Two.  If I'm

13   doing the math wrong, the bottom line is a total of six years,

14   five and one.  I'll figure out the details if I have messed it

15   up a bit.

16        As far as supervised release, I place Mr. McFarland on

17   supervised release for three years on all counts.

18        There is an agreed-upon forfeiture of $26,191,306.28.

19        There is a special assessment of $500.

20        All of the mandatory standard and special conditions

21   set out in the PSR are imposed.

22        I don't know if the government is planning on

23   submitting a restitution order?

24        MS. GREENBERG:  Yes, your Honor.

25        THE COURT:  I gather you don't have it today?

Iabnmcfs

1          MS. GREENBERG:  I do not, but we will submit it within

2     the 90 days.

3          THE COURT:  OK.

4          Let me inform Mr. McFarland that he has 14 days to

5     appeal the sentence that I've imposed unless he waived that

6     right in his plea agreement.  I don't have his plea agreement

7     in front of me.

8          MR. JACKSON:  Thank you, your Honor.  We appreciate

9     the Court's consideration.

10          Your Honor, may we ask that one additional thing.

11          THE COURT:  Sure.

12          MR. JACKSON:  We would ask if the Court would

13     recommend to the Bureau of Prisons that Mr. McFarland be based

14     in the Otisville facility.  It would allow him proximity to his

15     family during the time period of his incarceration.

16          THE COURT:  I have no problem with that, of course.

17          MR. JACKSON:  Thank you.

18          THE COURT:  Is there anything further?

19          Any open counts?  Anything like that?

20          MS. GREENBERG:  Yes, I believe there are open counts

21     on the underlying indictment.  I believe there are open counts.

22          THE COURT:  Why don't we assume there are.  If there

23     are, the motion to dismiss them is granted.

24          MS. GREENBERG:  Your Honor may have mentioned it, but

25     did you expressly adopt the PSR?

Iabnmcfs

1          THE COURT:  I did at the outset.

2          MS. GREENBERG:  OK.

3          THE COURT:  Anything further?

4          MR. JACKSON:  No.  Thank you, your Honor.

5          We appreciate the Court's consideration.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25