# HANTMAN & ASSOCIATES

ATTORNEYS AT LAW

1120 Avenue of the Americas
4th Floor
New York, New York 10036

**ROBERT J. HANTMAN**
rhantman@hantmanlaw.com
New York, New Jersey, & Florida Bars

(P) 212-684-3933
(F) 212-465-2192
www.Hantmanlaw.com

April 14, 2020

**VIA ELECTRONIC FILING AND FAX**

The Hon. Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**RE: Inmate William McFarland, United States Marshal #91186-054;**
**Index #: 1:17-cr-00600-NRB-1; Request for Compassionate Release**

Dear Judge Buchwald;

Our firm represents the above-referenced inmate, William McFarland, United States Marshal #91186-054, on his request for compassionate release, pursuant to 18 U.S.C. § 3582(c), 28 C.F.R. § 571.61, The Cares Act Section 12003(b)(2), and the recent directives of Attorney General William Barr to the Federal Burau of Prisons ("BOP") in carrying out these provisions to combat the spread and effects of Covid-19.

Given the severe outbreak of Covid-19 in the low-security facility, Elkton Federal Correctional Institution ("Elkton"), where Mr. McFarland is currently serving a sentence for the non-violent crime of wire-fraud, Mr. McFarland's preexisting conditions make him particularly vulnerable to catching and suffering from severe or fatal consequences of the virus which present "extraordinary and compelling circumstances", - unforeseen at the time of Mr. McFarland's sentence - which necessitate his immediate release to home confinement. Indeed, the outbreaks across the nation in the BOP prison system have been held to constitute "extraordinary and compelling reasons" under § 3582 (c)(1)(A)(i) by numerous judges in recent days and weeks.

Recognizing his prior actions, and your understandable view of his actions, attached please find a statement written by Mr. McFarland regarding his personal growth, changed perspective, and lessons learned thus far throughout his incarceration. (Exhibit A)  As we have been unable to get a sworn affidavit from him due to the current pandemic, we hope that this statement is acceptable to the court.

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

The situation at Elkton is of the worst at all of the BOP facilities. According to the BOP website, officially, at least 24 inmates and 14 staff members have contracted the virus, and three inmates have died from it (as of April 13, 2020).[1] After speaking to "the officials at the Federal Bureau of Prisons, the Department of Justice, Governor DeWine and his team, the warden at Elkton, the Ohio National Guard and local hospitals treating patients from the facility," Ohio Congressman Bill Johnson called the facility "a petri dish, a breeding ground for the virus."[2] According to the Ohio Newspaper, the Cleveland Scene, as of April 7th, 71 inmates were in isolation with symptoms, 37 inmates had been transferred to an outside hospital with the virus or similar symptoms, 12 of those being placed on ventilators, and three staff members have been infected.[3]

Further, our client and other inmates at Elkton have expressed that the situation is, in fact much worse than these figures, and a video taken by one inmate, while unofficial and unconfirmed, has been circulating displaying and discussing the poor conditions at Elkton.[4]

While we have been unable to obtain an official statement from Elkton, nor a sworn affidavit from Mr. McFarland due to the condition at the facility, Mr. McFarland claims that both the facility's Warden and Assistant Warden are in the hospital. He further claims that his housing unit does not currently have a case manager nor counselor and that he's confined to a large room with 140 inmates. Mr. McFarland has informed us that over 30 of these inmates have gotten sick and have been removed from the Unit, that the staff has been quoted as saying, "[inmates] would have better luck playing Russian roulette [than being in Elkton]." Further we understand that the prison staff who run the commissary stopped showing up to work, leaving inmates unable to buy hygiene products, including soap. Families of inmates and staff are picketing outside of the facility.[5] The situation has gotten so desperate, and the local hospitals so overwhelmed with inmates, that The National Guard has had to come in and build a makeshift hospital within the facility.[6]

---

[1] *See COVID-19 Cases,* Federal Bureau of Prisons, (last checked Apr. 8, 2020),  https://www.bop.gov/coronavirus/#
[2] "Johnson Statement on FCI Elkton", (Apr. 6, 2020) (accessible at https://billjohnson.house.gov/news/documentsingle.aspx?DocumentID=402824)
[3] Vince Grzegorek, "At Elkton Federal Prison in Ohio, 37 Inmates Hospitalized Due to COVID-19, 3 Dead, 71 in Isolation", The Cleveland Scene, (Apr. 7, 2020), https://www.clevescene.com/scene-and-heard/archives/2020/04/07/at-elkton-federal-prison-in-ohio-37-inmates-hospitalized-due-to-covid-19-3-dead-71-in-isolation.
[4] Keegan Hamilton, "Prisoner Uses Smuggled Cellphone to Beg for Help With Coronavirus on Facebook Live", Vice News, (Apr. 5, 2020), https://www.vice.com/en_us/article/z3b9qj/prisoner-uses-smuggled-cellphone-to-beg-for-help-with-coronavirus-on-facebook-live
[5] Carolyn Sistrand, "Peaceful protests held near Elkton as concern for inmates grows", WKBN 27 First News, (Apr. 11, 2020), https://www.wkbn.com/news/coronavirus/peaceful-protests-held-near-elkton-as-concern-for-inmates-grows/.
[6] Gerry Ricciutti, "Ohio National Guard arrives to help sick Elkton inmates", WKBN 27 Frist News, (Apr. 8, 2020), https://www.wkbn.com/news/coronavirus/ohio-national-guard-arrives-to-help-sick-elkton-inmates/

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

As you are likely aware, Attorney General William Barr has directed federal prison authorities to begin identifying more inmates for home confinement to avoid a larger outbreak of the coronavirus inside the agency's 122 institutions.[7] At the time of his initial directive, March 26th, 2018, only 6 inmates and four staffers had contracted Covid-19 in the whole BOP system, but since then, that number has grown exponentially to 352 inmates and 189 BOP staffers.[8] Attorney General Barr has stated that "there are some at-risk inmates who are non-violent and pose a minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *Id.*

Further, Attorney General Barr has individually and specifically listed FCI Elkton as one of three BOP facilities to give priority to under his directives due to their especially poor conditions.[9] Due to the severity of the condition at Elkton particularly, we request, on behalf of Mr. McFarland, a telephonic hearing seeking compassionate release.

