UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                             :        S2 17 Cr. 600 (NRB)

WILLIAM MCFARLAND,                          :

               Defendant.          :

-----------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT WILLIAM MCFARLAND'S MOTION FOR RELEASE

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Kristy J. Greenberg
Assistant United States Attorney

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 3

I.   THE DEFENDANT'S MOTION MUST BE DENIED FOR FAILURE TO EXHAUST
     HIS ADMINISTRATIVE REMEDIES ............................................................. 3

     A.  The Statute's Exhaustion Requirement Is Mandatory and Contains No Exceptions.... 4

     B.  The Defendant's "Exceptions" Argument Fails ............................................. 7

II.  THE DEFENDANT HAS NOT DEMONSTRATED EXTRAORDINARY AND
     COMPELLING REASONS FOR HIS IMMEDIATE RELEASE .................................. 12

     A.  Applicable Law .................................................................................... 12

     B.  The Defendant's Alleged Medical Conditions Have Not Been Verified……….…..14

     C.  The Defendant's BOP Disciplinary Violation Counsels Against His Release………...17

     D.  The Section 3553(a) Factors Weigh Against the Defendant's Release………………...18

CONCLUSION....................................................................................................... 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -*v.*-                                                    :          S2 17 Cr. 600 (NRB)

WILLIAM MCFARLAND,                                :

                    Defendant.              :

----------------------------------------------------------------x

### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT WILLIAM MCFARLAND'S MOTION FOR RELEASE

The Government respectfully submits this memorandum of law in opposition to the motion for release filed by defendant William McFarland (the "defendant").

### PRELIMINARY STATEMENT

The defendant, who engaged in a massive fraud scheme, who committed another fraud scheme while on pretrial release, who voluntarily lied to law enforcement, who has no documented serious medical conditions, who committed a serious disciplinary violation in prison, and who has served less than half of his sentence, now moves this Court to release him immediately and permanently from prison, on the ground that he is a greater risk for complications in the event that he were to get COVID-19. That motion should be denied for multiple reasons.

*First*, this Court lacks authority to order the defendant's release at this time, because he has not exhausted his administrative remedies. The defendant's claim that the Court may simply excuse or ignore that undisputed failure, over the Government's objection, is wrong. It has been rejected by the Third Circuit, *see United States v. Raia*, No. 20-1033, --- F.3d ---, 2020 WL

1647922, at *2 (3d Cir. Apr. 2, 2020), and also by the majority of courts in this district to have been presented with it.  For good reason: "Lawmakers who created the statutory right of a convicted defendant to bring an application to reduce his sentence placed a limitation on his right to do so."  *Id.* at *3.  "[T]he Court is not free" to disregard that limitation by "infer[ring] a general 'unwritten 'special circumstances' exception'" that is irreconcilable with the statute's plain language.  *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y Apr. 8, 2020) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016)) (denying motion of HIV-positive inmate).

*Second*, the defendant fails to discharge his burden to demonstrate that he, personally and individually, falls into the category of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release.  18 U.S.C. § 3582(c)(1)(A).  The defendant, unlike many others who have moved for release in recent days and weeks, is young and has no documented medical conditions that render him particularly vulnerable to COVID-19.  The defendant provides no documentation of any medical conditions, nor is there reference to any serious medical conditions in his prison medical records.  The defendant did not report medical conditions that he claims predated his arrest to the Probation Office or to the Court in connection with sentencing; to the contrary, the defendant reported that he was in good health.

*Third*, and in any event, even assuming *arguendo* that the defendant had otherwise met or could meet his burden, release would remain unwarranted.  The law requires that the same Section 3553(a) factors considered at sentencing be considered in weighing a motion for release. As noted above, the defendant incurred a serious disciplinary violation in prison and has served less than half of his sentence.  Release at this time would not be in accord with those factors.

## ARGUMENT

### I.    THE DEFENDANT'S MOTION MUST BE DENIED FOR FAILURE TO EXHAUST HIS ADMINISTRATIVE REMEDIES

The defendant does not dispute that he has failed to exhaust his administrative remedies. Nor could he, because his April 8, 2020 request to the Federal Bureau of Prisons ("BOP") has not yet been ruled upon, much less has he availed himself of his right to appeal within the BOP a denial, were one to occur, *see* 28 C.F.R. §§ 542.15, 571.63, nor has it been 30 days from the receipt by the BOP of his request.  The defendant asserts that, nonetheless, the Court should excuse or waive his failure to exhaust his administrative remedies.  (Def. Mem. 4-5.)  The law is squarely to the contrary.