Mr. McFarland has informed us that he has pre-existing conditions that make contracting Covid-19 easier, and which increase his potential to suffer severe health issues and death if he does so, including being diagnosed with asthma as a teenager. The CDC has specifically emphasized the increased risk of contracting and suffering more severe consequences of Covid-19 in those who have asthma.[10] Further, he has informed us that he was diagnosed on the "extreme" scale of the allergy spectrum, for issues related to breathing and his cardiovascular system, and that he has experienced heart issues since his early 20's. For these issues, Mr. McFarland has explained to us that, prior to arrest and incarceration, he saw two independent cardiologists due to his heart going out of rhythm and skipping beats. While incarcerated, in August of 2019, Mr. McFarland suffered a heart issue that the FCI Otisville Doctor then described as a "cardiac event." Mr. McFarland was advised that this was a mild heart attack. Mr. McFarland's heart issues don't come as a surprise; as he has informed us that both of his parents have diagnosed heart problems. His father has Atrial fibrillation (AFib), and over the past five years has been hospitalized several times due to this heart condition. In addition, his mother has a diagnosed heart murmur. I would expect that his medical records are available for the courts review.

Prior to the enactment of the First Step Act, only the BOP could bring a motion for compassionate release on behalf of an inmate; an inmate could not bring such a motion before a

---

[7] Office of the Attorney General, Memorandum for Director of Burau of Prisons - Prioritization of Home confinement as appropriate in response to COVID-19 Pandemic, (March 26, 2020) (accessible at; https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf)

[8] *See COVID-19 Cases,* Federal Bureau of Prisons, (last checked Apr. 8, 2020),  https://www.bop.gov/coronavirus/#

[9] Office of the Attorney General, Memorandum for Director of Bureau of Prisons – Increasing Use of Home Confinement at Institutions most Affected by COVID-19, (April 3, 2020) (accessible at; https://www.fd.org/sites/default/files/covid19/barr_memo_caresact_apr3_2020.pdf); *and see,* Michael Balsamo and Michael R. Sisak, "Barr orders increase in home confinement as virus surges", ABC News, (April 4, 2020), https://abcnews.go.com/Politics/wireStory/barr-orders-increase-home-confinement-virus-surges-69972840.

[10] See People with Moderate to Severe Asthma, Ctrs. for Disease Control and Prevention (Mar. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

| FLORIDA | NEW JERSEY | FLORIDA |
|---|---|---|
| HANTMAN & ASSOCIATES | JOSEPH J. FERRARA | ENTIN & DELLA FERA, P.A. |
| 650 WEST AVENUE | OF COUNSEL | OF COUNSEL |
| SUITE 2408 | 111 PATERSON AVENUE | 110 SE 6TH ST., SUITE 1970 |
| MIAMI BEACH, FL 33139 | HOBOKEN, NJ 07030 | FORT LAUDERDALE, FL 33301 |

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

court on his own. Various district courts ruled that the prior version of the compassionate release statute required, as a jurisdictional matter, that any such motion is brought by the BOP. See, e.g., Morales v. United States, 353 F.Supp.2d 204, 405 (D. Mass. 2005); United States v. Sumner, 201 F.Supp.3d 21, 22-23 (D. D.C. 2016).

Following the passage of the First Step Act, the "exceptions" allowing the court to revisit a sentence, to which the courts in both Morales and Sumner referred, were expanded. According to 18 U.S.C. § 3582 (c)(1)(A), the statute allows a defendant to bring a compassionate release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendants behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Based on reasonable statutory interpretation, the law clearly indicates that a defendant's failure to request that the BOP file a motion at all is a jurisdictional flaw, but that a failure to complete the statute's 30-day waiting period is not. Cases such as Morales and Sumner make abundantly clear that, under the earlier version of § 3582, defendants had no right to bring a compassionate release motion, and courts had no jurisdiction to hear such motions. Under the current version, the law maintains a preference – but not an absolute requirement – that the BOP and not individual defendants file the compassionate release motions. To the extent that Morales and Sumner speak to the current requirements of § 3582, they suggest that failure to request a compassionate release motion from the BOP before filing one with the court would be a jurisdictional defect and be fatal to the motion. Where the earlier version of the statute barred defendants from filing such motions on their own, the current version prohibits defendants from doing so without first requesting the BOP.

This statute does not, however, extend to the waiting period described by the statute. First, the text of the statute provides two pathways by which a defendant may ordinarily file a motion for compassionate release: either by exhausting an administrative right to appeal the BOP's failure to file such a motion or by waiting 30 days after requesting they do so. 18 U.S.C. § 3582 (c)(1)(A)(ii). The statute further specifies "whichever is earlier" among these two potential dates is the date on which the defendant is ordinarily allowed to file. *Id*. In doing so, Congress ensured that neither exhaustion of remedies nor a 30-day waiting period is per se required. Congress further manifested an intent that, generally speaking, a defendant be able to file a compassionate release motion expeditiously. Accordingly, the waiting period and exhaustion of remedies clauses are best understood as a "claims-processing rule" that can be set aside by the court, at least in cases of a dire emergency.

Several federal appellate courts, in interpreting a different position of 18 U.S.C. § 3582 (c) have held that the language of that subsection is non-jurisdictional. United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter generally dealing with sentences of imprisonment... .[n]or is subsection (c) phrased in jurisdictional terms."); *see also* United States v. Calton, 900 F.3d 706, 711 (5th Cir. 2018) (citing United States v. Carabello-Martinez, 866 F.3d 1233, 1243 (11th Cir.

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

2017); United States v. May, 855 F3.d 271, 274 (4th Cir. 2017); United States v Anderson, 772 F.3d 662, 667 (11th Cir. 2014); United States v. Beard, 745 F.3d 288, 291 (7th Cir. 2014); United States v. Trujillo, 713 F.3d 1003, 1005 (9th Cir. 2013); United States v. Weatherspoon, 696 F.3d 416, 421 (3rd Cir. 2012); *see also* United States v Green, 886 F.3d 1300, 1306 (10th Cir 2018)). Accordingly, subsection (c) generally should not be understood to impose jurisdictional requirements. While prior holdings governing compassionate release under earlier versions may create an ongoing requirement that defendants request that the BOP file compassionate release motions before filing their own, the waiting period prescribed by the statute cannot be understood as a jurisdictional requirement.