#### A.  The Statute's Exhaustion Requirement is Mandatory and Contains No Exceptions

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances.  One such circumstance is the so-called compassionate release provision, under which the defendant here seeks relief, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances."  *Id.* § 3582(c)(1)(A)(i).  A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id.* (emphasis added).  Accordingly, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.  In short, Section 3582(c)(1)(A)'s exhaustion requirement requires "ful[] exhaust[ion]."

3

That ends this matter at this time.  This is so because Section 3582(c)'s exhaustion requirement is statutory, not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions."  *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  Statutory exhaustion requirements "stand[] on a different footing."  *Id.*  "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to."  *Id.*  Thus, where a statute contains mandatory exhaustion language, as it does here, the only permissible exceptions are those contained in the statute.  *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) has mandatory exhaustion language with no exceptions.  The plain language of the statute states that a court "may not" modify a sentence unless the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden.  Unlike the Prison Litigation Reform Act ("PLRA"), for example, there is no statutory qualifier that a defendant need only to exhaust all "available" remedies.[1]  *See also* 28 U.S.C. § 2254(b)(1)(A) (habeas statute requires exhaustion of all remedies "available in the courts of the State").  Thus, Section 3582(c)(1)(A) is a mandatory exhaustion provision with no applicable exceptions.  *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims).  As Circuit Judge Sullivan, sitting by

---

[1] In particular, the PLRA demands that an inmate exhaust "such administrative remedies *as are available*," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable."  *Ross*, 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule).  Here, no such exception exists in the statute.

designation, recently explained, Section 3582(c)'s exhaustion requirement is "clear as day" and is therefore mandatory. *United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020).  For this reason, this Court lacks the authority to grant the defendant's motion at this time.

In recent weeks, as the Court is aware, numerous defendants have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be waived or excused.  The only court of appeals to have addressed the question has rejected the argument and required exhaustion.  *See United States v. Raia*, No. 20-1033, --- F.3d ---, 2020 WL 1647922 (3d Cir. Apr. 2, 2020).  In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at *2.  The vast majority of district courts in this District, including this one, have also required exhaustion despite COVID-19 claims.[2]  These decisions are consistent with the plain language of Section 3582(c).

---

[2] *See United States v. Wright*, 17 Cr. 695 (CM), 2020 WL 1922371, at *2 (S.D.N.Y. Apr. 20, 2020); *United States v. Demaria*, No. 17 Cr. 569 (ER), 2020 WL 1888910, at *4 (S.D.N.Y. Apr. 16, 2020); *United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *3-*5 (S.D.N.Y. Apr. 14, 2020); *United States v. Bonventre*, 10 Cr. 228 (LTS), 2020 WL 1862638, at *2-*3 (S.D.N.Y. Apr. 14, 2020); *United States v. Pereyra-Polanco*, 19 Cr. 10 (NRB), 2020 WL 1862639, at *1 (S.D.N.Y. Apr. 14, 2020); *United States v. Rabadi*, No. 13 Cr. 353 (KMK), 2020 WL 1862640, at *2-*3 (S.D.N.Y. Apr. 14, 2020); *United States v. Reese*, No. 12 Cr. 629 (VM), 2020 WL 1847552, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Engleson*, 13 Cr. 340 (RJS), 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020); *United States v. Fana*, 19 Cr. 11 (GHW), 2020 WL 1816193, at *5 (S.D.N.Y. Apr. 10, 2020); *United States v. Canale*, 17 Cr. 287 (JPO), 2020 WL 1809287, at *2 (S.D.N.Y. Apr. 9, 2020); *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Ramos*, No. 14 Cr. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Crosby*, No. 09 Cr. 1056 (WHP) (S.D.N.Y. Apr. 7, 2020) (Tr. of 4/7 conference, at 13); *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020); *United States v. Arena*, No. 18 Cr. 14

To be sure, COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously. But the text of Section 3582 contains no exigency exception for such circumstances, and indeed the text affirmatively refutes the availability of such an exception. While many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim is brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). This 30-day alternative rule is a "limited futility-like exception," and, therefore, "[g]iven Congress's decision to mandate exhaustion and specify a single alternative, the Court is not free to infer a 'general unwritten special circumstances exception.'" *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (quoting *Ross*, 136 S. Ct. at 1856, 1862); *see also United States v. Arena*, No. 18 Cr. 14 (VM) (Dkt. 354 at 2) (S.D.N.Y. Apr. 6, 2020) (stating that there is "simply no authority that permits [the defendant] to circumvent the administrative exhaustion requirement" based on a claim of futility, because the ability to seek relief after 30 days constitutes "an express futility provision"). Ultimately, defendants' arguments regarding the need for a futility exception "boil[] down to a pragmatic insistence that a 30-day waiting period is simply too long to wait in the current health crisis. But there is nothing in the First Step Act or its history to suggest that courts may modulate the exhaustion waiting period when they see fit." *Ogarro*, 2020 WL 1876300, at *5.