While Mr. McFarland made a petition to the Warden of Elkton for compassionate release on April 8th, 2020, the Warden has not yet replied. As stated, it is believed that he and the Assistant Warden are currently in the hospital.

In any event, "exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."[11] As recently held by the Honorable Judge Analisa Torres on April, 1st, 2020, in her opinion granting the Compassionate Release of Wilson Perez. *United States v. Perez*, No. 17 Cr. 513 (AT), Dkt. 98 at 2, 6–7. (that opinion attached hereto as Exhibit B).[12]

In the past two weeks, numerous courts, including this one, have ordered the temporary release from custody of inmates held in pretrial or presentencing custody. *See, e.g.*, *United States v. Chandler*, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at *1–3 (S.D.N.Y. Mar. 31, 2020) (granting bail application, pursuant to 18 U.S.C. § 3142(i), of the defendant charged with being a felon in possession of a firearm); *United States v. McKenzie*, No. 18 Cr. 834 (PAE), 2020 WL 1503669, at *2–3 (S.D.N.Y. Mar. 30, 2020) (granting bond pending sentencing, pursuant to 18 U.S.C. § 3145(c), to the defendant who had pleaded guilty to a single count of assault with a deadly weapon and had previously been released on bond); *United States v. Hernandez*, No. 19 Cr. 169 (VM), 2020 WL 1503106, at *1 (S.D.N.Y. Mar. 30, 2020) (granting bail application, pursuant to § 3142(i), of a 64-year-old defendant with asthma and high blood pressure that placed him "at a substantially heightened risk of dangerous complications should he contract COVID-19"); *United States v. Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, pursuant to § 3145(c), to a defendant who had pleaded to a narcotics offense); *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail application, pursuant to § 3142(i), of 65-year-old defendant with COPD, in light of "unique confluence of serious health issues and other risk factors facing this defendant, . . . Which place him at a substantially heightened risk of dangerous

---

[12] "On March 26, 2020, Perez submitted to the BOP his application for a sentence modification. ECF No. 96 at 4. To date, the BOP has not acted on that request. The Court holds, however, that Perez's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the Covid-19 pandemic. And the Court agrees with the parties that this threat also constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served. Accordingly, Perez's motion is GRANTED."

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

complications should [he] contract Covid-19"); *cf. United States v. Stephens*, --- F. Supp. 3d ---, No. 15 Cr. 95, 2020 WL 1295155 (AJN), at *3 (S.D.N.Y. Mar. 19, 2020) (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement, while noting that, in the alternative, § 3142(i) would necessitate his temporary release). And while the requirement of administrative exhaustion appears thus far to have limited the number of cases in which defendants serving their sentences have obtained compassionate relief from a court under § 3582(c)(1)(A)(i), at least two courts, finding administrative exhaustion, have resolved such a claim and granted such relief. *See United States v. Muniz*, No. 4:09-Cr-0199-1, 2020 WL 1540325 (KPE), at *1–2 (S.D. Tex. Mar. 30, 2020) (finding extraordinary and compelling reasons under § 3582(c)(1)(A)(i) in light of the heightened risk to inmate presented by Covid-19); *United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829 (LGS), at *3 (S.D.N.Y. Mar. 27, 2020) (same); *cf. United States v. Perez*, No. 17 Cr. 513 (AT), Dkt. 98 at 2, 6–7 (finding extraordinary and compelling reasons under § 3582(c)(1)(A) and waiving the requirement of exhaustion of administrative remedies).

Further, the US Attorney's office for the Southern District of New York office has stated that it does not oppose similar compassionate releases due to vulnerability to Covid-19. Specifically, regarding the unopposed compassionate release of Daniel Hernandez, a 23-year-old former gang member who pleaded guilty to an array of charges including weapons possession, armed robbery and dealing fentanyl and heroin, Nicholas Biase, spokesman for the U.S Attorney's Office for the Southern District of New York said, "The government did not oppose counsel's motion for compassionate release because the defendant's medical condition placed him at high risk during the coronavirus outbreak."[13] This medical condition was the same one that Mr. McFarland has asthma.

Given these developments, it is clear that Mr. McFarland is an ideal candidate for compassionate release. He is a first-time non-violent offender, having pleaded guilty to one charge of wire fraud. Nonetheless, he has no pending charges, no history of violence, and no gang affiliations. He is currently at the low-security satellite facility, which is significant as CARES ACT priority is given to inmates residing in low or minimum-security facilities.[14]

We have been informed that, upon arriving at Elkton, Mr. McFarland was told that he was a target for 2021 home confinement via the RDAP program, which takes one year off of the sentence, and provides an additional 1 year of home confinement. Therefore, allowing him to carry out his sentence in home confinement now, due to Covid-19, would not be a significant alteration of his sentencing.

---

[13] Maria Puente, *Rapper Tekashi 6ix9ine released early from prison due to coronavirus; Bill Cosby, R. Kelly, other celebs want out, too*, USA Today, (Mar. 31, 2020), https://www.usatoday.com/story/entertainment/celebrities/2020/03/31/locked-up-celebs-fearing-coronavirus-fail-win-early-release/5096351002/
[14] Office of the Attorney General, Memorandum for Director of Burau of Prisons - Prioritization of Home confinement as appropriate in response to COVID-19 Pandemic, (March 26, 2020) (accessible at; https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf)

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

During his incarceration, Mr. McFarland has proven his commitment to help and support the overall community, as demonstrated through his launching of an initiative called Project-315, a mission to help connect in-need families with their incarcerated loved ones by funding phone calls. Mr. McFarland has informed us that this initiative has aided in the BOP's decision to allow free phone calls for all inmates during this pandemic. A full letter from Mr. McFarland to the public regarding this initiative can be found on the project's website[15] and is attached hereto as Exhibit C, for your convenience.