---

(VM) (S.D.N.Y. Apr. 6, 2020) (Dkt. 354 at 2-3); *United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020). *But see United States v. Scparta*, No. 18 Cr. 578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020); *United States v. Russo*, 16 Cr. 441 (LJL), 2020 WL 1862294, at *7 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, No. 19 Cr. 541 (JSR), 2020 WL 18211988, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020).

As the Third Circuit properly recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions—particularly at a time like this when many inmates are making petitions advancing similar claims—and adjudicate those positions in a consistent manner. The Court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment. *See United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020).

In any event, to ignore the mandatory, express, statutory exhaustion requirement, whatever its merits, would be legal error. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1848 (2018) ("[T]his case presents a question of statutory interpretation, not a question of policy."); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (Where a "statute's language is plain, the sole function of the courts is to enforce it according to its terms." (internal quotation marks omitted)); *cf., e.g.*, *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) ("This is not a free-ranging search for the best copyright policy, but rather depends solely on statutory interpretation." (internal quotation marks omitted)).

**B.  The Defendant's "Exceptions" Argument Fails**

In the face of unambiguous statutory language, and numerous cases applying it in this district and elsewhere, the defendant claims, relying principally on *United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020), that this Court both may and should find that the exhaustion requirement is waived "in light of the extraordinary threat posed– in his unique circumstances –by the COVID-19 pandemic."  (Def. Mem. 5.)  That claim is wrong.  The statute's plain language does not permit exceptions.

*Perez* relied on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which is inapposite because it involves judge-made, not statutory, exhaustion doctrine.  *See Washington*, 925 F.3d at 116 (stating that the statute in question "does not mandate exhaustion of administrative remedies" but finding that exhaustion requirement was nevertheless appropriate); *id.* at 118 ("Although not mandated by Congress, [exhaustion] is consistent with congressional intent.").[3]  Thus, it was appropriate for the court to consider judge-made exceptions to the judge-made exhaustion requirement, or to put it differently, the scope of the judge-made requirement. *See Ross*, 136 S. Ct. at 1857.  But this case involves a mandatory, express, statutory exhaustion requirement.  That is entirely different.  *See Bastek*, 145 F.3d at 95 (rejecting application of various exceptions to exhaustion requirement where clear statutory requirement exists); *Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004) (rejecting futility exception to exhaustion requirement in Immigration and Nationality Act because such an exception is "simply not available when the exhaustion requirement is statutory," as opposed to judicial); *United States v. Gonzalez-Roque*, 301 F.3d 39, 46-48 (2d Cir. 2002) (rejecting argument that statutory exhaustion requirement for collaterally attacking a removal order should be excused in light of defendant's *pro se* status in removal proceedings).

To be sure, *Washington* states: "Even where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute.  The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'"  *Washington*, 925 F.3d at 118 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).  But the inclusion of

---

[3] *Perez* is also inapposite because it was a case where delay amounted to denial because the defendant in *Perez* had a very short period (less than three weeks) remaining on his sentence. *See Perez*, 2020 WL 1546422, at *3.  The defendant omits this fact.  And his case is far different because "Perez has a well-documented history of medical complications. . . ." *Id.* at *1.  The defendant does not.  *See infra* Section II.B.

the foregoing phrase "by statute" is not supported by the citation that follows. *McCarthy* is another case involving a judge-made exhaustion requirement. *See McCarthy*, 503 U.S. at 152 ("Congress has not *required* exhaustion of a federal prisoner's *Bivens* claim." (emphasis in original)). It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute. *See Bastek*, 145 F.3d at 95 (rejecting application of *McCarthy* exceptions in a statutory case). Moreover, while *Washington* goes on to discuss three recognized exceptions to exhaustion, it is again describing three exceptions recognized in *McCarthy* in the judge-made context, and as the Supreme Court made crystal clear in *Ross*, there is a critical distinction between statutory and judge-made exhaustion requirements. As Judge Sullivan has explained, given that *Washington* was a judge-made exhaustion case, its statement that exhaustion mandated "by statute" is "not absolute" is dicta. *See Ogarro*, 2020 WL 1876300, at *4; *see also Woodson*, 2020 WL 1673253, at *3 ("The passing reference to 'exhaustion [that] is seemingly mandated by statute . . . is not absolute' in [*Washington*] was not necessary to the Court of Appeals' holding."); *Roberts*, 2020 WL 1700032, at *2 (rejecting argument that *Washington* permits excusing exhaustion under Section 3582(c); unlike those that are judge-made, "statutory exhaustion requirements, such as those set forth in Section 3582(c), must be strictly enforced"). *Washington*'s dicta cannot supplant the clear statements to the contrary in cases like *Ross* and *Bastek*. Thus, Judge Torres erred by citing *Washington*'s discussion of judge-made exceptions to a judge-made exhaustion rule to justify excusing exhaustion under Section 3582(c). *See Perez*, 2020 WL 1546422, at *2 (relying on *Washington*).