According to Mr. McFarland, he has received one sole incident report during the early months of his approximately 22-month incarceration. This incident occurred at the minimum-security camp in Otisville, NY, where Mr. McFarland was cited for the minor offense of having a USB device that he was using to help write a self-reflection book, that he hopes to publish to assist him in fulfilling restitution to those he harmed. Mr. McFarland realizes that he was wrong to have the USB device, for which he served three months in solitary confinement. He thought that it was worthwhile to aid him in writing the book faster to make restitution to the people he hurt. Still, he now realizes, after the worst months of his life, and sincere reflection in the solitary confinement of the Special Housing Unit, how wrong he was to think that way. Besides this incident, Mr. McFarland has been a model inmate helping other intimates and the prison community everywhere he has been, including teaching a music class that culminated in a concert for the most violent and gang-affiliated inmates at Brooklyn Metropolitan Detention Center. Priority should be given in Mr. McFarland's case for the demonstration of his ethical conduct while serving his sentence, per Attorney General William Barr's directive.[16]

As stated, the attached letter from Mr. McFarland provides further information regarding this sole infraction. (Exhibit A)

Regarding Mr. McFarland's PATTERN assessment, he has provided the following information; The assessment was determined manually by the unit staff at Elkton where he was told on January 15, 2020, that he is FIRST STEP ACT "Eligible (the most important assessment), but with a HIGH risk of recidivism. Mr. McFarland immediately went and saw the staff regarding this and received reassurance from three different staff members along the lines of, '*this was a mistake. You are not a high risk of recidivism. You will be reduced to a minimum. We must have typed it in the wrong. We'll fix it for you in April when you have your next team meeting. It won't matter before then.*"

The team meeting is a meeting every six months to review an inmate's case file and has not yet occurred since the mistake was made. At the time, Mr. McFarland listened to them, as he

---

[15] https://www.project-315.com/
[16] Office of the Attorney General, Memorandum for Director of Bureau of Prisons - Prioritization of Home confinement as appropriate in response to COVID-19 Pandemic, (March 26, 2020) (accessible at; https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf)

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

had no immediate concern about the error; however, the situation has obviously changed. We are in the process of contacting Mr. Cohn, Mr. McFarland's unit manager, to get this officially changed. Still, Mr. McFarland has personal written notes and timestamps from the meetings with the three staff members who confirmed this mistake. Again, this is significant because CARES ACT priority is given to FIRST STEP ACT eligible inmates with a favorable PATTERN Score.[17]

Also, relevant to the analysis under Attorney General Barr's guidelines is that Mr. McFarland has explained his home-confinement plan should he be granted compassionate release. He has very supportive family friends that will ensure that his basic needs are met and taken care of. He also has a specific place to go to carry out his sentence. If granted the opportunity for home confinement, he would live with a close friend in Manhattan, New York. This residence is large enough to support the court-ordered social distancing as well as quarantine requirements that are impossible to comply with at Elkton. Mr. McFarland will have access to recommended safety equipment, including masks, hand sanitizer, as well as other CDC recommended cleaning and protection measures that he does not have access to while incarcerated.

In the event that this location is unacceptable, Mr. McFarland suggests that he could also stay with his family in either New Vernon or Seaside Park, New Jersey. If necessary we can request verification of their  willingness and ability to provide support and stability for Mr. McFarland.[18]

In addition, Mr. McFarland is not a risk to the community nor a threat to public safety. The crime to which he pled guilty for was the non-violent financial crime of wire fraud. However, he is a low risk of recidivism for such financial crimes as he has explained that he has a supportive family that has attested to providing for his basic needs. Further, he has independent earning potential through several avenues, including a pending deal with a major streaming service where Mr. McFarland will be interviewed for a substantial fee, a novel, a memoir, and a podcast hosting job, which can all be completed from within home detention. Naturally he will need to obtain permission from the Government and this court and be in compliance with all Restitution requirements and pay all existing fines.

Being able to work on these projects while in home confinement will allow Mr. McFarland to not only supply for his own basic needs but also begin paying restitution through legitimate means and provide value to society, while closely being monitored. This is again significant as CARES ACT priority is given to those that have a verifiable re-entry plan that will

---

[17] Office of the Attorney General, Memorandum for Director of Burau of Prisons - Prioritization of Home confinement as appropriate in response to COVID-19 Pandemic, (March 26, 2020) (accessible at; https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf)
[18] Mr. McFarland's father has specifically agreed to subsidies and pay for any mental health and phycological wellness assistance for Mr. McFarland upon release to home detention.

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

prevent recidivism and maximize public safety, including verification that being home would present a lower risk of contracting Covid-19 than remaining in prison.[19]

Mr. McFarland was sentenced to 72 months' imprisonment plus three years Supervised Release. As he wishes not to avoid his sentencing, but simply avoid potentially life-threatening consequences from Covid-19, in conjunction with this request that he serve the remainder of his sentence on Home Detention, he would be willing to increase the Supervised Release time, post-Home Detention, from 3 years to 5 years. For the duration of Home Detention and Supervised Release, Mr. McFarland will pay 50% of all income to the Court for restitution and fines as required. Further, Mr. McFarland will engage a third-party CPA to provide Probation with an audited monthly report of all personal accounting, and he will fully take on all additional expenses to pay for the professional services.

Mr. McFarland is aware that additional requirements, conditions, and supervision are entirely under the jurisdiction and power of the Court, and that this motion provides a list of proposed additional conditions to demonstrate his willingness to put the interest of the people he hurt first ahead of his own, to provide recovery, and to show his understanding and awareness of the fact that any wronging or noncompliance would result in severe punishment and additional jail time.

In summary, Mr. McFarland meets valid, genuine, and urgent conditions under Attorney General Barr's memorandum and state of emergency declaration as well as the CARES ACT for priority consideration of compassionate release. Mr. McFarland's chronic asthma and other underlying conditions are incredibly dangerous CDC-recognized conditions that put him at great health risk should he contract Covid-19 in the close-confines of institutional incarceration. Mr. McFarland has gotten both the support of family and a plan for home confinement that is appropriate for his circumstances, where he may continue to work on his restitution. Finally, if granted the opportunity for home confinement, Mr. McFarland plans to serve his time safely and without the additional risk, stress, and fear associated with Covid-19 and this world-changing global pandemic. His worst and understandable fear is that a denial of his request will inevitably lead to infection by the Coronavirus. Thank you for your Honors consideration of his request.