The defendant also argues that "the waiting period and exhaustion of remedies clauses are best understood as a 'claims-processing rule' that can be set aside by the court, at least in cases of dire emergency." (Def. Mem. 4.) That is not the case. Section 3582(c)'s exhaustion requirement

is a claims-processing rule – a rule that seeks "to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times" – that is mandatory, but may be waived by the Government.  *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *see United States v. Gentille*, 19 Cr. 590 (KPF), 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020); (finding that Section 3582(c)'s exhaustion requirement is a claims-processing rule); *United States v. Monzon*, No. 99 Cr. 157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (finding that Section 3582(c)(1)(A)'s exhaustion requirement is at least a claims-processing rule); *see Eberhart v. United States*, 546 U.S. 15, 19 (2005) ("These claim-processing rules thus assure relief to a party properly raising them, but do not compel the same result if the party forfeits them."); *Ogarro*, 2020 WL 1876300, at *3-4.  But Section 3582(c)'s exhaustion requirement may not be set aside by the court for equitable reasons because courts are not free to create equitable exceptions to statutory commands if doing so "would be inconsistent with the text of the relevant statute." *Young v. United States*, 535 U.S. 43, 49 (2002); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

Here, the text of the relevant statute is inconsistent with the defendant's proposed exception for cases involving "dire emergency."  The text of Section 3582 contains no exigency or similar exception, and indeed, the text refutes the availability of such an exception in two respects.  *First*, while many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim may be brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  This statutory alternative suggests that Congress recognized that even if compassionate release requests cannot always await

the full administrative process to be completed, the BOP should have at least 30 days to act on such a request.  Legislative history is in accord.  *See Roberts*, 2020 WL 1700032, at *2 (legislative history "indicates that Congress recognized the importance of expediting applications for compassionate release and still chose to require a thirty-day waiting period").  As Judge Sullivan has explained, given that Congress expressly chose *30 days* as the period after which judicial review is available, courts are not free to make a different choice. *Ogarro*, 2020 WL 1876300, at *5; *see also Roberts*, 2020 WL 1700032, at *2 ("Given Congress's decision to mandate exhaustion and specify a single alternative, the Court is not free to infer a 'general unwritten special circumstances exception.'" (quoting *Ross*, 136 S. Ct. at 1856, 1862)).

    *Second,* despite the suggestion that Congress cannot have foreseen circumstances as exigent as the ones now facing the defendant, that simply is not so.  Rather, in cases presenting the most urgent circumstance – inmates diagnosed with a terminal illness – Section 3582(d) requires the BOP to process any application for compassionate release in 14 days. That the Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period – which excusing exhaustion would provide – in a case, such as this, where the risk to the inmate, while serious, remains potential.  Thus, even assuming it were correct that equitable exceptions to statutory claims-processing rules are appropriate in *some* contexts, *see Hamer v. Neighborhood Hous. Servs. Of Chicago*, 138 S. Ct. 13, 18 n.3 (2017) (reserving on question), the proposed "dire emergency" exception is not permissible here. *See Ogarro*, 2020 WL 1876300, at *4 (rejecting application of equitable doctrines to this statute).

    In sum, the analysis of a statutory exhaustion requirement, like any other statutory requirement, must "begin[] with the text" and utilize "ordinary interpretive techniques." *Ross*, 136 S. Ct. at 1856 and 1858 n.2; *see also, e.g.*, *Ron Pair Enters.*, 489 U.S. at 241.  The text

of Section 3582(c) is unambiguous and provides for no exceptions.  "[T]he Court is not free to

infer" one that is irreconcilable with that text.  *Roberts*, 2020 WL 1700032, at *2; *see also, e.g.*,

*Woodson*, 2020 WL 1673253, at *3.

## II.   THE DEFENDANT HAS NOT DEMONSTRATED EXTRAORDINARY AND COMPELLING REASONS FOR HIS IMMEDIATE RELEASE

Because the defendant's motion must be denied at this time for failure to exhaust his

administrative remedies, the Court need not reach the merits of his motion.  But if the Court were

to choose to reach the merits, it should reject the motion.  While COVID-19 is undoubtedly

serious, and the situation is dynamic, the defendant has not met his burden to demonstrate

compelling and extraordinary circumstances warranting immediate release.  Although the

defendant claims to have asthma, extreme allergies, breathing issues, and a heart condition, he

has presented no evidence to verify that he has those conditions, much less to address the

severity of those conditions.  Indeed, there is no reference in the defendant's BOP medical

records of the defendant suffering from any of those conditions.  Because the defendant has not

shown that he suffers from a serious medical condition that would put the defendant at a high

risk of experiencing more dire complications from COVID-19, his motion should be denied.