Respectfully submitted
/s/ Robert J Hantman_____
Robert J Hantman

---

[19] Office of the Attorney General, Memorandum for Director of Burau of Prisons - Prioritization of Home confinement as appropriate in response to COVID-19 Pandemic, (March 26, 2020) (accessible at; https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf)

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

Exhibit A

FLORIDA                        NEW JERSEY                     FLORIDA
HANTMAN & ASSOCIATES           JOSEPH J. FERRARA              ENTIN & DELLA FERA, P.A.
650 WEST AVENUE                OF COUNSEL                     OF COUNSEL
SUITE 2408                     111 PATERSON AVENUE            110 SE 6TH ST., SUITE 1970
MIAMI BEACH, FL 33139          HOBOKEN, NJ 07030              FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

The Federal Correctional Institution, Elkton
8730 Scroggs Rd, Lisbon, OH 44432
(330) 420-6200

The Hon. Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Buchwald,

The attached motion attempts to outline the current situation and risks that lead to me ask to serve the remainder of my sentence on home detention. However, I believe I need to write you a letter outliningin the person behind the motion you're considering, who I've come to be, and how the justice system has changed my life. Regardless of your consideration, I hope you can get a glimpse into my mind, and see the role the justice system has played on my life, and hopefully, in some small way, society, and the world around me.

When I was arrested, my family and friends couldn't understand my actions. Their demand for answers only got worse as I violated bail, was sentenced, and finally had a USB device in Otisville. Their questions focused on the following themes:

"When will you learn?"
"Do you understand why you did what you did?"
"How will you change?"

If the people who love and know me best were asking these questions, I can only imagine what everyone else is asking. It's time to provide answers.

1) When will you learn?

When I was on bail, I didn't even realize I had to learn. I was trying to hang on to the life I thought I had. I didn't understand. I was mentally fighting back, thinking that while I was totally wrong in my actions, my intentions were good. I was thinking I just wanted to make everyone happy and make things work at all costs.

This thinking couldn't have been more wrong. I had to let go. I had to reset. I had to completely change.

It took me violating bail, being in prison for a year, and finally getting sent to the SHU before I realized where I went wrong. I needed to reflect on why I did what I did. I needed to stop mentally fighting what my family and friends were telling me. I needed to address the gaping hole in my rationalization and thought process that the words you used to describe me during sentencing made glaringly appearant. I needed to understand why I did what I did. And most importantly, I needed to reset, to learn where I went wrong, know why I went wrong, and set a plan, and begin taking the steps to change myself.

2) Do you understand why you did what you did?

I didn't recognize the man you described at sentencing. When I heard 6 years, it felt like I was handed a life sentence. My mind immediately turned to thoughts of showing everyone I wasn't this horrible person. In this pursuit, I didn't realize what I needed had nothing to do with showing others. What I needed to do - what I truly believe you were trying to tell me - was that in order to go as horribly wrong as I did, something was off. Something went so completely wrong with my morality, that it couldn't be described or pushed aside by anything else. You were telling me the acts of bad so far outweighed any good, that there's only one choice, and that was to completely change my approach to life.

The lengthy sentence should've woken me to this reality.

I'm embarrassed to say that this wasn't yet rock bottom. In my attempt to prove that I wasn't this person, I was dead set on writing a book and giving all of the proceeds to recovery. I had a USB device to try and once again go too fast. This lead me to go to the SHU in July of 2019. Prior to going to the SHU, I'd been dead set on not doing anything illegal, but I was still determined to show, through positive results, at all costs. Looking back, it's unbelievable that I didn't yet realize this "at all costs" mentality was poison. I still had this mindset, and still hadn't realized what you were trying to tell me. I had so much to learn before I could do something right.

Fortunately, the SHU woke me up. It helped me see the truth. It was singlehandedly the best thing to happen to me.

1

FLORIDA                          NEW JERSEY                       FLORIDA
HANTMAN & ASSOCIATES             JOSEPH J. FERRARA                ENTIN & DELLA FERA, P.A.
650 WEST AVENUE                  OF COUNSEL                      OF COUNSEL
SUITE 2408                       111 PATERSON AVENUE             110 SE 6TH ST., SUITE 1970
MIAMI BEACH, FL 33139            HOBOKEN, NJ 07030               FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

The Federal Correctional Institution, Elkton
8730 Scroggs Rd, Lisbon, OH 44432
(330) 420-6200

The understanding of why I went wrong all started with the realization that the true punishment of jail isn't anything like I expected it would be. The SHU taught me that the true punishment of jail is the cries and pleas for help from the ones I love. It's the tears, the pain, the suffering, and the begging to just "PLEASE DO SOMETHING" from my loved ones, and the complete inability to help. It's being separated from these loved ones in a cage for 3 months, when the one phone call we're allowed per month cuts off just as the person on the other end is pleading for help. The true punishment is not going to jail ourselves, but that we impart our sentence on the innocent ones we love.

I thought I'd learned I didn't belong here in my 7 months in Brooklyn. I thought seeing people get stabbed, threatened, raped, and even commit suicide, would be enough. I though that when someone came into my cell with a knife, and said, "only one of us leaves alive," I'd realize how horribly wrong I went. This all may have scarred me straight -- it's a running joke amongst my dormmates that I annoyingly say, "be careful. don't do anything illegal" -- but it didn't show me the desperate need to completely change my approach. I'm further embarrassed to admit that this wasn't enough, that it took going to solitary confinement to see the full picture of pain that I spread on others. However, I'm proud that during my time in solitary, I was able to realize that I needed to reset. I promised myself that I'd make this the best thing to ever happen to me, the ones I love, and the ones I hurt and let down.

3) How will you change?

After 22 months in jail, and 9 months after going to the SHU, I'm making good on my promise to myself. I've come to learn the patience required for my intentions to come to fruition. I've also come to see that the first step is being true to myself, and making good on my personal promises, goals, and intentions. The reflections in the SHU can be summed up in one statement: I lost my purpose and mission. In order to reset, I needed a clear mission; a goal for every single day. Something I could began living and executing from within the confines of the SHU.