### A.  Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering

the factors set forth in section 3553(a) to the extent that they are applicable, if it finds

that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a

reduction is consistent with applicable policy statements issued by the Sentencing Commission."

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13.  That

statement provides that the Court may reduce the term of imprisonment if "extraordinary and

compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Gotti*, No. 02 Cr. 743 (CM), --- F. Supp. 3d ---, 2020 WL 497987, at \*5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

### B.  The Defendant's Alleged Medical Conditions Have Not Been Verified

In recognition of the "significant levels of infection at…Elkton (Ohio)" – where the defendant is incarcerated, U.S. Attorney General William Barr stated the need "to move with dispatch in using home confinement when appropriate to move vulnerable inmates" out of FCI Elkton and similarly affected institutions, and directed the BOP "to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with inmates at…FCI Elkton," among other institutions.[4] *See* April 3, 2020 Memorandum from Attorney General Barr to BOP, www.justice.gov/file/1266661/download.  On April 22, 2020, United

---

[4]  The BOP has made and continues to make efforts to respond to the threat posed by COVID-19 at FCI Elkton.  *See* April 16, 2020 Declaration of FCI Elkton Health Services Administrator S. Dees, attached hereto as Exhibit A.  In addition to the steps taken at the national level, FCI Elkton has also taken a number of additional measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with BOP policy and CDC guidelines; ordered enhanced cleaning and medical supplies; and taking a number of other preventative measures.  *Id.*

States District Judge for the Northern District of Ohio James S. Gwin ordered the identification of all inmates 65 or older and those with documented, pre-existing medical conditions – including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher) – so that they could be evaluated for eligibility for transfer out of FCI Elkton through any means.  (Third Def. Mem., Ex. 1 at 12, 20.)

The crux of the defendant's argument is that incarceration under the present circumstances poses a risk to his health due to his pre-existing conditions: asthma since he was a teenager, extreme allergies for issues related to breathing and his cardiovascular system, and heart issues since his early 20s.  (Def. Mem. 3.)  Although the defendant claims that these medical issues predated his arrest in this case, (*id.*), and that his pre-existing conditions of the type described by Judge Gwin are "documented," (Third Def. Mem. 2), the defendant presented no documentation whatsoever of any of his purported medical conditions.  Moreover, the defendant's September 6, 2018 Presentence Investigation Report does not mention asthma, allergies, breathing issues, or a heart condition.  (PSR, Dkt No. 59, ¶¶ 106-107.)  To the contrary,

███████████████████████████████████████████████

██████████████████████, "the defendant reported to be in good health. He said he regularly exercises and since age 16 he has been participating, on/off, in Brazilian Jiu-Jitsu (a form of martial art) and Muay Thai (a form of boxing)."  *Id.*

Furthermore, the Government examined the BOP's medical records for the defendant, created during intake screenings and subsequent physical examinations at Brooklyn Metropolitan Detention Center, FCI Otisville, and FCI Elkton; these records fail to contain any evidence that

the defendant suffers from asthma, extreme allergies, breathing issues, or heart issues.  *See*

William McFarland's BOP Medical Records, attached hereto as Exhibit B.  To the contrary, his

medical records are replete with references that he does <u>not</u> suffer from serious allergies,

respiratory, or cardiovascular problems. *Id.*  For example, the defendant claims that in August

2019, he suffered a "heart issue that the FCI Otisville Doctor then described as a 'cardiac event'"

and that he was "advised that this was a minor heart attack." (Def. Mem. 3.)  Not so. ███

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

███   Indeed, there is no reference to any heart issues – in August 2019 or at any time during

his incarceration – in the defendant's BOP medical records. *Id.*  Given the defendant's young

age of 28 and his lack of any documented pre-existing health conditions, the defendant has not

discharged his burden to demonstrate that he — personally and individually — falls into the

narrow band of inmates who are "suffering from a serious physical or medical condition," "that

substantially diminishes the ability of the defendant to provide self-care within the environment

of a correctional facility and from which he or she is not expected to recover."  U.S.S.G.

§ 1B1.13, Application Note 1(A); *see also United States v. Pinto-Thomaz*, No. 18-CR-579 (JSR),

2020 WL 1845875, at *3 (S.D.N.Y. Apr. 13, 2020) (denying defendants' compassionate release

motions for two defendants who did not point to strong evidence of a medical condition that

increased their risk of experiencing more dire complications from COVID-19).