I adopted a personal mission and purpose of dedicating my life to helping everyone I let down and those around me, being there for my family, and making sure all of my actions, in furtherance of my purpose, are done transparently and within the allowed boundaries. This was easy to start with in the SHU. There were a number of men that I can only describe as desperate and forgotten. The smallest of actions could make their day. I started waking up with one goal - before I can help those I let down, and before I can be there for my family, I needed to spend each day helping one person in my environment. In the three months I spent in the SHU, I know I made a positive impact - from the inmates to the guards and staff, I think I made everyone's time a little bit better.

In October, I was transferred to Elkton. The ultimate punishment of distance from family and loved ones was exacerbated, but I've continued my purpose: following my mission of helping those I let down, while doing good for the environment around me. In addition to what I'm working on for those I hurt, I saw the devastation that Coronavirus is having on inmates and their innocent families. As I learned in the SHU, the ultimate punishment is on our families - taking us away from them when they need us most. Specifically, many families have been hurt economically by the virus, and haven't been able to send their incarcerated loved ones the money needed to stay in touch via the prison phone. With help from my friends at home, I launched a small initiative, called Project-315, to help connect these in-need families, by funding a prison pay-phone call. We funded every single family/inmate who applied, and a week later, the BOP made phone calls free for all inmates during this emergency. This was a very small step, but I believe it's necessary for my growth and the overall good that I've been focusing on providing everyone I let down.

The motion outlines the seriousness of the situation at FCI Elkton, the health risks that I'm exposed to by being here, and how I can contribute positively via home detention. However, regardless of your consideration of the motion, I'd like you to know the impact this situation has had on me. My thoughts immediately after sentencing couldn't have been further from reality. It took me longer than it should've, but your message has come through. It'll be a long road, but I can finally report, everything feels right. I'm living with a level of peace and acceptance that I lost in the events leading up to my arrest. I'm working harder than ever, in furtherance of a mission I truly know is right. I know that by living every day with the dedication of helping those I let down, and by doing it within the rules and regulations, I will slowly but surely continue down the path so I badly needed to regain.

Sincerely,
Billy McFarland

2

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

Exhibit B

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

WILSON PEREZ,

                              Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/1/2020____

17 Cr. 513-3 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Wilson Perez, a prisoner serving his sentence at the Metropolitan Detention Center (the "MDC"), moves for a reduction of his term of imprisonment under the federal compassionate release statute, codified at 18 U.S.C. § 3582(c)(1)(A).  Def. Letter, ECF No. 92.  For the reasons stated below, Perez's motion is GRANTED.

**BACKGROUND**

On October 21, 2019, Perez pleaded guilty to kidnapping and conspiracy in violation of 18 U.S.C. § 1201.  ECF No. 85.  On January 2, 2020, the Court sentenced him to three years of imprisonment and two years of supervised release.  ECF No. 89.  "Perez has a well-documented history of medical complications which stem from injuries suffered during his incarceration."  Gov't Letter at 3, ECF No. 95.  While housed at the Metropolitan Correctional Center, he was the victim of two vicious beatings, resulting in a broken jaw and shattered bones around his eye socket; both attacks sent him to the hospital and necessitated reconstructive surgeries of his face, with the second surgery requiring metal implants.  *See* Sentencing Tr. 9:8–18, ECF No. 74.  Although Perez's physicians directed that he receive follow-up care, such care was repeatedly delayed or difficult to obtain.  *See id.* 10:22–12:17.  He continues to suffer from pain and persistent vision problems.  Because Perez has been detained since his arrest on September 27, 2017, ECF No. 17, his prison sentence is set to terminate on April 17, 2020, Def. Letter at 1.

14

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

Perez requests release in advance of that date because he is at risk of contracting, and experiencing serious complications from, COVID-19 if he remains at the MDC. *Id.* at 1–2. He spends most of each day with a cellmate in a small cell "that is barely large enough for a single occupant," where he is "breathing recirculated air" and "unable to practice proper hygiene." *Id.* at 1. Additionally, Perez "is in pain and not receiving pain medication." *Id.* The Federal Bureau of Prisons (the "BOP") acknowledges that COVID-19 is present within the MDC. *See* COVID-19 Tested Positive Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/. The Government does not object to Perez's release on the merits, conceding that Perez has a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues," and that "he has less than a month remaining on his sentence." Gov't Letter at 3. But the Government questions the Court's authority to act on Perez's application, arguing that he has not exhausted the administrative remedies under § 3582(c)(1)(A), which requires that a defendant seeking compassionate release present his application to the BOP and then either (1) administratively appeal an adverse result if the BOP does not agree that his sentence should be modified, or (2) wait for 30 days to pass. Gov't Letter at 3–4.

On March 26, 2020, Perez submitted to the BOP his application for a sentence modification. ECF No. 96 at 4. To date, the BOP has not acted on that request. The Court holds, however, that Perez's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic. And the Court agrees with the parties that this threat also constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served. Accordingly, Perez's motion is GRANTED.

2

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

## DISCUSSION

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i)     extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Perez must both meet the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence.  The Court addresses these requirements in turn.

I.     Exhaustion

Section 3582(c)(1)(A) imposes "a statutory exhaustion requirement" that "must be strictly enforced."  *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (citing *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (internal quotation marks and alterations omitted)).[1]  The Court may waive that requirement only if one of the recognized exceptions to exhaustion applies.

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute."  *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503

---

[1] The Court need not decide whether § 3582(c)'s exhaustion requirement is a jurisdictional requirement or merely a mandatory claim-processing rule.  *See Monzon*, 2020 WL 550220, at *2 (describing split between courts on that question).

3

FLORIDA     NEW JERSEY     FLORIDA
HANTMAN & ASSOCIATES     JOSEPH J. FERRARA     ENTIN & DELLA FERA, P.A.
650 WEST AVENUE     OF COUNSEL     OF COUNSEL
SUITE 2408     111 PATERSON AVENUE     110 SE 6TH ST., SUITE 1970
MIAMI BEACH, FL 33139     HOBOKEN, NJ 07030     FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

U.S. 140, 146–47 (1992)).[2]  There are three circumstances where failure to exhaust may be excused.  "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue."  *Id.*  Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief."  *Id.* at 119.  Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice."  *Id.*

  All three of these exceptions apply here.  "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.  Moreover, the relief the agency might provide could, because of undue delay, become inadequate.  Finally, and obviously, [Perez] could be unduly prejudiced by such delay."  *Washington*, 925 F.3d at 120–21; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").  Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez.  The Court concludes that requiring him to exhaust administrative

---

[2] The Supreme Court has stressed that for "a statutory exhaustion provision . . . Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to."  *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  Even when faced with statutory exhaustion requirements, however, the Supreme Court has allowed claims to proceed notwithstanding a party's failure to complete the administrative review process established by the agency "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate," so long as the party presented the claim to the agency.  *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976).  That reasoning explains the Second Circuit's holding that even statutory exhaustion requirements are "not absolute."  *Washington*, 925 F.3d at 118.  Perez has presented his claim to the BOP, *see* ECF No. 96 at 1, so the situation here is analogous.