**C. The Defendant's BOP Disciplinary Violation Counsels Against His Release**

The defendant's recent misconduct in prison also weighs against his release.   *See* March

26, 2020 Memorandum from Attorney General Barr to BOP at 1-2,

https://www.justice.gov/file/1262731/download (inmates who have incurred a BOP violation

within the last year do not receive priority treatment for home confinement).  The defendant's

disciplinary violation was not, as the defendant characterizes it, a "minor offense."  (Def. Mem.

7.)  On July 17, 2019, an officer inspected the defendant's locker and noticed an empty oatmeal

box containing a black ink pen taped to the right side of the locker door.  *See* William

McFarland's BOP disciplinary records, attached hereto as Exhibit C, at WM000097.  When the

officer opened the pen, he noticed a USB port on one end that allows USB devices to be

connected to each other. *Id.*  The officer asked the defendant what it was, and the defendant

replied, "I don't know.  I found it at work." *Id.*  Later, the officer paged the defendant to the unit

officer's station, at which time the defendant stated, "I'm sorry I brought that when I transferred

from Brooklyn."  When asked what it is used for, the defendant replied "it is used for recording."

*Id.*  The defendant admitted that the incident report with the above details was true as written.

*Id.* at WM000096.  As a result of his possession of an electronic device and lying to an officer,

the defendant was segregated from the general population for 40 days, lost 40 days of good

conduct time, and lost privileges, including use of the phone, for 90 days.[5]  *Id.* at WM000097-98.

Needless to say, a minor offense does not land an inmate in solitary confinement for three

months.  As the BOP incident report notes, misbehavior of this nature is serious because it

impairs "staff's ability to maintain a safe and secure facility." *Id.* at WM000097.  Considering

---

[5] On May 8, 2019, the defendant also was cited for failure to follow safety regulations.  *Id.* at
WM000098.  This incident could properly be characterized as a minor discipline incident.

the defendant's criminal conduct while on pretrial release and subsequent voluntary lies to law enforcement to blame another individual for his criminal conduct, the defendant's serious disciplinary incident in prison is yet another example of the defendant's belief that the rules do not apply to him.  The defendant's misconduct counsels against his release.

### D.  The Section 3553(a) Factors Weigh Against the Defendant's Release

The same Section 3553(a) factors that warranted the defendant's sentence counsel against release, particularly given that he has served less than half of his sentence.[6]  The Court stated at sentencing:

> I will now turn to the specific factors a judge should consider in sentencing under 18 United States Code 3553(a). I have already addressed to some extent the nature and circumstances of the offense, but given the truly unusual series of offenses which Mr. McFarland committed, it is worth reviewing them. Reviewing them in their totality demonstrates that Mr. McMarland is a fraudster and not simply a misguided young man.
>
> The first is the fraud connected specifically with Fyre and the Fyre Festival whereby over a hundred investors lost over $24 million.
>
> The second is the NYC VIP Access ticket scam, which Mr. McFarland decided to commit while on pretrial release, ripping off people for some $150,000, all the while disguising the fact that he was the face behind the ticket scam. Indeed, in the second series of schemes he targeted some of the same people he had

---

[6]  The BOP is at this time prioritizing for home confinement consideration inmates who either: (i) have served 50% or more of their sentences, or (ii) have 18 months or less remaining in their sentences and have served 25% or more of their sentences. (Third Def. Mem. 2, Ex. 2 at 7.)  The defendant is in neither of those categories: he has served roughly 31% of his sentence, and has 40 months remaining in his sentence.  *See* William McFarland's BOP sentencing computation data as of April 21, 2020, attached hereto as Exhibit D, at WM000102.  The defendant also claims that carrying out his sentence in home confinement would not be a significant alteration of his sentencing because he was told that he was a target for 2021 home confinement via the Residential Drug Abuse Program ("RDAP"), which he states would take one year off of his sentence and provide an additional one year of home confinement.  (Def. Mem. 6.)  This is incorrect.  According to BOP counsel, in February 2019, the defendant was found to be unqualified for the RDAP, so he will not be eligible to get a year off of his sentence for completion of that program.  The defendant's home detention eligibility date is February 28, 2023.  (Ex. D at WM000101).

defrauded in the Fyre scam, demonstrating his manipulative capacity and lack of remorse.

And the third is even more unusual. Mr. McFarland sought a proffer session with the FBI at which, in the presence of his lawyer, he perjured himself multiple times over, most offensively trying to blame an employee whose name and accounts he had used to disguise his involvement in the NYC VIP Access fraud.

When people commit serious crimes which show no respect for the legal system and the law, there must be just punishment, and that punishment must consider individual deterrence and general deterrence.  While the defendant has argued that he committed these crimes because he suffers from certain psychological conditions which explain his actions, I reject that evaluation. Rather, it is my conclusion, based on all the submissions which I've carefully considered, that the defendant is a serial fraudster, and that to date his fraud, like a circle, has no end.