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

To be sure, "the policies favoring exhaustion are most strongly implicated" by challenges to the application of existing regulations to particular individuals. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). Ordinarily, requests for a sentence reduction under § 3582(c) would fall squarely into that category. But "courts should be flexible in determining whether exhaustion should be excused," *id.* at 151, and "[t]he ultimate decision of whether to waive exhaustion . . . should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239. Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Perez's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

Here, delaying release amounts to denying relief altogether. Perez has less than three weeks remaining on his sentence, and pursuing the administrative process would be a futile endeavor; he is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before his release date. Perez asks that his sentence be modified so that he can be released now, and not on April 17, 2020, because remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19. He has had two surgeries while incarcerated, and continues to suffer severe side effects such as ongoing pain and persistent vision problems. ECF No. 96 at 4. As the Government

5

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

concedes, Perez faces a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues." Gov't Letter at 3.  Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling."

Accordingly, the Court holds that Perez's undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement.[3]

II.    Extraordinary and Compelling Reasons for Release

The Court also finds that Perez has set forth "extraordinary and compelling reasons" to reduce his sentence to time served.  18 U.S.C. § 3582(c)(1)(A)(i).  The Government does not dispute that Perez has done so.  Gov't Letter at 3.  And Perez's medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-19, clears the high bar set by § 3582(c)(1)(A)(i).

The authority to define "extraordinary and compelling reasons" has been granted to the United States Sentencing Commission, which has defined that term at U.S.S.G. § 1B1.13, comment n.1.  *See United States v. Ebbers*, No. 02 Cr. 11443, 2020 WL 91399, at *4–5 (S.D.N.Y. Jan. 8, 2020).  Two components of the definition are relevant.  First, extraordinary and compelling reasons for modification exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13

---

[3] A number of courts have denied applications for sentence modification under § 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19 on the ground that the defendants failed to exhaust administrative remedies.  *See, e.g.*, *United States v. Zywotko*, No. 2:19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Eberhart*, No. 13 Cr. 00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Hernandez*, No. 19 Cr. 834, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020).  But in several of those cases, the defendant was not in a facility where COVID-19 was spreading, and in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19.  In this case, unlike those, Perez has established that enforcing the exhaustion requirement carries the real risk of inflicting severe and irreparable harm to his health.

6

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

comment n.1(A)(ii).  Perez's recent surgeries, and his persistent pain and vision complications, satisfy that requirement.  Confined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus.  And although he may recover in the future from the surgeries and their complications, there is no defined timeline for that recovery; certainly, he is not expected to recover within the remainder of his sentence.

The Honorable Lorna G. Schofield recently granted an application for sentence reduction under § 3582(c) under similar circumstances.  *See United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020).  Judge Schofield approved the request of a defendant confined to the Brooklyn Residential Reentry Center (the "RCC") stating that his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC."  *Id.* at *3 (citing U.S.S.G. § 1B1.13 comment. n.1(A)). The same justifications apply here.

Second, U.S.S.G. § 1B1.13 comment. n.1(D) authorizes release based on "an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."  Perez meets this requirement as well, because he has weeks left on his sentence, is in weakened health, and faces the threat of a potentially fatal virus.  The benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.

Accordingly, the Court finds that Perez has demonstrated extraordinary and compelling reasons justifying his release.

7

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

**CONCLUSION**

For the reasons stated above, Perez's motion for a reduction of his term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) is GRANTED.  Perez's term of imprisonment is reduced to time served.  It is ORDERED that Perez be released immediately to begin his two-year term of supervised release.

The Clerk of Court is directed to terminate the motion at ECF No. 92.

SO ORDERED.

Dated: April 1, 2020
       New York, New York

_____
         ANALISA TORRES
     United States District Judge

8

21

FLORIDA
HANTMAN & ASSOCIATES
650 WEST AVENUE
SUITE 2408
MIAMI BEACH, FL 33139

NEW JERSEY
JOSEPH J. FERRARA
OF COUNSEL
111 PATERSON AVENUE
HOBOKEN, NJ 07030

FLORIDA
ENTIN & DELLA FERA, P.A.
OF COUNSEL
110 SE 6TH ST., SUITE 1970
FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

## Exhibit C

4/9/2020                                                    Letter from Billy McFarland — Project-315

**Project-315**          Home   Donors   Letter from Billy   Contact   Donate   ✖    **Apply**

**04/03/2020**

Dear Families and Those Interested in Helping Inmates,

Since this is the first time I'm speaking or launching something publicly in quite some time, I believe it's important to address your inevitable questions and concerns, regarding my intentions and the legitimacy of the project, in an effort to help as many people as possible.

First, I'd like you to know that I know how badly I messed up. I lied, deceived, and ultimately hurt many people in pursuit of what I thought would be successful business ventures. What I did was absolutely despicable, and the responsibility for the damages caused starts and ends with me. There's absolutely no excuse for my actions. There's not a day that goes by that my reflection of these choices doesn't make me sick. Ultimately, my mistakes may prove to be unforgivable, but as I sit here and take all of this in, I think back to the day I was sentenced. I promised to dedicate myself to helping those I hurt through the only way I thought appropriate: by living my apology. After nearly 2 years in jail, I believe in this more than ever. To everyone I hurt, I'm extremely sorry. I'll work for the rest of my life to try and make up, in some small way, for what I did. Before we get to Project-315, and what I believe to be the first realized step of living my apology, I'd like to share the impetus of the festival, how it led me to Project-315, and how it'll power my mission of helping everyone I hurt.