Beyond his statement in Court today, which I do not know exactly how to evaluate, the absence prior to today of any moral recognition of the wrongfulness of his conduct is at the heart of the need for specific deterrence. It is also clear that Mr. McFarland has actually been dishonest most of his life. He started out with small scams which have grown over time.

(Sentencing Tr. (Dkt. 69) 54-55.)  The Court also explained that the defendant's "commission of additional crimes while on pretrial release" and "voluntarily lying to law enforcement" were the "driving factor" in his sentence because "the Court must uphold the rule of law."[7]  (*Id.* at 55-56.)

Everything that the Court said remains true.  Reducing the sentence of the defendant to less than half of what he was sentenced to serve, particularly given the wholly unsubstantiated

---

[7] In assessing which inmates should be granted home confinement, the BOP is to consider the totality of circumstances of each inmate, including the inmate's score under a risk assessment tool for BOP inmates – Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"), with inmates who have anything above a minimum score not receiving priority treatment.  *See* March 26, 2020 Memorandum from Attorney General Barr to BOP, https://www.justice.gov/file/1262731/download.  The defendant claims that he was told on January 15, 2020, that he had a PATTERN assessment of 'high' risk of recidivism, but that he "received reassurance from three different staff members" that this was a mistake and would be reduced to 'minimum' risk of recidivism.  (Def. Mem. 7-8.) According to BOP counsel, the defendant was rescored on April 22, 2020, to a 'medium' risk of recidivism.  Because the defendant has above a minimum PATTERN score, he would not receive priority treatment with respect to this factor in the BOP's home confinement analysis.

medical conditions that constitute the basis of his motion, is unwarranted.[8]  *Cf.*, *e.g.*, *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (explaining the court denied a request to change a sentence of 33 months' imprisonment to home confinement for 72 year-old defendant at MCC deemed by the BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing," and recommending the BOP expedite designation to a long-term facility); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure; "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served."), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

The defendant asserts that he should be released to home confinement so that he may "begin paying restitution through legitimate means and provide value to society."  (Def. Mem. 8.)  While the defendant may, as he claims, have earning potential from a pending deal with a major streaming service for an interview at a substantial fee, a novel, a memoir, and a podcast

---

[8] The defendant cites the home confinement decisions relating to inmates Daniel Hernandez and Leslie Stahl, both of whom are readily distinguishable from the defendant.  (Def. Mem. 6; Third Def. Mem. 2-3.)  Unlike the defendant, Mr. Hernandez and Mr. Stahl were both hospitalized in 2019 for their medical conditions, which were verified by their medical records.  *See United States v. Daniel Hernandez,* 18 Cr. 834 (PAE) (S.D.N.Y. March 31, 2020) (Dkt 445) at 2; *United States v. Lewis Stahl,* 18 Cr. 694 (RA) (S.D.N.Y. April 7, 2020) (Dkt 49) at 8.  Judge Engelmayer granted Mr. Hernandez's compassionate release motion after Mr. Hernandez had exhausted administrative remedies, served the substantial majority of his prison sentence, and publicly cooperated against members of a violent gang.  *See United States v. Daniel Hernandez,* 18 Cr. 834 (PAE) (S.D.N.Y. April 1, 2020) (Dkt 451) at 7.  None of those factors are present in the defendant's case.  Unlike the defendant, the BOP approved Mr. Stahl for home-confinement placement.  *See United States v. Lewis Stahl,* 18 Cr. 694 (RA) (S.D.N.Y. April 7, 2020) (Dkt 49) at 5; *United States v. Lewis Stahl,* 18 Cr. 694 (RA) (S.D.N.Y. April 23, 2020) (Dkt 65).  Also, in contrast to the defendant's young age, Mr. Stahl is 64 years-old.  *Id.*

hosting job, (Def. Mem. 8), the defendant's professed desire to use his earnings to make restitution to his victims is belied by his repeated efforts to exploit his criminal conduct for his own financial benefit.  *First*, while on pretrial release, the defendant defrauded victims of NYC VIP Access – many of the same victims of his Fyre and Magnises fraud schemes – and later had the audacity to claim that he was motivated to commit the NYC VIP Access fraud so that he could pay restitution to his Fyre fraud victims.  (October 8, 2018 Dr. Andrew P. Levin Letter (Dkt 67-1.)  Of course, he did no such thing: he made approximately $150,000 from the NYC VIP Access fraud – none of which he repaid to any of his victims.