Many of you only know me from the Fyre Festival. If I were you, I'd think this is a scam, and that I am full of shit. I'd also question anything I read that tried to convince me otherwise. So, instead of saying that Project-315 is very real, and the people we're trying to help are truly suffering and experiencing pain, I'm going to tell you why I'm doing it, and do my best to focus on the results.

Prior to Fyre, I started and ran a couple of startups. It was through these companies that I came to form a personal belief—and underlying life purpose. Summed up, my discovery was that connecting and bringing people together, who otherwise wouldn't have met, is the most powerful source of value, impact, innovation, and good. I saw the magic in this world occurring in the unique intersection of diverse people, experiences, and ideas.

After spending years building brands that aimed to connect different people through experiences, I found another slice of magic, one that only augmented my theme, in the small islands of the Bahamas. Desperately wanting to share with the world what I "found" - I dreamed of helping everyone experience the magic I was experiencing—the festival was conceived to be the ultimate manifestation of my theme and purpose, in my newfound favorite place in the world.

I legitimately tried to execute the festival, but I clearly made wrong, immoral, and terrible decisions along the way. However, while the festival failed, the resulting prison time has matured my mission, and only solidified my belief that the good that can be created and shared when different people come together is more than potent; it's my source of inspiration to help those I've wronged.

Today I'm launching Project-315, an initiative to help bring together and connect in-need federal inmates and their families who have been affected by the Coronavirus. I believe it's only appropriate that the focus remains on this mission and the people around the world affected by the virus.

Even though my exposure to the effects of Coronavirus are limited compared to yours, as we remain locked-down, I do see what's happening to inmates and their families. As some of us watch our families get sick, we're confronted with what I've learned to be the biggest challenge of incarceration –– not being able to answer the cries and pleas for help from the ones we love.

I know I'm not alone when I say that the usual daily thoughts and dreams of freedom and life beyond bars have given way to a much simpler, yet ultimately more important wish: to simply be able to be there, by the sides of our family and loved ones, who are sick and compromised. As I experience and participate in the usual jail-house conversations, it's clear they've turned to a singular theme: "What-if" scenarios –– what we'd all trade and give up, the additional punishments and pain we'd voluntarily put ourselves through just to help our families not be alone during this crisis. It's in times like these that we discover that the true punishment for our previous mistakes is not the obvious aspect of jail itself, but the veiled consequence of having to helplessly watch as the ones we love suffer.

In normal times, families separated by incarceration look to grasp at any possible contact with each other. Now, when they need us most, we're driven even further apart. Despite visitation having been canceled (and rightfully so), the Bureau of Prisons has really

https://www.project-315.com/letter                                                                          1/3

FLORIDA                        NEW JERSEY                                              FLORIDA
HANTMAN & ASSOCIATES           JOSEPH J. FERRARA                                       ENTIN & DELLA FERA, P.A.
650 WEST AVENUE                OF COUNSEL                                              OF COUNSEL
SUITE 2408                     111 PATERSON AVENUE                                     110 SE 6TH ST., SUITE 1970
MIAMI BEACH, FL 33139          HOBOKEN, NJ 07030                                       FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

4/9/2020                                    Letter from Billy McFarland — Project-315

come through for us in granting inmates additional phone privileges. If you haven't experienced prison - whether personally or through a loved one - it may be difficult to understand the impact of a 15-minute prison call. But when the ultimate sentence of distance and separation is imposed, and a family is struggling through sickness, economic challenges, and other hardships as a result of this invisible enemy, just the sound of hearing a loved one's voice can help a distraught family through the hardest of days.

Unfortunately, a great number of the nearly 2,000 inmates I live with don't have the money needed for a full phone call, the cost of which is $3.15. And it doesn't just end with my facility. The cash crunch being experienced by many of our families exacerbates the pain caused from the virus and punishment of distance. The good news is that it doesn't take much to make a big difference.

I'm lucky enough to have family and friends who have experienced, firsthand, the impact of hearing one another's voice. I hope this is just the start, and as families share their stories and tears, we can come together to allow Project-315 to connect many more of the nearly 180,000 federally incarcerated men and women across the country with their families, especially when they - the innocent ones - need us most.

Sincerely,

Billy McFarland

#91186-054

FCI Elkton

P.O. Box 10

Lisbon, OH 44432

P.S. - A Note on Funding: All donations, except for fees to receive and distribute funds, go directly to inmates and their families. I understand no one may join me in this endeavor. My hope is that once Project-315 proves to be impactful, you'll also decide to join me. To clarify a few parameters: I am not touching any of the money. I don't have access to the funds. I'm not getting paid. And I'm not receiving any financial benefit. I'm driven to connect and bring people together while helping everyone I hurt, and most importantly, doing it while operating within the allowed boundaries. Regardless of your stance on my mission, I hope it's obvious that I don't want to come back to jail. I also believe it's imperative that we operate with extreme transparency. Weekly accounting will be published, and any questions regarding the accounting records will be answered publicly.

Apply for Free Call                                    Donate Now

@project_315_   |   team@project-315.com

23

FLORIDA                        NEW JERSEY                                      FLORIDA
HANTMAN & ASSOCIATES           JOSEPH J. FERRARA                               ENTIN & DELLA FERA, P.A.
650 WEST AVENUE                OF COUNSEL                                      OF COUNSEL
SUITE 2408                     111 PATERSON AVENUE                             110 SE 6TH ST., SUITE 1970
MIAMI BEACH, FL 33139          HOBOKEN, NJ 07030                               FORT LAUDERDALE, FL 33301

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.

24

| FLORIDA | NEW JERSEY | FLORIDA |
|---|---|---|
| HANTMAN & ASSOCIATES | JOSEPH J. FERRARA | ENTIN & DELLA FERA, P.A. |
| 650 WEST AVENUE | OF COUNSEL | OF COUNSEL |
| SUITE 2408 | 111 PATERSON AVENUE | 110 SE 6TH ST., SUITE 1970 |
| MIAMI BEACH, FL 33139 | HOBOKEN, NJ 07030 | FORT LAUDERDALE, FL 33301 |

PLEASE SEND ALL CORRESPONDENCE TO THE NEW YORK, NY ADDRESS LISTED ABOVE.