*Second*, while on pretrial release, the defendant arranged for the sale of Fyre Festival merchandise, but instructed his associate (the "Associate") to publicly deny the defendant's association with the sale.  (Gov't Sentencing Submission (Dkt 63) 34, n.7.)  During the defendant's proffer with the Government, the defendant claimed that the sale lost approximately $300 due to the Associate's need to pay the venue that held the sale, but there is no way to verify whether the defendant made a profit since the defendant hid his involvement with this sale from the Government and the public.  (*Id.*)  Only after law enforcement began investigating the Fyre Festival merchandise sale by interviewing the Associate and questioning the defendant about it in his proffer did the defendant forfeit the remaining Fyre Festival merchandise to the Government.  (October 5, 2018 Def. Sentencing Submission (Dkt 66-3).)

*Third*, while the defendant was on pretrial release, Hulu's *Fyre Fraud* documentary "production paid [the defendant] for licensed behind-the-scenes footage and consent to an eight-hour interview" for an undisclosed amount under $250,000.  *See* Scott Tobias, *Fyre Fight: The Inside Story of How We Got Two Warring Fyre Festival Documentaries in the Same Week,* The

21

Ringer, January 15, 2019, WM000106, attached hereto as Exhibit E.[9]  Needless to say, the

defendant did not use any of the money from Hulu to make restitution to his victims.  And lastly,

to add insult to injury, the defendant now makes the preposterous claim that his BOP disciplinary

violation of bringing a recording device to jail in July 2019 was motivated by his desire to write

"a self-reflection book" "faster to make restitution to the people he hurt."  (Def. Mem. 7, Def.

Mem. Ex. A at 1.)  The defendant appears committed to capitalizing on his infamy to build his

own fortune.  The defendant's argument that he should be released so that he can make

restitution should be soundly rejected.

Moreover, despite the defendant's repeated references to serving the remainder of his

prison sentence in home confinement (Def. Mem. 1, 6, 8, 9), "the only way to grant [him] the

relief [he] seeks (*i.e.*, release from prison) under Section 3582(c) is to reduce [his] sentence to

time served — in other words, to *permanently* release [him]."  *Roberts*, 2020 WL 1700032, at *3

(emphasis in original); *see also United States v. Urso*, No. 03 Cr. 1382 (NGG), 2019 WL

5423431, at *1 (E.D.N.Y. Oct. 23, 2019); 18 U.S.C. § 3621(b).  Of course, in theory, the Court

could so reduce the defendant's sentence, and also order that he be confined to live with his close

friend in Manhattan or, alternatively, his family in New Jersey, for a particular period of time, as

a special condition of supervised release.  But the defendant, who bears the burden, has not

provided a verified home confinement plan; his submission lacks any details about his proposed

Manhattan residence and its residents.  While on pretrial release, the defendant resided with a

friend at his Manhattan townhouse worth approximately $31 million free of cost. (PSR ¶¶ 102,

103.)  As it was described in the Presentence Report, "[t]he seven-floor, four-bedroom, seven-

---

[9]  The Government first learned from news reports after the defendant's sentencing that the
defendant had been paid for an interview and footage that included his brazen commission of the
NYC VIP Access fraud while on pretrial release.

bathroom luxurious townhouse features, among other things, a Zen garden, four kitchens, elevator access, a wine room, a media center, a home spa and fitness center, a billiard room, and a rooftop for entertaining."  (PSR ¶ 102.)  The defendant's release to a $31 million townhouse or any other luxury residence would not be in accord with Section 3553(a) factors.  But even assuming *arguendo* that release after serving less than half of a prison sentence were otherwise consistent with Section 3553(a) in this case, such a condition here would be effectively unenforceable, both because it is difficult to detect such a violation generally, and for a violation to have consequences, the defendant would have to be returned to prison, after he has been exposed to multiple others in Manhattan or New Jersey at the height of the pandemic.

* * *

Just a few days before the defendant made a compassionate release request to the BOP, the defendant had a phone call from prison with a NY Post reporter who reported the following from their conversation:

> McFarland tells the Post that he's not worried about catching the coronavirus, but he supports the release of prisoners most at risk: 'Elderly people who are at the greatest medical risk should definitely be considered for release.'

*See* Doree Lewak, *Fyre Fest's Billy McFarland reveals new project from prison, swears it's no 'scam'*, NY Post, April 3, 2020, WM000112, attached hereto as Exhibit F.  The reason for the defendant's lack of concern about catching coronavirus is obvious: he is not among the inmates who are at the greatest medical risk of experiencing more dire complications from COVID-19. There is not a scintilla of evidence in the defendant's medical records of any medical conditions, much less a serious one.  The defendant committed egregious fraud offenses for years, and rightly received a six-year term of imprisonment.  The defendant's good health, disciplinary incident in prison, and the Section 3553(a) factors strongly counsel against his release.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

Dated:  New York, New York
         April 28, 2020

                                   Respectfully submitted,

                                   GEOFFREY S. BERMAN
                                   United States Attorney

                       By:    s/ Kristy J. Greenberg
                              Kristy J. Greenberg
                              Assistant United States Attorney
                              (212) 637-2469